UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE: HONORABLE CLAIRE R. KELLY, JUDGE

CANADIAN SOLAR INTERNATIONAL
LIMITED ET AL.,

       Plaintiffs and Consolidated Plaintiffs,

and

SHANGHAI BYD CO., LTD. ET AL.,

       Plaintiff-Intervenors and
       Consolidated Plaintiff-Intervenors,

v.

UNITED STATES,

       Defendant,

and

SOLARWORLD AMERICAS, INC. ET AL.,

       Defendant-Intervenor and
       Consolidated Defendant-Intervenors.

Consol. Court No. 17-00173

**PUBLIC VERSION**

**Business Proprietary
Information Has Been
Deleted on Pages 20 and 25**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Phone: +1.202.637.5600
Fax: +1.202.637.5910

*Counsel to Canadian Solar International Limited;
et al.*

March 7, 2018

# TABLE OF CONTENTS

Page

RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ................................................. 1

    I.    ADMINISTRATIVE DETERMINATION OF WHICH REVIEW IS SOUGHT .................................................................................................................... 1

    II.    ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT ........................ 2

          1.    Commerce's application of partial adverse facts available on the basis of certain unaffiliated cell and module suppliers' failure to report their factors of production is not supported by substantial evidence on the record and is otherwise not in accordance with law. ............ 2

          2.    Commerce's selection of the surrogate value for Canadian Solar's consumption of module glass is not supported by substantial evidence on the record and is contrary to law .................................................. 3

          3.    Commerce's selection of the surrogate value for Canadian Solar's consumption of nitrogen gas is not supported by substantial evidence on the record and is contrary to law .............................................................. 4

    III.    STATEMENT OF FACTS ...................................................................................... 5

    IV.    STANDARD OF REVIEW .................................................................................... 8

ARGUMENT ...................................................................................................................... 10

I.    COMMERCE'S APPLICATION OF AN ADVERSE INFERENCE WITH RESPECT TO MISSING SUPPLIER INFORMATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW ............................................................. 10

    A.    The Limited Conditions That Permit Commerce to Apply Adverse Facts Available to Calculate a Cooperative Respondent's Dumping Margin Are Not Present Here ...................................................................................... 12

          1.    Commerce's "Leverage" Finding Is Not Supported by Substantial Evidence on the Record .............................................................................. 13

          2.    There Is No Evasion Factor Present in This Case That Supports Collateral Application of AFA .................................................................... 17

    B.    Conclusion—This Matter Should be Remanded to Commerce to Apply Neutral Facts Available ....................................................................................... 19

II.   COMMERCE'S USE OF IMPORTS UNDER THAI HTS 7007.19.90000 TO VALUE CANADIAN SOLAR'S MODULE GLASS CONSUMPTION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW ............................. 19

    A.   The Thai Surrogate Value Is Distorted by Absurdly High-Price, Low-Volume Imports from Hong Kong ......................................................................21

    B.   Commerce's Reliance on Thai Import Data from the Prior Administrative Review as a Benchmark Is Not Supported by Substantial Evidence .....................25

    C.   Using the Thai AUV Also Conflicted With Commerce's Avowed Policy of Avoiding SVs That Demonstrate Considerable Price Volatility.............................28

    D.   Commerce Unreasonably Rejected Canadian Solar's Own Market Economy Purchases of the Identical Input as a Benchmark ..................................29

    E.   Conclusion.................................................................................................31

III.  COMMERCE'S USE OF IMPORTS UNDER THAI HTS 2804.30.00000 TO VALUE CANADIAN SOLAR'S NITROGEN GAS CONSUMPTION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW.................................... 31

    A.   The Thai Surrogate Value Diverges Violently from the Credible Benchmarks on the Record.......................................................................33

    B.   Commerce's Reliance on AUVs from Ecuador and South Africa as Benchmarks Is Unreasonable .....................................................................37

    C.   The Thai Surrogate Value Is Inherently Unreliable Because It Is Distorted by High-Price, Low-Volume Imports from the United States and Switzerland.............................................................................................39

    D.   The Thai AUV Is Aberrational.............................................................41

IV.   CONCLUSION ...........................................................................................42

# TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................. 8

19 U.S.C. § 1677b(c)(1) ....................................................................... 21

19 U.S.C. § 1677e(a)(1) ....................................................................... 12

19 U.S.C. § 1677e(b) ...................................................................... 12, 13

**Judicial Decisions**

*Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ................................................................................ 25, 33

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ................................ 9

*Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336 (Fed. Cir. 2006) ........................... 10

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) .... 18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ................. 9

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197 (1938) ............................................ 8

*Daewoo Elecs. Co. v. Int'l Union of Elec., Technical, Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511 (Fed. Cir. 1993) ................................................................... 8

*Dulin v. Mansfield*, 250 F. App'x. 338 (Fed. Cir. 2007) ........................................ 16

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ............... 8, 9

*Home Meridian v. United States*, 772 F.3d. 1289 (Fed. Cir. 2014) ............................. 30, 31

*Hubei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185 (2004) ............. 22

*Jinan Yipin Corp. v. United States*, 31 C.I.T. 1901, 526 F. Supp. 2d 1347 (2007) ............... 40

*Mueller Comercial de Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ...... 11, 13, 14, 17

*N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) ......................... 8

*Nippon Steel v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ................................. 12

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ............................. 9

*Parkdale Int'l v. United States*, 475 F.3d 1375 (Fed. Cir. 2007) .................................................. 21

*Peer Bearing Company—Changshan v. United States*, 752 F. Supp. 2d 1353 (Ct. Int'l Trade 2012) ................................................................................................................................................ 33

*QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ............................................... 21

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) ........................................ 9

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed. Cir. 2005) .............................................. 9

*SolarWorld Americas, Inc. v. United States*, Slip Op. 17-143 (Ct. Int'l Trade 2017) ...... 22, 24, 26

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) .......................................................... 8

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 35 I.T.R.D. (BNA) 1136 (Ct. Int'l Trade 2013) .................................................................................................................. 38, 40

*Xiping Opeck Food Co. v. United States*, 34 F. Supp. 3d 1331 (Ct. Int'l Trade 2014) ............... 18

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ...... 9

## <u>Administrative Determinations</u>

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce, May 19, 1997) .................................................................................................................................... 22

*Certain Activated Carbon From the People's Republic of China*, 80 Fed. Reg. 61,172 (Dep't Commerce, October 9, 2015) (final results of antidumping duty administrative review; 2013-2014) .............................................................................................................................. 22, 26

*Certain Cased Pencils from the People's Republic of China*, 71 Fed. Reg. 38,366 (Dep't Commerce, July 6, 2006) (final results of antidumping duty administrative review) ......... 29, 30

*Certain Frozen Warmwater Shrimp From the People's Republic of China*, 77 Fed. Reg. 53,856 (Dep't Commerce, September 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ....................................... 28

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't Commerce, December 7, 2012) (amended final determination and antidumping duty order) ...................................................... 5

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 39,905 (Dep't Commerce, June 20, 2016) (final results of antidumping duty administrative review and final determination of no shipments; 2013-2014) ......................................................................................................................... 27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 93,888 (Dep't Commerce, December 22, 2016) (preliminary results of antidumping duty administrative review and preliminary determination of no shipments; 2014-2015) .................................................................................. 6, 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce, June 27, 2017) (final results of antidumping duty administrative review and final determination of no shipments; 2014-2015) ......................................................................................... passim

*Multilayered Wood Flooring from the People's Republic of China*, 79 Fed. Reg. 26,712 (Dep't Commerce, May 9, 2014) (final results of antidumping duty administrative review; 2011-2012) ........................................................................................................................ 30

*Steel Wire Garment Hangers From the People's Republic of China*, 80 Fed. Reg. 13,332 (Dep't Commerce, March 13, 2015) (final results of antidumping duty administrative review; 2012-2013) ........................................................................................................ 26

# MEMORANDUM OF POINTS AND
## AUTHORITIES IN SUPPORT OF MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

Canadian Solar International Limited; Canadian Solar (USA), Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Cells Co., Ltd.; CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd.; and CSI Solar Power (China) Inc. (collectively, "Canadian Solar"), in their role as plaintiffs and consolidated plaintiffs in the above-captioned consolidated action, hereby submit this Memorandum of Points and Authorities in Support of Canadian Solar's Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade. For the reasons set forth below, Canadian Solar respectfully requests that the Court reverse the challenged determination of the U.S. Department of Commerce and remand with instructions to recalculate Canadian Solar's dumping margin in a manner consistent with this Memorandum and the Court's findings.

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

## I.     ADMINISTRATIVE DETERMINATION OF WHICH REVIEW IS SOUGHT

Canadian Solar seeks review of the final results issued by the U.S. Department of Commerce, International Trade Administration ("Commerce"), in its third administrative review of the antidumping duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China, Case No. A-570-979. The final determination was published as *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce, June 27, 2017) (final results of antidumping duty administrative review and final

determination of no shipments; 2014-2015) ("*Final Results*").  P.R. 580.[1]  This appeal also

contests certain aspects of Commerce's accompanying Issues and Decision Memorandum for the

Final Results of the 2014-2015 Antidumping Duty Administrative Review of Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of

China (June 20, 2017) ("*Final Decision Memo*").  P.R. 569.  The period of review was December

1, 2014 through November 30, 2015.

## II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

Plaintiffs seek judgment on the agency record with respect to the following issues raised

in their Complaint and corresponding revision to the antidumping margin applicable to Canadian

Solar as follows:

> **1.  Commerce's application of partial adverse facts available on the basis of certain unaffiliated cell and module suppliers' failure to report their factors of production is not supported by substantial evidence on the record and is otherwise not in accordance with law.**

Commerce's application of partial adverse facts available for missing factors of

production data from certain unaffiliated solar cell and module suppliers is unlawful and is not

supported by substantial evidence on the record.  The record demonstrates that Canadian Solar

cooperated to the best of its ability in repeatedly seeking to procure the missing data from the

unaffiliated suppliers—accordingly, Commerce should have applied "neutral" facts available in

this regard.

Furthermore, the bases for Commerce's application of an adverse inference are likewise

unlawful and unsupported by substantial evidence.  That is, Commerce's findings that

---

[1]     Throughout this brief, citations to the public record will be referenced "P.R. ___" and citations to the confidential record are referenced "C.R. ___".

(A) Canadian Solar failed to induce cooperation from unaffiliated suppliers and to prevent "evasion" of dumping duties, and (B) Canadian Solar was in a position to exercise "leverage" to induce cooperation from uncooperative solar cell and solar module suppliers, are not supported by substantial evidence. Indeed, Canadian Solar repeatedly requested the suppliers' compliance but was met with reticence. The evidence demonstrates that Canadian Solar did not in fact possess sufficient leverage to motivate its suppliers.

   2. **Commerce's selection of the surrogate value for Canadian Solar's consumption of module glass is not supported by substantial evidence on the record and is contrary to law.**

Commerce failed to rely on the best available information in calculating a surrogate value for module glass by unlawfully and unreasonably relying on Thai import data for "safety glass," classified under harmonized tariff schedule ("HTS") category 7007.19.90000 (*i.e.*, "Toughened (tempered) safety glass, not suitable for incorporation in vehicles, aircraft, spacecraft or vessels; Other"), despite substantial record evidence that the average unit value ("AUV") for imports under this tariff category is both aberrational and is not sufficiently specific to Canadian Solar's module glass consumption. Commerce's surrogate value for glass consumption is clearly aberrational, as extraordinarily high-priced imports from Hong Kong comprise over 60 percent of the average Thai import value, despite representing merely 0.4 percent of the total volume of Thai imports. Such a disproportionate effect undermines the reliability of Commerce's surrogate value. Moreover, the benchmarks that Commerce used to determine that the surrogate value is "within range" are themselves aberrational.

In reaching its determination, Commerce unlawfully and unreasonably rejected (A) other valid benchmark prices proffered by Canadian Solar demonstrating that the AUV under this HTS category is aberrational and improperly found that the Thai import value is "within the range" of other valid benchmark values; (B) evidence that the Thai import data are distorted by the

presence of very low-volume and extraordinarily high-priced imports from Hong Kong; and (C) the available alternative, non-aberrational bases for valuing module glass proffered by Canadian Solar.

3. **Commerce's selection of the surrogate value for Canadian Solar's consumption of nitrogen gas is not supported by substantial evidence on the record and is contrary to law.**

Commerce unlawfully valued the consumption of nitrogen gas using the AUV for Thai imports under HTS category 2804.3000000 (*i.e.*, "Hydrogen, rare gases and other non-metals; Nitrogen"). Commerce unlawfully and unreasonably rejected benchmark prices proffered by both Canadian Solar and Trina which demonstrated that the AUV under this tariff heading is aberrational, and Commerce improperly found that the Thai import value is within the "range" of other valid benchmark prices. The benchmarks upon which Commerce relied to reach this conclusion are themselves aberrational. Notably, the Thai AUV is between 3,808 and 13,600 percent higher than the AUVs of three other potential surrogate countries—Mexico, Romania, and Bulgaria. Moreover, the Thai AUV is unreliable because it is based on an exceedingly small import volume, which is trivial in comparison to the import volumes for other potential surrogate countries.

Furthermore, even if the benchmark selected by Commerce was valid, Commerce also unlawfully and unreasonably refused to adjust the Thai import data to remove aberrantly high-valued, low-volume imports from the United States and Switzerland that grossly distort the average. These aberrational imports have an especially strong impact on the Thai AUV given the small data set from which it was calculated.

## III.    STATEMENT OF FACTS

On December 7, 2012, Commerce published in the *Federal Register* the amended final determination and antidumping duty ("AD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't Commerce, December 7, 2012) (amended final determination and antidumping duty order).

On February 9, 2016, Commerce published a notice initiating the third antidumping administrative review, covering a period of review ("POR") from December 1, 2014 through November 30, 2015. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 6,832, 6,835 (Dep't Commerce, February 9, 2016).  P.R. 602.

On March 28, 2016, Commerce selected two mandatory respondents: (1) Canadian Solar International Limited, and (2) Trina Solar, consisting of Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science and Technology Co., Ltd., and other affiliated companies (collectively, "Trina").  *See* Memorandum from Jeff Pedersen, Senior International Trade Compliance Analyst, Office IV to Abdelali Elouaradia, Director, Office IV, regarding Respondent Selection (Dep't Commerce, March 28, 2016) at 6.  P.R. 155, C.R. 104.  Commerce ultimately "collapsed" Canadian Solar International Limited with affiliated companies Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Cells Co., Ltd.; CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd.; and CSI Solar Power (China) Inc. (collectively, "Canadian Solar").  Memorandum from Jeff Pedersen, Senior International Trade Compliance Analyst, Office IV to Abdelali Elouaradia, Director, Office IV, regarding Affiliation and Single Entity Memorandum for Canadian Solar International Limited (Dep't Commerce, December 16, 2016).  P.R. 516, C.R. 582.

Canadian Solar submitted responses to Commerce's initial AD questionnaire, a questionnaire regarding double remedies, supplemental questionnaires, and other factual submissions from April 2016 through December 2016. *See* Issues and Decision Memorandum for Preliminary Results of the 2014-2015 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From the People's Republic of China, Case No. 570-979 (Dep't Commerce, December 16, 2016) ("*Preliminary Decision Memo*") at 2. P.R. 499. Canadian Solar also submitted comments on surrogate country selection and surrogate values ("SVs") from June 2016 through October 2016. *Id.* at 3.

On December 22, 2016, Commerce published in the *Federal Register* the preliminary results of its third administrative review. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 93,888 (Dep't Commerce, December 22, 2016) (preliminary results of antidumping duty administrative review and preliminary determination of no shipments; 2014-2015) ("*Preliminary Results*"). P.R. 518. Commerce assigned weighted-average dumping margins of 30.42 percent to Canadian Solar and 7.72 percent to Trina. *Id.*

In the *Preliminary Results*, Commerce applied partial adverse facts available ("AFA") to calculate Canadian Solar's dumping margin because certain unaffiliated suppliers of solar cells and/or solar modules did not report their factors of production ("FOPs"). To account for the missing factor usage information, as partial AFA, in the *Preliminary Results* the Department applied the highest consumption quantity reported for each FOP that Canadian Solar used to produce solar cells and solar modules. *See* Memorandum from Jeff Pedersen, International Trade Analyst, to Abdelali Elouaradia, Director, AD/CVD Operations, Office IV, Re: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic

of China: Unreported Factors of Production (Dep't Commerce, Dec. 16, 2016). P.R. 517, C.R. 585.

In the *Preliminary Results*, Commerce also adopted an SV for the consumption of module glass based on Thai import data for tempered glass, classified under HTS category 7007.19.90000 (*i.e.*, "Toughened (tempered) safety glass, not suitable for incorporation in vehicles, aircraft, spacecraft or vessels; Other"). *See* Memorandum from Jeff Pedersen, International Trade Analyst, to the File, Re: 2014-15 Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Factor Valuation Memorandum (Dep't Commerce, Dec. 16, 2016) at Attachment II. P.R. 505.

In the *Preliminary Results*, Commerce adopted an SV for nitrogen gas that was based upon Thai import data for HTS category 2804.3000000 (*i.e.*, "Hydrogen, rare gases and other non-metals; Nitrogen"). *Id.*

Canadian Solar timely submitted its original case brief on January 25, 2017, and submitted a revised case brief on April 10, 2017, in accordance with Commerce's instructions. Case Brief of Canadian Solar International Limited, et al. ("Case Brief"). P.R. 560, C.R. 594. On February 3, 2017, Canadian Solar submitted its rebuttal brief. Canadian Solar's Rebuttal Case Brief. P.R. 551. Canadian Solar requested a hearing on January 23, 2017, and, on May 15, 2017, Commerce held a hearing on issues limited to the case briefs and rebuttal briefs submitted by Canadian Solar and other parties. *Final Decision Memo* at 3. P.R. 569.

On June 27, 2017, Commerce published its *Final Results* in the *Federal Register*, 82 Fed. Reg. 29,033 (Dep't Commerce, June 27, 2017). P.R. 580. Commerce, with certain adjustments, continued to apply partial AFA to calculate Canadian Solar's dumping margin on the basis of the

missing FOPs from unaffiliated supplies.  Furthermore, over the objections raised by Canadian

Solar, Commerce continued to use the same SVs for nitrogen and module glass relied on in the

*Preliminary Results*.  Commerce assigned weighted-average dumping margin of 13.07 percent to

Canadian Solar and 4.66 percent to Trina.  *Id.*

        After publication of the *Final Results*, Canadian Solar timely commenced an action to

challenge Commerce's determinations in this administrative review.  Canadian Solar's action

was subsequently consolidated with the actions of other participants in the administrative review.

*See* Order of September 26, 2017 (Docket No. 41).

## IV.    STANDARD OF REVIEW

        In appeals of final antidumping duty determinations, the Court shall hold unlawful and

remand any administrative determination by Commerce that is "unsupported by substantial

evidence on the record or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (quoting

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  It must be "more than a scintilla, and

must do more than create a suspicion of the existence of the fact to be established."  *N.L.R.B. v.

Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

        In making the evidentiary judgment, the Court "looks to the record as a whole, including

any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean

(Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks

and citation omitted), and determines "whether the evidence and reasonable inferences from the

record support {the agency's} finding."  *Daewoo Elecs. Co. v. Int'l Union of Elec., Technical,

Salaried & Mach. Workers*, *AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation

marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

When the Court reviews the imposition of an antidumping duty, the dumping margin must be examined for its accuracy and fairness even where Commerce acted in conformity with its statutory and regulatory obligations. *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995). Commerce's rate calculations must be designed to accurately reflect the respondent's true dumping margin. *See*, *e.g.*, *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible"); *Gallant Ocean (Thailand) Co., v. United States*, 602 F.3d at 1323 (a rate must be a "reasonably accurate estimate of the respondent's actual rate") (internal quotation marks and citations omitted); *SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005) ("Antidumping laws intend to calculate antidumping duties on a fair and equitable basis"); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (the "basic purpose of the statute" is to "determin{e} current margins as accurately as possible").

In order to review whether Commerce's interpretation of the statute is in accordance with the law, the Court follows the two-step test of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-45 (1984). First, the Court determines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress's intent is clear, the Court must give effect to that unambiguously expressed intent. *Id.* at 842-43. Second, if the statute is silent or ambiguous with respect to the precise question, the Court must determine whether the agency's interpretation of the statute is a permissible construction. *Id.* at 843. The

Court may defer to the agency's interpretation only if it is reasonable, procedurally sufficient, and consistent with agency policy. *Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1340 (Fed. Cir. 2006).

## ARGUMENT

I. **COMMERCE'S APPLICATION OF AN ADVERSE INFERENCE WITH RESPECT TO MISSING SUPPLIER INFORMATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW**

In the administrative proceedings below, Canadian Solar willingly supplied its own FOP data and made a persistent and good faith effort to comply with Commerce's request to obtain similar FOP information from its unaffiliated suppliers of cells and modules. Canadian Solar contacted these suppliers repeatedly over a period of up to four months and requested FOP data from each supplier between three and eleven times. In communications with the unaffiliated suppliers, Canadian Solar repeatedly stressed that it was an "urgent" matter, yet was met with reticence and outright rejections by the suppliers. *See* Canadian Solar's June 8, 2016 Section A Supplemental Questionnaire Response at Exhibits SA-14 and SA-16 (e-mail communications with suppliers); P.R. 263, C.R. 281-285; *see also* Canadian Solar's July 8, 2016 Section D Supplemental Questionnaire Response at Exhibit SD-13 (follow-up communications with suppliers); P.R. 330, C.R. 358-365; *see also* Canadian Solar's September 2, 2016 Supplemental Questionnaire Response at Revised Exhibit SD2-1 (a list of each attempt to obtain the FOP data from the suppliers); P.R. 428, C.R. 518. Commerce ignored these extensive, good faith efforts on the part of Canadian Solar, however, and applied adverse facts available in this regard. Such application was unlawful and unsupported by substantial evidence—at most, Commerce was required to apply "neutral" facts available.

Canadian Solar remained cooperative after Commerce issued its antidumping questionnaire to Canadian Solar's largest (by supplied quantity) five unaffiliated suppliers of solar cells and largest five unaffiliated suppliers of solar modules. *See* Letters Pertaining to Canadian Solar Cell Suppliers, dated June 5, 2016; P.R. 276-279, C.R. 304-307; and dated August 9, 2016; P.R. 405-409, C.R. 494-498. Canadian Solar continued to request cooperation from the selected suppliers after Commerce issued the questionnaires. *See* Canadian Solar's September 2, 2016 Supplemental Questionnaire Response at Revised Exhibit SD2-1 (a list of each attempt to obtain the FOP data from the suppliers); P.R. 428, C.R. 518. A number of these suppliers still refused to supply FOPs.

In the *Final Results*, Commerce applied partial facts available in the calculation of Canadian Solar's dumping margin to account for the unreported supplier FOPs. Rather than filling the gap in the record with accurate "neutral" facts available, however, Commerce applied an inference adverse to the interests of Canadian Solar and used the highest consumption rates for FOPs for solar cells and modules sold in the United States. *Final Decision Memo* at 18. P.R. 569. Relying principally on the Federal Circuit's decision in *Mueller Comercial de Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ("*Mueller*"), Commerce justified the use of adverse inferences against Canadian Solar as necessary "in order to induce cooperation by interested parties whose information is needed to calculate a respondent's dumping margin in situations where the respondent has a mechanism to induce the non-cooperating party to cooperate." *Final Decision Memo* at 16. P.R. 569. Against the weight of the evidence, Commerce concluded that Canadian Solar could have, and should have, exercised leverage over the unaffiliated suppliers by refusing to do business with them in the future as a "tactic to force {cooperation}." *Id.* Commerce also justified its decision to apply an adverse inference because

the extent of the missing information was significant.  *See* Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Unreported Factors of Production (December 16, 2016) ("*AFA Memo*") at 4-7.  P.R. 517, C.R. 585.

Canadian Solar does not dispute that certain supplier FOP data requested by Commerce was missing from the administrative record and that Commerce therefore had the authority to use "the facts otherwise available" to fill these gaps in the record.  Resort to the facts otherwise available is expressly authorized where "necessary information is not available on the record." 19 U.S.C. § 1677e(a)(1).  Canadian Solar strongly contests, however, Commerce's application of adverse inferences in the selection of the facts available.  As explained below, the application of adverse inferences to Canadian Solar was unreasonable under the circumstances and promoted no legitimate policy objectives.

### A.  The Limited Conditions That Permit Commerce to Apply Adverse Facts Available to Calculate a Cooperative Respondent's Dumping Margin Are Not Present Here

Where an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of *that party* in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b) (emphasis added).  A respondent fails to cooperate to the best of its ability when it fails "to do the maximum it is able to do."  *Nippon Steel v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Canadian Solar was indisputably a cooperative respondent that put forth its maximum effort to provide the information requested by Commerce.  At Commerce's request, Canadian Solar repeatedly, and urgently, asked its unaffiliated suppliers to provide FOPs, making between three and eleven attempts per supplier to obtain the information over a period of up to four months.  *See* Canadian Solar's September 2, 2016 Supplemental Questionnaire Response at

Revised Exhibit SD2-1. P.R. 428, C.R. 518. In doing so, Canadian Solar exhausted all available means for obtaining the FOP information.

As a cooperative respondent, the plain language of the statute generally prohibits the application of an adverse inference to Canadian Solar in determining the margin of dumping. Commerce nevertheless claimed an exception to this rule. Relying on the Federal Circuit's decision in *Mueller*, Commerce claimed that application of AFA was permitted in this case as necessary to "induce cooperation by interested parties whose information is needed to calculate a respondent's dumping margin in situations *where the respondent has a mechanism to induce the non-cooperating party to cooperate*." *Final Decision Memo* at 16 (emphasis added). P.R. 569. Commerce, however, misconstrues and misapplies the narrow exception identified in *Mueller*.[2]

### 1. Commerce's "Leverage" Finding Is Not Supported by Substantial Evidence on the Record

Commerce relied on *Mueller* in the *Final Results* for the proposition that, when it needs information from non-cooperating parties in order to calculate the respondent's dumping margin, Commerce can apply AFA where the respondent has a mechanism to induce the non-cooperating party's cooperation, but fails to do so. *Final Decision Memo* at 16-17 (citing *Mueller*, 753 F.3d at 1233, 1235). P.R. 569. In *Mueller*, the cooperative respondent had an existing close relationship with the uncooperative party, which the Federal Circuit found was an important consideration in determining whether a respondent can "force" cooperation. *See Mueller*, 753 F.3d at 1235. Specifically, the Federal Circuit suggested that the cooperative respondent could have refused to do business with the uncooperative respondent in the future as a tactic to force

---

[2]   The exception should be sparingly applied, if at all, given the statutory language generally permitting Commerce to apply an adverse inference only to "that party"—i.e., the party that failed to cooperate. *See* 19 U.S.C. § 1677e(b).

cooperation. *Mueller*, 753 F.3d at 1235. In other words, the Federal Circuit affirmed an implicit factual finding by Commerce in that case that the respondent failed "to do the maximum it is able to do."

Here, the record lacks sufficient evidence to support the claim that Canadian Solar could have induced the suppliers' compliance. As evidence for its purported "leverage" over the unaffiliated suppliers, Commerce asserted that Canadian Solar has "long-term relationships" with some of its solar cell suppliers. *See Final Decision Memo* at 16. P.R. 569. Commerce also offered that Canadian Solar is a significant producer in the solar market, is growing rapidly, and purchased a substantial quantity of solar cells and modules from its suppliers during the POR. *See id.* However, these claims are not supported in the record and, even if they were supported, none of these claims—whether taken individually or together—is sufficient to support a finding that Canadian Solar *actually* could have forced its suppliers into compliance.

As a preliminary matter, the record shows that Canadian Solar employed the limited leverage it actually had to seek cooperation from these suppliers. As noted above, Canadian Solar repeatedly attempted to obtain the FOP data from each uncooperative supplier over a period of several months and conveyed to each supplier the gravity of the request. *See*, *e.g.*, Canadian Solar's September 2, 2016 Supplemental Questionnaire Response at Revised Exhibit SD2-1. P.R. 428, C.R. 518. Nonetheless, many of the suppliers issued flat rejections—this is not surprising because (1) Commerce sought highly sensitive data (*i.e.*, internal costs), (2) the suppliers were not themselves under review, and (3) the suppliers had no direct stake (i.e., financial harm of benefit) in the review. Therefore, this is not a situation akin to *Mueller* where a respondent possessed leverage but failed to exercise that leverage. If anything, the refusal of these suppliers to accede to Canadian Solar's entreaties for support—or even to respond

meaningfully to them—demonstrates that whatever leverage Canadian Solar possessed by virtue of its status in the industry and relationship with the suppliers, was insufficient to induce cooperation. Punishing Canadian Solar for failing to secure an outcome that was not within its power to secure is unreasonable and finds no support in *Mueller* or the AFA statute.

Here, the record lacks substantial evidence of an existing, long-term relationship between Canadian Solar and any of its suppliers. Commerce argues that "the existence of supplier specific accounts in the accounting system and corporate divisions within Canadian Solar dedicated to the purchase of solar cells demonstrate the existence of long-term relationships between Canadian Solar and its solar cell suppliers." *Final Decision Memo* at 16. P.R. 569. This is irrelevant. That Canadian Solar maintains accounting mechanisms for identifying and handling its suppliers does not evidence long-term relationships and demonstrates nothing about the power of Canadian Solar to coerce its suppliers' cooperation. Commerce's statement to the contrary is entirely conclusory. The same mechanisms are equally consistent with short-term or transitory relationships. It was unreasonable for Commerce to conclude on this basis that Canadian Solar was capable of forcing the unaffiliated suppliers to disclose their confidential cost information to Commerce in a proceeding in which they had no stake.

The factual predicates of Commerce's "leverage" finding are also unsustainable. For example, Commerce found that Canadian Solar was in a position to exercise leverage to induce cooperation from its suppliers given its absolute size and that it has purchased a substantial amount of solar cells and modules from suppliers. *Id.* P.R. 569. However, the record does not demonstrate that Canadian Solar actually represented a significant share of the supplier's businesses. In fact, Commerce agreed that such evidence is lacking, instead asserting that "we cannot conclude, based on the lack of such information, that Canadian Solar's refusal to do

business with its uncooperative suppliers would not serve{ } as a mechanism to induce cooperation." *Id.* However, this assertion has no evidentiary weight—on the contrary, "{t}he absence of evidence in support of an alleged fact clearly is an evidentiary circumstance that weighs against the existence of the alleged fact." *See Dulin v. Mansfield*, 250 F. App'x. 338, 340 (Fed. Cir. 2007).

In fact, Commerce conducted no economic analysis of Canadian Solar's global market share or market share in China, and so did not demonstrate the level of Canadian Solar's influence over cell and module suppliers—Commerce simply speculated as to these facts. Moreover, the record evidence—that various suppliers refused Canadian Solar's repeated requests to provide FOPs—directly contradicts Commerce's rank speculation that respondent represented a large enough portion of the suppliers' businesses to carry such leverage. As such, Commerce's inference does not amount to substantial evidence.

Commerce further acknowledged that Canadian Solar purchased cells and modules from a number of suppliers. *See AFA Memo* at 6. P.R. 517, C.R. 585. This diffusion of purchases among suppliers further reduces the likelihood that Canadian Solar represented a substantial proportion of the business of any one of its suppliers, which in turn minimizes Canadian Solar's ability to pressure the suppliers to comply with Commerce's requests. There are many other solar cell producers in China and around the globe to whom the suppliers can turn. *See* Case Brief at 15. P.R. 560, C.R. 594.

In summary, if Commerce chooses to base its leverage finding on Canadian Solar's purported market power and relationship with its suppliers, it was incumbent upon Commerce to identify positive evidence of such market power, rather than simply speculating as to its possible

existence as it did in this case. This is particularly true given that Canadian Solar in fact exercised whatever leverage it actually possessed, to no effect.

> **2.     There Is No Evasion Factor Present in This Case That Supports Collateral Application of AFA**

Other important facts also distinguish this case from the case presented to the Federal Circuit in *Mueller*. Foremost, the uncooperative party in *Mueller* was itself a mandatory respondent in the same administrative review under appeal. Commerce worried appropriately that the uncooperative party in that case would be permitted to evade its *own* dumping rate from the review, which was calculated on the basis of AFA, by exporting its merchandise through the cooperative respondent. *See Mueller*, 753 F.3d at 1236. Commerce deemed it appropriate to foreclose that possibility by applying AFA in calculating the dumping margin for the cooperative respondent, through whom the uncooperative party already exported. The Federal Circuit held that this evasion rationale *could* be a reasonable consideration in calculating the cooperative party's dumping margin. However, even in that limited circumstance, Commerce must balance this factor with the need to calculate an accurate rate that reflects the party's cooperative status. *Id.* at 1236.

The present case is clearly distinguished from *Mueller* in that the non-cooperating parties were not themselves respondents in the administrative review—indeed there is no evidence that they exported the merchandise under consideration—and thus had no individual dumping rate to potentially evade by exporting through Canadian Solar. Therefore, the limited exception to the non-application of AFA to cooperating respondents to avoid evasion recognized in *Mueller* does not apply in this case.

Commerce argued that the evasion rationale applies here because "the uncooperative suppliers could avoid the appropriate dumping margins that should apply to the merchandise

they produced by failing to cooperate, similar to the concern in *Mueller*." *Final Decision Memo* at 17. P.R. 569. Commerce suggested that the uncooperative suppliers "could obtain a more favorable result by not cooperating because {their} consumption rates could be even higher than Canadian Solar's rates." *Id.* However, the effect of Canadian Solar's dumping rate on these suppliers is unknown. As explained above, Commerce provided insufficient evidence demonstrating the amount of each supplier's business that Canadian Solar comprises. *See id.* Commerce's speculation cannot support the application of AFA against Canadian Solar.

The limits on Commerce's authority to impose collateral AFA on a cooperative party are also reflected in other case law from both the Federal Circuit and this Court. In *Changzhou Wujin Fine Chem. Factory Co. v. United States*, the Federal Circuit found that Commerce's application of collateral AFA based on a policy of evasion and inducement was not reasonable because the record lacked sufficient evidence with respect to both policies. 701 F.3d 1367, 1378 (Fed. Cir. 2012). As in this case, the facts neither supported a finding that the cooperating parties could induce the non-cooperating party to provide the requested information, nor a finding that the non-cooperating party was likely to evade its own duties by engaging with the cooperating parties. *Changzhou*, 701 F.3d at 1378. This Court similarly has found the application of AFA to be unreasonable where the adverse inferences used to calculate a cooperative party's dumping rate had no impact on the uncooperative parties. *See Xiping Opeck Food Co. v. United States*, 34 F. Supp. 3d 1331, 1349-50 (Ct. Int'l Trade 2014).

Moreover, it is unlawful to apply AFA here because Commerce's decision harms Canadian Solar, a cooperative party, but the uncooperative suppliers can sidestep the burden altogether by shifting their business to other producers. This undermines the purported policy rationale.

**B.     Conclusion—This Matter Should be Remanded to Commerce to Apply Neutral Facts Available**

For all of the aforementioned reasons, Commerce's application of partial AFA in calculating Canadian Solar's dumping margin is not in accordance with law. This matter should be remanded to Commerce to apply neutral facts available using the FOPs as reported by Canadian Solar.

**II.     COMMERCE'S USE OF IMPORTS UNDER THAI HTS 7007.19.90000 TO VALUE CANADIAN SOLAR'S MODULE GLASS CONSUMPTION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW**

In valuing Canadian Solar's module glass consumption, Commerce chose a tariff classification that was unsupported by substantial evidence and which resulted in an aberrantly high SV. Canadian Solar described the type of glass employed on the front of its solar panels during the POR as "embossed, polished, un-tempered or half-tempered or tempered, coated, or drilled, and pre-cut according to the size of solar panels." *See* Canadian Solar's June 17, 2016 Section C Supplemental Questionnaire Response at 45. P.R. 281, C.R. 309. Based on this description, Canadian Solar proposed that the Department value its consumption of glass inputs using Thai imports classified under the HTS category for float glass (*i.e.*, 7005.29.90001, "Float glass and surface ground or polished glass, in sheets, whether or not having an absorbent, reflecting or non-reflecting layer, but not otherwise worked; For glass of a thickness not exceeding 5 mm"), with an AUV during the investigation period of $0.30.[3] *See* Memorandum from Jeff Pedersen, International Trade Analyst, to the File, Re: 2014-15 Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the

---

[3] This figure reflects a conversion of the GTA value, 10.26 Baht per kilogram, using Commerce's average POR exchange rate. *See* Case Brief at 45-46. P.R. 560, C.R. 594.

People's Republic of China: Factor Valuation Memorandum (Dep't Commerce, Dec. 16, 2016) at

Attachment I. P.R. 505. Canadian Solar advocated the use of this AUV because HTS

7005.29.90001 is the tariff category that most specifically describes the glass inputs used by

Canadian Solar. *See* Case Brief at 35-36. P.R. 560, C.R. 594.

For the *Final Results*, Commerce valued Canadian Solar's solar module glass instead

using the AUV of Thai imports under HTS category 7007.19.90000 ("Toughened (Tempered)

Safety Glass, Not Suitable For Incorporation Into Vehicles, Aircraft, Spacecraft or Vessels;

Other") with an AUV of $2.79 per kilogram. *See Final Decision Memo* at 45. P.R. 569.

The AUV of $2.79 per kilogram from this data diverged violently from all credible

benchmarks on the record, including: (1) the AUV proposed by Canadian Solar under HTS

7005.29.90001 ($0.31); (2) Canadian Solar's own purchases of solar module glass from market-

economy sources ($[      ]); and (3) the price for safety glass during the POR from Bulgaria

($1.34) originally submitted by the Petitioner. *See* Case Brief at 31; P.R. 560, C.R. 594;

Canadian Solar's Surrogate Value Submission at Exhibit SV-1; P.R. 347, C.R. 406. Indeed, the

$2.79 per kilogram Thai AUV for solar module glass was so absurdly high relative to Canadian

Solar's actual experience and the relevant benchmarks that it ended up accounting for between

13 to 19[4] percent of Canadian Solar's *total* cost of manufacturing ("COM") for the subject

merchandise during the POR. *See* Case Brief at 29. P.R. 560, C.R. 594. In fact, even though it

is a relatively minor input into the manufacture of solar modules, the cost of module glass valued

on the basis of the Thai AUV was similar in magnitude to the *combined* cost of the subject

merchandise's two most predominant material inputs—polysilicon and wafers. *See id.* By way

---

[4]     Based on preliminary valuations and depending on the product model (control number
("CONNUM")). *See* Case Brief at 29. P.R. 560, C.R. 594.

of analogy, Commerce's use of this aberrational SV is akin to setting the cost of the glass on a laptop screen as if it were the cost of the CPU and most of the other electronic components. This is a patently absurd result that severely inflated Canadian Solar's dumping margin and prevented Commerce from calculating an accurate dumping margin.

Canadian Solar and Yingli submitted extensive evidence and arguments challenging the use of the tariff provision for tempered safety glass to value their solar glass inputs and demonstrating the aberrant nature of the Thai AUV as compared to multiple credible benchmarks on the record. Commerce nevertheless stiffly defended its use of the Thai AUV on several grounds, none of which is supported by substantial evidence on the record.

**A.    The Thai Surrogate Value Is Distorted by Absurdly High-Price, Low-Volume Imports from Hong Kong**

When subject merchandise is exported from a nonmarket economy ("NME") country Commerce must value respondent FOPs using SVs from a suitable surrogate market economy country. In selecting the SV, Commerce must use the "best available information regarding the values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1). Commerce has discretion in deciding what constitutes the "best available information" because this term has no statutory definition. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). In exercising this discretion, however, Commerce must ground its selection of the best available information in the primary purpose of the statute—which is to calculate the most *accurate* dumping margins possible. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d at 1191; *see also Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007). In order to achieve the statutory purpose of accuracy and to be supported by substantial evidence, Commerce's choice of the best available information "must evidence a rational and reasonable

relationship to the factor of production it represents." *Hubei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1191 (2004).

In consideration of the foregoing, it is Commerce's practice not to use aberrational values as SVs. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce, May 19, 1997). Commerce must accordingly defend its SV choices when a party presents data that demonstrates the SV is aberrational or otherwise undermines the SV's reliability. In assessing a claim that a particular SV is aberrational, Commerce's practice is to examine all relevant price information on the record in order to accurately value the relevant input. *See*, *e.g.*, *Certain Activated Carbon From the People's Republic of China*, 80 Fed. Reg. 61,172 (Dep't Commerce, October 9, 2015) (final results of antidumping duty administrative review; 2013-2014), and accompanying Issues and Decision Memorandum ("*Activated Carbon Decision Memo*") at 26-27.

As this Court recently confirmed during its consideration of nearly identical claims presented with respect to the solar glass SV in *SolarWorld Americas, Inc. v. United States*:

> Commerce considers import data aberrationally high if the data is "many times higher than the import values from other countries." Final Decision Memo at 33. Commerce's practice also excludes unit values within import data when those values themselves are aberrational and distort the import data. See Final Results of Redetermination Pursuant to *Catfish Farmers of America v. United States*, Consol. Court No. 08-00111, at 4–7, (Sept. 14, 2009), ECF No. 100-1 ("Catfish Farmers Remand Results"); Issues and Decision Mem. for the Investigation of Steel Wire Rope from the {PRC}, A-570-859, at Comment 1, (Feb. 28, 2001), available at http://ia.ita.doc.gov/frn/summary/prc/01-4895-1.txt (last visited Oct. 13, 2017) ("*Steel Wire Rope from the PRC*").

Slip Op. 17-143 at 10-11 (Ct. Int'l Trade 2017).

In *SolarWorld Americas*, plaintiff Yingli presented information showing that the Thai SV for glass under HTS 7007.19.90 was distorted by low-quantity, high-value imports from Hong

Kong with an average value of $191.47 per kilogram, compared to an average value of imports

from all other countries of $1.00 per kilogram. *Id.* at 12. The Court observed that the Hong

Kong data made up just 1.6% of the total volume of imports but accounted for more than 75% of

the total value, and that Commerce failed to explain why it selection of this SV was reasonable in

light of these facts. The Court observed that cases cited by Commerce in support of its

determination—specifically, *Steel Wire Rope from PRC* and *Catfish Farmers Remand Results*—

were examples where Commerce chose to extract unit values from with the import value, where

unit value distorted the import value:

> In *Steel Wire Rope from PRC*, Commerce excluded Malaysian unit
> values from the selected import value for wire rod, because the
> Malaysian unit values were "many times higher than the import
> values from other countries, and are not in line with numerous
> other prices for wire rod on the record." *Steel Wire Rope from
> PRC* at Comment 1. In *Catfish Farmers Remand Results*,
> Commerce excluded unit values from Japan and the Netherlands
> from the import value used as surrogate value for respondent's
> labels because the unit value from the Netherlands and Japan were
> more than 79 and 30 times greater respectively, than the overall
> average import values. *See Catfish Farmers Remand Results* at 5-
> 6.

Slip Op. 17-143 at 13 (citations omitted). As the Court further observed:

> In *Steel Wire Rope from the PRC*, Commerce also referenced prior
> agency practice to exclude, "where appropriate – aberrational data
> that appear to distort the overall value for a specific import
> category." *Steel Wire Rope from the PRC* at Comment 1 (citing
> Chrome-Plated Lug Nuts From The {PRC}, 63 Fed. Reg. 53,872,
> 53,873 (Dep't Commerce Oct. 7, 1998) (final results of AD
> administrative review) (excluding German unit value from Indian
> import data when calculating surrogate value, because the German
> unit value was "many times higher than" the values of other unit
> values within the Indian import data)).

*Id.* at 13, n.11. The Court concluded that these cases "seem to demonstrate a practice that would

support excluding from the import value any aberrational inputs within that value, and

Commerce has not explained why that apparent practice should not be followed in this case."

The facts at issue in this subsequent third review are virtually indistinguishable and suffer from the same defects that recently led to remand in *SolarWorld Americas*. The Thai SV during the POR is similarly distorted by aberrant imports from Hong Kong. These high-price, low-volume imports from Hong Kong likewise have a disproportionate impact on the Thai AUV for the current POR. The following table presents the price and volume of these imports and their impact on the average Thai data for the POR.[5] *See* Case Brief at 33. P.R. 560, C.R. 594.

| | Thai Module Glass Imports from Hong Kong | Thai Module Glass Data – Including Imports from Hong Kong | Thai Module Glass Data – Excluding Imports from Hong Kong |
|---|---|---|---|
| **Price (USD per kilogram)** | $413.10 | $2.79 | $1.11 |
| **Volume (Kilograms)** | 9,185 | 2,257,801 | 2,248,616 |

Based on these figures, Thai imports of module glass from Hong Kong during the POR represented merely 0.4 percent of the total volume of imports but account for 60.2 percent of the average import *value* during the POR. This means that the imports from Hong Kong increase the average price of imports into Thailand during the POR by over 250 percent.

When the Hong Kong data is excluded from the calculation, the Thai AUV for the current POR plummets from $2.79 per kilogram to $1.11 per kilogram. This is a level similar to the credible benchmarks on the record from other potential surrogate countries (*i.e.*, the Bulgarian

---

[5]     The Thai import data also includes import data points from France that are aberrant (*i.e.*, low-volume, high-price). However, because the imports from France are so tiny that they do not impact the AUV of the Thai safety glass, Canadian Solar did not contest below the inclusion of these data points in the SV calculation.

import AUV and the market economy purchase price data) and is no longer aberrational. The

following table illustrates this point. *See* Case Brief at 35. P.R. 560, C.R. 594.

| Source | Module Glass Price (USD per kilogram) |
|---|---|
| Thailand – Import Data Including Imports from Hong Kong | $2.79 |
| Thailand – Import Data Excluding Imports from Hong Kong | $1.11 |
| Bulgaria – Import Data | $1.34 |
| Canadian Solar Market Economy Purchase Price | $[     ] |

The fact that the Thai import price excluding the aberrant Hong Kong data is similar in

magnitude to the credible benchmark prices further demonstrates that the Thai SV is unreliable

and unrepresentative as long as the imports from Hong Kong remain in the data pool. For all of

the foregoing reasons, the Thai SV used to value Canadian Solar's module glass in the *Final*

*Results* is clearly distorted by the presence of aberrational import data from Hong Kong and

should be remanded for the same reasons articulated in *SolarWorld Americas*.

**B.     Commerce's Reliance on Thai Import Data from the Prior Administrative
Review as a Benchmark Is Not Supported by Substantial Evidence**

As it did during the second review, Commerce asserted that its normal practice is to

compare the AUV from the primary surrogate country against the AUVs under the same HTS

category from other potential surrogate countries, namely those that Commerce deems to be at a

similar stage of economic development as the NME country at issue, to determine if the SV

appears aberrational. *See*, *e.g.*, *Final Decision Memo* at 47; P.R. 569; Final Results of

Redetermination Pursuant to *Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp.

2d 1311, 1317 (Ct. Int'l Trade 2013) ("*Blue Field*"), dated March 18, 2014, at 8. Commerce also

noted that it may compare the AUV for imports into the primary surrogate country during the

POR to prior year historical import data for the same HTS category in that country. *See*, *e.g.*, *Final Decision Memo* at 47; P.R. 569; *Activated Carbon Decision Memo* at 26.

In this case, Commerce compared the POR AUV of $2.79 per kilogram to the historical Thai AUV from AR2 of $4.14 per kilogram and to the POR AUV for Bulgaria of $1.34 per kilogram and concluded that the Thai POR value "is in the range of those values and hence does not stand out as aberrational." *Final Decision Memo* at 49. P.R. 569. However, this comparison was clearly unreasonable because the AR2 AUV suffers from the very same defects that afflict the POR AUV. For proof of this fact, the Court need look no further than to its recent remand determination in *SolarWorld Americas* where the Court sustained this same challenge. Slip Op. 17-143 at 14-15. Since this Court ruled that the selection of the Thai AUV as the SV for valuing glass for the prior POR was unsupported by substantial evidence on the record, that AUV could not reasonably serve as a credible benchmark (or "book end") for the third review.

Second, Commerce's determination in the *Final Results* to use the Thai AUV from AR2 as a benchmark price was unreasonable because it did not comport with Commerce's stated practice of using historical import data as a benchmark. When doing so, Commerce's practice has been to "{examine} data from the same HTS category for the surrogate country whose data are allegedly aberrational over multiple years to determine if the current data appear aberrational compared to historical values." *Final Decision Memo* at 47 (citing *Steel Wire Garment Hangers From the People's Republic of China*, 80 Fed. Reg. 13,332 (Dep't Commerce, March 13, 2015) (final results of antidumping duty administrative review; 2012-2013) and accompanying Issues and Decision Memorandum at 19). P.R. 569. While Commerce explained that it will compare the SV to the AUVs for the same surrogate country spanning "multiple years," in the present case Commerce in fact used only the AUV for a *single* year (*i.e.*, AR2) as the benchmark.

It was unreasonable for Commerce to use the historical data from AR2 alone as a benchmark not only because it is contrary to agency practice described above but also because the AR2 AUV differs substantially from the AUVs of the immediately preceding years. These values, as well as the AR2 AUV as a percent of the preceding years' AUVs, appear in the following table. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 39,905 (Dep't Commerce, June 20, 2016) (final results of antidumping duty administrative review and final determination of no shipments; 2013-2014) and accompanying Issues and Decision Memorandum at 29-31.

| Source | Module Glass Price (USD per kilogram) | Thai AR2 Value as a Percent of Historical Value |
|---|---|---|
| Thailand – AR2 Import Data | $4.14 | N/A |
| Thailand – AR1 Import Data | $0.98 | 422.4% |
| Thailand – Solar I Investigation Import Data | $0.86 | 481.4% |

The AR2 AUV is 4.2 times greater than the AUV from the preceding review covering POR 1 and 4.8 times greater than the AUV for the initial investigation. As the AR2 value differs significantly from both of the earlier prices in the investigation, it was clearly not representative of the Thai "historical" value for module glass and is inappropriate to use as a benchmark in and of itself in the present review. The AR2 data should have been rejected if the Department consistently applied the same standard enunciated in prior cases discussed above.

### C. Using the Thai AUV Also Conflicted With Commerce's Avowed Policy of Avoiding SVs That Demonstrate Considerable Price Volatility

Canadian Solar pointed out in its administrative briefs that Commerce's reliance on the Thai AUV conflicted with the approach taken by the agency in other cases, including *Certain Frozen Warmwater Shrimp From the People's Republic of China*, 77 Fed. Reg. 53,856 (Dep't Commerce, September 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ("*Frozen Warmwater Shrimp*"), and accompanying Issues and Decision Memorandum at 47-50. In response, Commerce attempted to factually distinguish that earlier case on the grounds that the Thai data at issue there "demonstrated considerable price volatility based on historical data and compared with imports during the POR into economically comparable countries." *Final Decision Memo* at 48. P.R. 569. Commerce claimed that the data in the present case does not exhibit such volatility.

Commerce's claim that the Thai AUV data has not historically demonstrated price volatility is not supported by substantial evidence. In *Frozen Warmwater Shrimp* Commerce found that the POR price of $14.54 per kilogram for Thai shrimp feed was aberrational when compared to the Thai values corresponding to two other PORs, which were $2.60 per kilogram and $25.49 per kilogram. Commerce found that this degree of price volatility undermined the reliability of the POR data, rendering it unusable as an SV. *See Frozen Warmwater Shrimp*, Issues and Decision Memorandum at 47-50. In its examination of another administrative review in *Frozen Warmwater Shrimp*, this Court subsequently upheld Commerce's determination that the imports of shrimp feed into Thailand for the examined PORs were aberrational based on extreme AUV volatility. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 145 F. Supp. 3d 1349, 1364-65 (Ct. Int'l Trade 2016).

The present case poses a similar situation in which the historical Thai import data for HTS category 7007.19.90000 demonstrates significant price volatility. As summarized above, the AUVs for the Thai data range from $0.86 per kilogram during the initial investigation to $4.14 per kilogram during AR2. In other words, the Thai AUV demonstrated value swings of 481%. Commerce's conclusion that this data failed to demonstrate price volatility cannot be squared with the facts and is not supported by substantial evidence. Because Commerce erroneously relied on this finding in accepting the Thai AUV, that decision must be reversed and remanded.

**D.** **Commerce Unreasonably Rejected Canadian Solar's Own Market Economy Purchases of the Identical Input as a Benchmark**

As Canadian Solar presented to Commerce in its administrative Case Brief, the administrative record for the review included two other credible benchmarks against which to assess the reliability of the selected SV: (1) the price of Canadian Solar's contemporaneous market economy ("ME") purchases of module glass; and (2) the AUV for safety glass imports during the POR from Bulgaria. *See* Case Brief at 30; P.R. 560, C.R. 594; SolarWorld's New Factual Information Submission at Exhibit 1; P.R. 450; Canadian Solar's Sixth Section D Supplemental Response Part 2 at Revised Exhibit D-8; P.R. 461, C.R. 535. Commerce, however, rejected the ME purchase price proffered by Canadian Solar as a benchmark. Commerce cited its "practice not to use a respondent's market economy purchase prices as benchmarks" and noted that this is proprietary information that does not necessarily represent industry-wide prices. *See Final Decision Memo* at 47-48. P.R. 569.

The cases Commerce relied upon in reaching that conclusion are, however, distinguishable. In *Certain Cased Pencils from the People's Republic of China*, 71 Fed. Reg. 38,366 (Dep't Commerce, July 6, 2006) (final results of antidumping duty administrative review)

("*Cased Pencils*"), the benchmarks proffered by the respondent apparently consisted of Indian

domestic prices, Indian export prices, and a Mexican price quote, that were "obtained from the

Indian and Mexican companies in direct response to a request for such prices" and "at the request

of respondent's counsel." *Id.*, Issues and Decision Memorandum at 7-8. The Department

highlighted the fact that these ME prices were subject to potential manipulation because they

were "prepared specifically for use in trade remedies cases." *Id.* There was also an apparent

question concerning possible affiliation with the seller that could taint the reliability of the data.

In stark contrast to the multitude of particularized concerns with the provenance of the pricing

data in *Cased Pencils*, the market economy prices proffered by Canadian Solar reflect actual

contemporaneous purchases by the respondent of the identical input.

In *Multilayered Wood Flooring from the People's Republic of China*, 79 Fed. Reg.

26,712 (Dep't Commerce, May 9, 2014) (final results of antidumping duty administrative

review; 2011-2012), Commerce similarly rejected the use of ME purchase benchmarks on the

grounds that the purchases at issue "are not necessarily representative of industry-wide prices

available to the producers" and therefore did not meet the Department's preference for publicly

available information. *Id.*, Issues and Decision Memorandum at 40. However, while it may be

appropriate to apply these standards in determining whether to actually use data as the SV in a

dumping calculation, it is not reasonable to apply the same rigorous standard for purposes of

simply benchmarking the reliability of an SV under consideration.

Commerce also referenced the Federal Circuit's decision in *Home Meridian v. United*

*States*, 772 F.3d. 1289 (Fed. Cir. 2014) as allegedly supporting the agency's categorical rejection

of ME purchases as benchmarks because they do not "constitute broad market average."

However, like the decision in *Cased Pencils*, *Home Meridian* was not addressing the

identification of benchmarks, but was instead addressing Commerce's refusal to use non-contemporaneous ME purchases as the SV. *See id.* Moreover, the Federal Circuit did not endorse a blanket rejection of such ME purchases, but pointedly emphasized that "neither § 351.408(c)(1) nor the Antidumping Methodologies permit Commerce to *categorically exclude* market economy purchases without making a factual determination as to the extent to which they inform the inquiry into what is the best available information for valuing relevant inputs." 772 F.3d at 1295 (emphasis original).

In summary, Commerce unreasonably rejected the ME purchase data in this case because it was in fact the best available information on the record to benchmark the Thai AUV that was under consideration and Commerce identified no evidence that undermined its reliability.

### E. Conclusion

For all of the foregoing reasons, Commerce's reliance on the Thai SV to value Canadian Solar's nitrogen gas in the *Final Results* is not supported by substantial evidence and is contrary to law and should be remanded for reconsideration.

### III. COMMERCE'S USE OF IMPORTS UNDER THAI HTS 2804.30.00000 TO VALUE CANADIAN SOLAR'S NITROGEN GAS CONSUMPTION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

Canadian Solar and Trina both consumed nitrogen gas in the manufacturing process. Unlike other important raw materials such as polysilicon and wafers, nitrogen gas is a relatively insignificant input in the manufacture of solar cells that is categorized in the normal course of business for accounting purposes as an overhead expense item and grouped with other minor inputs. *See* Canadian Solar's Section D Response at Exhibit D-6. P.R. 246, C.R. 236-239. In contrast to nitrogen's miniscule impact on Canadian Solar's production costs, Commerce valued respondent's nitrogen consumption using an SV that vastly overstates its significance.

For purposes of both the preliminary and final results of the review, Commerce selected Thai HTS 2804.30.0000 (Hydrogen, rare gases, and other non-metals; Nitrogen) with an AUV of $9.36 per kilogram. *See Final Decision Memo* at 52.  P.R. 569.  This $9.36 per kilogram price contrasts with other reliable benchmark prices on the record for nitrogen gas under the same HTS number from economically comparable countries of $0.07 per kilogram for Bulgaria, $0.25 per kilogram for Mexico, and $0.08 for Romania.  As the following table demonstrates, this amounts to a difference of between 3,808 and 13,600 percent.

| Source | Nitrogen Price (USD per kilogram) | Thai Value as a Percent of Benchmark Value |
|---|---|---|
| Thailand Import Data | $9.36 | N/A |
| Bulgaria Import Data[6] | $0.07 | 13,600% |
| Romania Import Data | $0.08 | 11,900% |
| Mexico Import Data | $0.25 | 3,808% |

*See* Letter from Howard Smith, Program Manager, AD/CVD Operations, Office IV, "Antidumping Duty Review of Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Request for Surrogate Country and Surrogate Value Comments and Information" (Dep't Commerce, May 24, 2016); P.R. 244; Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6; P.R. 391, C.R. 474.

Indeed, the $9.36 per kilogram SV for nitrogen proved to be so high that this single insignificant overhead item ended up accounting for between 13 and 19 percent of Canadian

---

[6]     The Bulgarian, Romanian, and Mexican nitrogen data reflect conversions of the GTA values to US Dollars per kilogram.  *See* Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6.  P.R. 391, C.R. 474.

Solar's total cost of manufacturing.[7]  In other words, the application of this aberrant SV for

nitrogen gas transformed this minor overhead item into an element of cost that is on par with the

two largest inputs of Canadian Solar's subject merchandise—polysilicon and wafers—*combined*.

*See* Case Brief at 37.  P.R. 560, C.R. 594.

As discussed below, Commerce's valuation of Canadian Solar's nitrogen consumption

using the Thai import data was not supported by substantial evidence and not in accordance with

law because: (1) the Thai SV "diverged violently" from the credible benchmarks on the record,

and (2) the Thai value is inherently unreliable because it is distorted by extremely high-priced,

very low-volume, imports from the United States and Switzerland.

A.    **The Thai Surrogate Value Diverges Violently from the Credible Benchmarks**
      **on the Record**

As this Court has found, "{i}f the agency's surrogate prices diverge violently from

credible benchmark prices, Commerce must explain why it chose to reject {a respondent's} data

while crediting its own."  *Blue Field*, 949 F. Supp. 2d at 1326 (citing *Peer Bearing Company—*

*Changshan v. United States*, 752 F. Supp. 2d 1353, 1371 (Ct. Int'l Trade 2012)).  In this case,

Commerce provided inadequate justification for choosing an SV for nitrogen that so clearly

diverges violently from the reliable benchmarks on the record.

Pursuant to its practice for investigating claims of aberrational data, Commerce compares

the AUV of the SV at issue to contemporaneous data on the record for potential surrogate

countries and also to historical import data on the record for the same country.  See *Final*

*Decision Memo* at 53.  P.R. 569.  The administrative record in this case contained benchmark

---

7       Based on preliminary valuations and depending on CONNUM.  *See* Case Brief at 37.
P.R. 560, C.R. 594.

prices from *three* of the economically comparable countries on Commerce's surrogate country list: (1) the average price of nitrogen during the POR from Bulgaria ($0.07 per kilogram); (2) the average price of nitrogen during the POR from Mexico ($0.25 per kilogram); and (3) the average price of nitrogen during the POR from Romania ($0.08 per kilogram). *See* Letter from Howard Smith, Program Manager, AD/CVD Operations, Office IV, "Antidumping Duty Review of Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Request for Surrogate Country and Surrogate Value Comments and Information" (Dep't Commerce, May 24, 2016); P.R. 244; Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6; P.R. 391, C.R. 474. Commerce does not dispute the use of these three surrogate country values as benchmarks. *See Final Decision Memo* at 52-55. P.R. 569. The administrative record also included contemporaneous purchases prices and price quotes from the Thai market placed on the record by respondent Trina. These included: (1) the average transaction price for three Thai purchases of nitrogen ($0.12 per kilogram); and (2) a price quote for nitrogen from Thailand ($0.06 per kilogram). *See* Trina's Surrogate Value Submission at Exhibit C-5. P.R. 344.

The $9.36 per kilogram SV that Commerce chose, based on Thai import data, diverges violently from each of these five benchmarks. The following table summarizes this data and shows the difference:

| Source | Nitrogen Price (USD per kilogram) | Thai Value as a Percent of Benchmark Value |
|---|---|---|
| Thailand Import Data | $9.36 | N/A |
| Bulgaria Import Data[8] | $0.07 | 13,600% |
| Romania Import Data | $0.08 | 11,900% |
| Mexico Import Data | $0.25 | 3,808% |
| Thailand Transaction Price Average | $0.12 | 7,933% |
| Thailand Price Quote | $0.06 | 15,867% |

*See* Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6 (Bulgaria, Romania, and Mexico data); P.R. 391, C.R. 474; Trina's Surrogate Value Submission at Exhibit C-5 (Thailand transaction price average and price quote); P.R. 344.

These figures reveal that the Thai SV used by Commerce was between 3,808 percent and 15,867 percent greater than the credible benchmarks on the record. Even comparing the Thai SV only to the potential surrogate country values, the Thai SV exceeds those benchmarks by between 3,808 percent and 13,600 percent. This is exponentially greater than the divergence that was at issue in *Frozen Warmwater Shrimp* (discussed *infra*), where Commerce appropriately determined the SV to be aberrational.

A comparison of the volume of Thai nitrogen imports to the volume of nitrogen imports of the other surrogate countries further undermines the reliability of the Thai data. As the table

---

[8]    The Bulgarian, Romanian, and Mexican nitrogen data reflect conversions of the GTA values to US Dollars per kilogram. *See* Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6. P.R. 391, C.R. 474.

below demonstrates, the volume of Thai imports of nitrogen during the POR was trivial compared to those of Bulgaria, Romania, and Mexico. *See* Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6. P.R. 391, C.R. 474.

| Source | Nitrogen Price (USD per kilogram) | Nitrogen Volume (Kilograms) | Alternate Volume as a Percent of Thai Volume |
|---|---|---|---|
| Thailand Import Data | $9.36 | 136,545 | N/A |
| Bulgaria Import Data | $0.07 | 10,734,975 | 7,862% |
| Romania Import Data | $0.08 | 6,584,800 | 4,822% |
| Mexico Import Data | $0.25 | 28,057,590 | 20,548% |

As the data reveals, the volumes of nitrogen imports into the three other surrogate countries are 4,822 percent to 20,548 percent greater than the volume of nitrogen imports into Thailand. The smaller sample size of imports into Thailand leaves the AUV calculation more vulnerable to being skewed by irregular prices. In comparison to the data on the record for other potential surrogate countries, the extremely low volume and the inordinately high price for imports of nitrogen into Thailand suggests that the SV is aberrational.

Commerce responds in the *Final Decision Memo* to the argument concerning relative volumes by (1) claiming that "small quantities alone are not inherently distortive," and (2) asserting that where there is no other indication that the value is aberrational, Commerce will ignore the differences in value. *Final Decision Memo* at 54. P.R. 569. This is wrong. This is not a situation where Canadian Solar and other respondents relied solely on the disparity in volumes to establish that the Thai value is aberrant. As noted above, the aberrant nature of the

Thai SV is self-evident from its violent disparity in comparison to all other potential surrogate country benchmarks for the same HTS number (with the exception Ecuador and South Africa, which are not reliable for the reasons discussed below).

> **B.** **Commerce's Reliance on AUVs from Ecuador and South Africa as Benchmarks Is Unreasonable**

In the *Final Decision Memo*, Commerce ultimately argued that the Thai SV is not aberrational because it is not the highest price among other economically comparable surrogate countries. Commerce specifically pointed to the contemporaneous AUVs for Ecuador and South Africa's nitrogen imports, which were $17.16 and $26.27 per kilogram, respectively, and concluded that the Thai value was "within range" of these benchmarks. *See Final Decision Memo* at 54. P.R. 569.

However, this contention fails because the AUVs from Ecuador and South Africa themselves are clearly aberrational—indeed, even more so than the Thai AUV. As argued to Commerce below, the Ecuador and South Africa AUVs are based on extraordinarily small volumes: a miniscule 6,498 kilograms for Ecuador and an equally miniscule 12,894 kilograms for South Africa. *See* Petitioner's July 25, 2016 Rebuttal SV Comments at Exhibit 3. P.R. 398, C.R. 483. As with the Thai data, the extremely small volume of imports correlates to a very high AUV. These volume and price figures indicate that nitrogen is being purchased neither in commercial quantities nor at market prices. While Commerce does not consider a low import quantity *alone* to be indicative of distortion in the AUV, there is in this case a *clear pattern* among the surrogate country data for nitrogen imports that calls into question Commerce's decision to use the Thai value. *See Final Decision Memo* at 54. P.R. 569. The AUVs for the three surrogate countries with import volumes of at least 6.5 million kilograms span a consistent range of only 18 cents. On the other hand, the three surrogate countries with import volumes

under 150,000 kilograms have wildly divergent AUVs that are much higher than those of countries with large import volumes.

Contrary to Commerce's suggestion that import volume is ordinarily irrelevant to the evaluation of SVs, this Court has recognized that "a very small relative quantity of imports triggers an obligation for Commerce to explain why the data is not aberrational." *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 35 I.T.R.D. (BNA) 1136 (Ct. Int'l Trade 2013) at *5 ("*Xinjiamei Furniture*"). Commerce failed to meet this burden with respect to the Ecuador and South Africa data. Indeed by its own admission, Commerce indicated that the import data for Ecuador and South Africa was "volatile." Commerce has acknowledged that such volatility is disqualifying of surrogate data in other cases, notably in *Frozen Warmwater Shrimp*. *Final Decision Memo* at 53-54. P.R. 569.[9]

For all of these reasons, Commerce's reliance on AUVs for South Africa and Ecuador as benchmarks for the Thai AUV was unreasonable. In fact, Commerce has abandoned this same argument in the preliminary determination for the subsequent (fourth) administrative review of the same order. In that case, Commerce has chosen to use the Mexican AUV instead of the Thai AUV to value nitrogen because the latter significantly diverges from the other surrogate country prices on the record. Accordingly, Commerce was "concerned that certain record evidence indicates that the AUV may not correctly reflect the actual broad market average price for

---

[9]     Commerce subsequently used *Frozen Warmwater Shrimp* as the basis for arguing that the Thai SV in the present review is not volatile because it is "less volatile" than the figures for South Africa, Ecuador, and Romania. *See id.* While the difference in the Thai import value between AR2 and AR3 is indeed of a smaller magnitude than for the referenced surrogate countries, it still shows substantial variation: falling from $11.68 per kilogram in AR2 to $9.36 per kilogram in AR3. Separately from any of the other potential surrogate countries, this is in and of itself a substantial variance that calls into doubt the SV's reliability.

nitrogen in Thailand." Notably, Commerce discounted the South African AUV as a benchmark because it was similarly aberrant as in AR3. *See* 2015-2016 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Factor Valuation Memorandum (January 2, 2018) at 4. Commerce should have reached a similar conclusion in this case. Its finding that the Thai AUVs are "within the range" of other benchmarks is unreasonable and not supported by substantial evidence.

C.    **The Thai Surrogate Value Is Inherently Unreliable Because It Is Distorted by High-Price, Low-Volume Imports from the United States and Switzerland**

Commerce's decision to use the Thai import data as the SV for Canadian Solar's nitrogen is further undermined by the fact that the Thai value is corrupted by extraordinarily high-priced imports from the United States and Switzerland. As the table below demonstrates, imports from these two countries account for *merely 1.57 percent of all imports* into Thailand during the POR but comprise a *disproportionate 22.6 percent of the AUV*. The table shows the impact of these prices by comparing the AUV for nitrogen including and excluding these figures.

|  | Nitrogen Imports from the United States | Nitrogen Imports from Switzerland | Nitrogen – Including Imports from the United States and Switzerland | Nitrogen – Excluding Imports from the United States and Switzerland |
|---|---|---|---|---|
| **Price (USD per kilogram)** | $140.55 | $646.23 | $9.36 | $7.22 |
| **Volume (Kilograms)** | 2,070 | 13 | 132,940 | 130,857 |

*See* Petitioner's July 25, 2016 Rebuttal SV Comments at Exhibit 3. P.R. 398, C.R. 483.

By any standard identified by Commerce in this proceeding, AUVs for nitrogen gas that are as high as $140.55 per kilogram and $646.23 per kilogram must be recognized as extraordinary—particularly when viewed against the vanishingly minimal quantities imported. Moreover, when the extremely high-price and extremely low-volume imports from the United States and Switzerland are properly excluded from the SV calculation, the Thai SV decreases from $9.36 to $7.22 per kilogram—a decrease of over 22%. The significant impact of such a trivial volume of imports is a strong indication that the inclusion of import data from the United States and Switzerland in the data pool renders the Thai data aberrational.

As discussed *infra*, Commerce was required to explain why the data are *not* aberrational when they are based on tiny volumes of imports. *See Xinjiamei Furniture*, 35 I.T.R.D. (BNA) 1136 at *5. Commerce provided no such explanation. In the *Final Results*, Commerce predicated its use of these irregular imports figures in the AUV calculation on its preference to use the "full" Global Trade Atlas ("GTA") dataset. According to Commerce, this prevents parties from "cherry-picking" import data in their favor. *See Final Decision Memo* at 54. P.R. 569. This is not an explanation supporting the reliability of the import data and as such fails the *Xinjiamei Furniture* standard. If flaws are identified in the data set, Commerce must take notice of such flaws. Moreover, Commerce does regularly adjust GTA datasets to remove potentially distorting imports—for example, Commerce has a "longstanding practice of eliminating imports from NME countries and countries known to have widely available export subsidies." *See*, *e.g.*, Final Results of Remand Redetermination Pursuant to *Jinan Yipin Corp. v. United States*, 31 C.I.T. 1901, 526 F. Supp. 2d 1347 (2007), dated March 14, 2008, at 20. If the Department finds it necessary and possible to exclude individual data points deemed unreliable for these reasons,

there is no reason why the Department may refuse to do so where other data points have been flagged as aberrant.

Here, the import prices are aberrational not only because of their disproportionate impact on the Thai AUV, but also because they significantly exceed all other import prices. The average prices on imports from all of the other twelve countries in the dataset range from $1.02 (imports from Austria) to $34.96 (imports from Denmark) per kilogram. *See* Petitioner's July 25, 2016 Rebuttal SV Comments at Exhibit 3. P.R. 398, C.R. 483. The prices of imports from the United States and Switzerland are 402 percent and 1,848 percent greater, respectively, than the next highest import price in the dataset. This proves that they are aberrational and should not be included in the SV calculation, despite Commerce's preference to use the entire dataset.[10]

### D.    The Thai AUV Is Aberrational

For all of the foregoing reasons, the $9.36 per kilogram Thai SV that Commerce used to value Canadian Solar's nitrogen consumption is aberrational. The use of this figure was therefore unlawful and not supported by substantial evidence on the record. This matter should be remanded to the Department to use a reliable alternative benchmark price or at the very least to alter the Thai SV calculation to exclude the aberrantly high priced imports from the United States and Switzerland.

---

[10]    Respondent Trina further cast doubt on the legitimacy of data for imports from the United States by demonstrating that the quantity and value of nitrogen imported into Thailand from the United States in the Thai import data differs significantly from the corresponding export figures recorded in the U.S. ITC Dataweb. According to the latter source, the AUV of imports of United States nitrogen into Thailand during the POR is $0.15 per kilogram as compared to the $140.79 per kilogram reported in the Thai statistics. Commerce responded to this claim principally by asserting that there is no reason to assume a "one-for-one" correspondence between the U.S. export data and the Thai import data. Respondents, however, were not quibbling over minor differences in the figures. The two are not even within range of each other and could not possibly be explained by timing differences. *See* Trina's Case Brief at 17-18. P.R. 531.

## IV.    CONCLUSION

For the foregoing reasons, Canadian Solar respectfully requests that the Court grant its

Motion for Judgment on the Agency Record and remand this case to Commerce with instructions

to recalculate Canadian Solar's dumping margin in a manner consistent with the points laid out

in this Memorandum.

A proposed order is attached.

Respectfully submitted,

/s/ Craig A. Lewis_____
Craig A. Lewis, Esq.
Jonathan T. Stoel, Esq.
Michael G. Jacobson, Esq.

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Canadian Solar International Limited;*
*et al.*

Dated:  March 7, 2018