# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED ET AL., | ) ) ) |
|      Plaintiffs and Consolidated Plaintiffs, | ) ) ) |
|   and | ) ) |
| SHANGHAI BYD CO., LTD. ET AL., | ) ) |
|      Plaintiff-Intervenors and<br>     Consolidated Plaintiff-Intervenors, | ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
|      Defendant, | ) ) |
|   and | ) ) |
| SOLARWORLD AMERICAS, INC. ET AL., | ) ) |
|      Defendant-Intervenor and<br>     Consolidated Defendant-Intervenors. | ) ) ) |

Before: Honorable Claire R. Kelly, Judge

Consol. Court No. 17-00173

## MEMORANDUM IN SUPPORT OF MOTION OF CONSOLIDATED PLAINTIFFS CHANGZHOU TRINA SOLAR ENERGY CO., LTD.; TRINA SOLAR (CHANGZHOU) SCIENCE & TECHNOLOGY CO., LTD.; YANCHENG TRINA SOLAR ENERGY TECHNOLOGY CO., LTD.; CHANGZHOU TRINA SOLAR YABANG ENERGY CO., LTD.; TURPAN TRINA SOLAR ENERGY CO., LTD.; HUBEI TRINA SOLAR ENERGY CO., LTD.; AND TRINA SOLAR (U.S.) INC., FOR JUDGMENT UPON THE AGENCY RECORD

Robert G. Gosselink
Jonathan M. Freed
**TRADE PACIFIC PLLC**
660 Pennsylvania Avenue, SE, Suite 401
Washington, D.C. 20002
(202) 223-3760

Dated: March 7, 2018

Counsel to Consolidated Plaintiffs, Trina

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ............................................................................................ ii

I.      STATEMENT PURSUANT TO RULE 56.2(c) ............................................. 1

        A.      The Administrative Determination Under Review ................................. 1

        B.      Issues Presented ..................................................................................... 1

        C.      Standard of Review ................................................................................ 2

II.     STATEMENT OF THE CASE ...................................................................... 3

III.    ARGUMENT ................................................................................................ 4

        A.      Commerce's Selection of a Surrogate Value Based Upon Thai Import Statistics
                for Nitrogen Gas Was Not Supported by Substantial Evidence ............................ 4

        B.      Commerce's Surrogate Value for Coated Glass Was Not the Best Available
                Information…………………………………………………………………12

        C.      Commerce Should Not Have Included Import Data in Its Calculation of Surrogate
                Values Where Import Values Were Reported With No Corresponding Import
                Quantities…………………………………………………………………...14

        D.      Commerce Should Have Included the Debt-Restructuring Line Item in the
                Calculation of TUS's U.S. Indirect Selling Expense Ratio ................................. 17

IV.     CONCLUSION ............................................................................................ 19

# TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................2, 5

19 U.S.C. § 1677b(c)(l). ..................................................................................4


**Judicial Decisions**

*Allied Pacific Food (Dalian) Co. Ltd. v. United States*, 587 F. Supp. 2d 1330, 1342 (CIT 2008)..5

*Asociacion Columbiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865 (1998) ..3

*Association of Am. School Paper Suppliers v. United States*, 716 F. Supp. 2d 1329, 1334 (CIT 2010) ......................................................................................................5

*Blue Field (Sichuan) Food Industrial Co., Ltd. v. United States*, 949 F. Supp. 2d 1311,  (CIT 2013)…………………………………………………………………………………7

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .............................................2

*CITIC Trading Co. v. United States*, 27 CIT 356, Slip Op. 03-23 at 16 (Mar. 4, 2003) ...............5

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...............................................................2

*Consolo v. FMC*, 282 U.S. 607 (1966) ...........................................................................................2

*CS Wind Vietnam Co., Ltd. v. U.S.,* 36 ITRD 1164, 2014 WL 5510084, Slip-Op. 14-128, (CIT 2014)…………………………………………………………………………………..13

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1277-78 (CIT 2006)…………………….5

*Fujitsu General. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) .........................................2

*Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) .........................4

*Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1308 (CIT 2007)………………5

*Nation Ford Chern. Co. v. United States*, 166 F.3d 1373, 1378 (Fed. Cir. 1999) ……………….5

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ...........................................3

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ....................................2

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009) ........................................................2
*Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353 (CIT 2011)………….......7

*Rhone-Poulenc, Inc. United States*, 20 CIT 573, 927 F. Supp. 451 (1996) ...................................3

*Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) …………………………………………………………………………4, 12

*Shanghai Foreign Trade Enters. Co., Ltd. v. United States*, 318 F. Supp. 1339 (CIT 2004)……..6

*Solarworld Americas, Inc. v. United States*, 2017 WL 4844276, CIT Slip Op. 17-143, (Oct 17, 2017) ........................................................................................................................... 6-7, 15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ........................................................3

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 37 CIT _, Slip Op. 13-30 at 10 (March 12, 2013).

*Zenith Electronics v. United States*, 77 F.3d 426, 431 (Fed. Cir. 1996) .......................................18

## **Administrative Determinations**

*Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 Fed. Reg. 49622 (Sept. 28, 2001) ..........................................................................................................................................*17*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013–2014*, 81 Fed. Reg. 39905 (Dep't Commerce, June 20, 2016) .................................................................................. 6, 15-16

*Melamine Institutional Dinnerware Products from the People's Republic of China*, 62 Fed. Reg. 1708, 1710 (Jan. 13, 1997) ........................................................................................................*17*

*Orange Juice from Brazil*, 74 Fed. Reg. 40167 (August 11, 2009) ............................................18

*Sweaters Wholly or in Chief Weight of Man-Made Fiber from the Republic of Korea*, 55 Fed. Reg. 32659 (August 19, 1990) ...............................................................................................*17*

**MEMORANDUM IN SUPPORT OF MOTION FOR
JUDGMENT UPON THE AGENCY RECORD**

## I.    STATEMENT PURSUANT TO RULE 56.2(c)

Consolidated Plaintiffs, Changzhou Trina Solar Energy Co., Ltd.; Trina Solar

(Changzhou) Science & Technology Co., Ltd.; Yancheng Trina Solar Energy Technology Co.,

Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.;

Hubei Trina Solar Energy Co., Ltd.; and Trina Solar (U.S.) Inc., (hereinafter Plaintiffs or

"Trina"), submit this brief in support of their Motion for Judgment upon the Agency Record

pursuant to USCIT Rule 56.2.

### A.    The Administrative Determination Under Review

This action is an appeal from the U.S. Commerce Department's final results of

administrative review in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, From the People's Republic of China: Final Results of Antidumping Duty*

*Administrative Review and Final Determination of No Shipments; 2014–2015*, 82 Fed. Reg.

29033 (Dep't Commerce, June 27, 2017) ("*Final Results*"), PR 568 and accompanying Issues

and Decision Memorandum (June 20, 2017), available at

https://enforcement.trade.gov/frn/summary/prc/2017-13426-1.pdf  ("*Decision Memorandum*"),

PR 2569, as amended in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, From the People's Republic of China: Amended Final Results of Antidumping Duty*

*Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 Fed. Reg.

40,560 (Dep't Commerce August 25, 2017) ("*Amended Final Results*"), PR 587.

### B.    Issues Presented

Plaintiffs seek judgment on the agency record with respect to four issues.

1.      Whether Commerce's reliance on Thai GTA import data for nitrogen was supported by substantial evidence considering that U.S. export data for nitrogen to Thailand reported drastically different quantities and values. In addition, whether reliance on Thai GTA import data for nitrogen was supported by substantial evidence considering other benchmark data on the record.

2.      Whether Commerce's valuation of coated glass with import data under a HTS classification with no limitation for glass thickness was supported by substantial evidence.

3.      Whether Commerce's calculation of surrogate values including import values that had no corresponding import quantities was supported by substantial evidence.

4.      Whether Commerce's exclusion of a debt restructuring line-item from the calculation of the U.S. indirect selling expense ratio for Trina Solar (U.S.) Inc., ("TUS") was supported by substantial evidence.

## C.      Standard of Review

When evaluating factual determinations contained in the final results of an antidumping duty administrative review, the Court must sustain Commerce's final results, unless they are "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu General. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. FMC*, 282 U.S. 607, 619-20 (1966) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008). Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which

conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-488 (1951).

This Court has found Commerce's determinations unlawful "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); see also *Asociacion Columbiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865, 880 (1998). Even where Commerce has acted in conformity with its statutory and regulatory obligations, the resulting dumping margin must be examined for its accuracy and fairness. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

## II.    STATEMENT OF THE CASE

Pursuant to a request from Trina, Commerce initiated an administrative review of Trina's U.S. sales for the December 1, 2014, through November 30, 2015, period of review ("POR").[1] On March 28, 2016, Commerce selected Trina as one of two mandatory respondents. Trina fully participated in the proceeding responding to the initial antidumping duty questionnaire and numerous supplemental questionnaires.

On December 22, 2016, Commerce published its preliminary results of review, in which it calculated a preliminary margin for Trina of 7.72 percent. *See Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2014-2015*, 81 Fed. Reg. 93,888 (Dec. 22, 2016) ("*Preliminary Results*"), and accompanying Memorandum to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "Crystalline Silicon Photovoltaic Cells, Whether or Not

---

[1] *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 6832, 6835 (February 9, 2016) ("*Initiation Notice*").

Assembled Into Modules from China:  Decision Memorandum for the Preliminary Results of the 2014-2015 Antidumping Duty Administrative Review" (December 16, 2016) ("*Preliminary Decision Memorandum*"). Thereafter, Trina submitted a case brief.[2]

On June 22, 2017, Commerce published the final results of the administrative review in which it calculated a final margin to Trina of 4.66 percent.[3]  On August 25, 2017, Commerce amended the *Final Results* and calculated a final rate for Trina of 5.82 percent.[4]  This appeal followed.

## III.    ARGUMENT

### A.    Commerce's Selection of a Surrogate Value Based Upon Thai Import Statistics for Nitrogen Gas Was Not Supported by Substantial Evidence

#### 1.    Legal Standard

In non-market economy ("NME") cases such as this, the statute requires that "the valuation of the factors of production shall be based upon the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(l).  The Court of Appeals for the Federal Circuit has explained that "{i}n determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir.

---

[2] Trina's Case Brief, page 17, (Jan 25, 2017), PR 531-534.

[3] *Final Results, PR 568.*

[4] *Amended Final Results*, PR 587

1994). Under the statute, "Commerce is vested with considerable discretion in selecting the best available information." *Allied Pacific Food (Dalian) Co. Ltd. v. United States*, 587 F. Supp. 2d 1330, 1342 (CIT 2008). But Commerce's selection of surrogate values still must be supported by substantial evidence in the administrative record. 19 U.S.C. § 1516a(b)(1)(B)(i). Therefore, while "the standard of review precludes the court from determining whether Commerce's choice of surrogate value was the best available information on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices." *CITIC Trading Co. v. United States*, 27 CIT 356, Slip Op. 03-23 at 16 (Mar. 4, 2003).

> In determining which surrogate value constitutes the best available information:
>
> {T}he statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping {rate} . . . This "best" choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.

*Association of Am. School Paper Suppliers v. United States*, 716 F. Supp. 2d 1329, 1334 (CIT 2010) (citations omitted). In this respect, the Court of Appeals for the Federal Circuit has made clear that Commerce should "avoid the use of distorted surrogate prices." *Nation Ford Chern. Co. v. United States*, 166 F.3d 1373, 1378 (Fed. Cir. 1999). Moreover, Commerce itself, in the preamble to its current regulations, recognizes that it does not use surrogate country data that is "aberrational." *Antidumping Duties, Countervailing Duties*, 62 Fed. Reg. 27296, 27366 (May 19, 1997) (Final Rule). Thus, when "confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1308 (CIT 2007); *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1277-78 (CIT 2006). In such a case, it is not enough for Commerce to "summarily discard the alternatives as flawed, Commerce must also evaluate the

reliability of its own choice." *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 37

CIT _, Slip Op. 13-30 at 10 (March 12, 2013), *quoting Shanghai Foreign Trade Enters. Co., Ltd.*

*v. United States*, 318 F. Supp. 1339, 1352 (CIT 2004).

> 2.    The Administrative Record Establishes That the Nitrogen
> Surrogate Value Based on Thai GTA Import Data Was Unreliable
> and That Alternate Surrogate Data in the Administrative Record
> Should Have Been Used

The *Final Results* should be reversed because Commerce ignored record evidence and

could not have reasonably relied on the Thai import data for nitrogen had it considered, rather

simply dismissed, the evidence demonstrating the unreliability of the Thai GTA import data.

Trina recognizes that it raised a similar challenge to Commerce's reliance on the Thai GTA

import data for nitrogen in the second administrative review and this Court sustained

Commerce's decision as reasonable.[5] In *Solarworld Americas, Inc. v. United States*, Trina argued

that four sets of alternative values for nitrogen established that the Thai GTA import data were

aberrational.[6]  While acknowledging that Commerce declined to assess aberration using the

information submitted by Trina, the Court reasoned that Commerce reasonably declined to even

consider this information because those data were individual invoices and price quotes and thus not

as insulated from potential bias as the Thai GTA import data.[7]  Trina respectfully disagrees with the

Court's reasoning because, in Trina's view, the reasoning essentially permits the agency to summarily

discard the alternatives as flawed without requiring Commerce to evaluate the reliability of its own

---

[5] *Solarworld Americas, Inc. v. United States*, 2017 WL 4844276, CIT Slip Op. 17-143, pages 28-32
(Oct 17, 2017), contesting, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, From the PRC: Final Results of Antidumping Duty Administrative Review*, 81 Fed.
Reg. 39,905 (Dep't Commerce Jun. 20, 2016) ("*Solar Cells AR2*"),

[6] *Id.*, at 29-30.

[7] *Id.,* at 30.

choice.[8] Even if the alternative prices for nitrogen submitted by Trina may not have satisfied Commerce's preference for broad-market averages as forcefully as the Thai GTA data, it does not follow that those facts are entirely irrelevant and can be dismissed. In *Blue Field (Sichuan) Food Industrial Co., Ltd. v. United States* ("*Blue Field*"), the Court explained the importance of benchmarking data for determining the reliability of surrogate values:

> Commerce may also review "benchmark" data to ensure the surrogate values it selects are reasonable. A benchmark is a product whose price roughly correlates with the price of an input assigned a surrogate value. Unlike surrogate values, however, benchmarks need not reflect the actual price of the inputs into foreign merchandise. Furthermore, benchmark data need not come from an economy comparable to the foreign producer's. *See Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1353, 1372 (2011).

949 F. Supp. 2d 1311, 1317 (Ct. Int'l Trade 2013).

Thus, Commerce cannot simply dismiss evidence without evaluating and explaining how it supports or detracts from its conclusions. Trina explains below how the alternative nitrogen information on the record of the third administrative review demonstrates that the Thai GTA import data was not the best available information.

But, before turning to that record evidence regarding alterative values and benchmarks, Trina will address a second line of its argument that was also dismissed in *Solarworld Americas, Inc. v. United States* regarding the inexplicable disparity between the United States exports to Thailand of nitrogen according to the official U.S. export data and the imports from the United States that Thailand reported to have been imported. In *Solarworld Americas, Inc. v. United States*, Trina explained that Commerce did not address the significant and inexplicable disparity between the reported Thai GTA imports of

---

[8] *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 37 CIT _, Slip Op. 13-30 at 10 (March 12, 2013).

nitrogen from the United States and the reported exports of nitrogen to Thailand by the United States.[9] This Court found that Commerce does not need to consider the U.S. export data to assess the reliability of the Thai import data.[10] Again, Trina respectfully disagrees.

The Thai GTA import data of nitrogen under harmonized tariff schedule ("HTS") classification 2804.30 reflects the same international trade as expressed in the U.S. ITC Dataweb export data for 2804.30, but for a lag for trade in transit that may have occurred at either the beginning or the end of the period examined. In its case brief, Trina enclosed the monthly data reported to represent Thailand's imports of nitrogen from the United States.[11] Enclosure 2 of Trina's Case Brief showed that the Thai GTA import value for nitrogen of over 291,443 USD exceeded the reported U.S. ITC Dataweb export value by over 115,000 USD.[12] But more importantly, the quantity reported to be imported into Thailand from the United States during this period was lower than the U.S. exports to Thailand during the same period by 786,249 kilograms.[13] The significant and inexplicable disparity between the reported Thai imports from the U.S. and the reported U.S. exports to Thailand results in a reported average Thai import price of U.S. nitrogen of $163.46/kg.[14] In contrast, the

---

[9] *Id.*, at 31.

[10] *Id.*

[11] Trina's Case Brief, page 17, (Jan 25, 2017), PR 531-534, and in Excel data of Enclosure 2 at PR 533.

[12] *Id.*

[13] *Id.*

[14] *Id.*

export price to Thailand reported by the ITC Dataweb U.S. data is $0.15/kg.[15]  Thus, the Thai import price for nitrogen from the U.S. exceeds the price for U.S. exports of nitrogen to Thailand by **96,238 percent**.  In its *Final Results*, Commerce dismissed Trina's argument stating that U.S. exports are inappropriate benchmarks and are not suitable for testing the validity of the selected surrogate value data.[16]  But, the U.S. export data to Thailand was not submitted as a benchmark price to assess the reliability of the Thai import price generally.  Rather, the two data sources are evidence of the exact same international trade of nitrogen and the two sources cannot be reconciled.  A reasonable mind could not conclude that both sets of data accurately reflect the same trade under HTS classification 2804.30.

Commerce went on to explain that it "does not expect one county's export quantities to be a one-to-one identical match to another country's import data."[17]  Trina agrees.  But, this is not a case of small differences between the U.S. export data and the Thai import data as detailed above.  If both sets of data (the U.S. export data and the Thai import data) are accurate reflections of the international trade of nitrogen, then what can possibly explain the enormously disparate value, quantity, and average unit prices between the Thai import data and the U.S. export data?  Again, the U.S. export price for nitrogen is not in of itself a benchmark to assess the reliability of the Thai import price for nitrogen.  Rather, the record of the underlying review possessed two sources of data for essentially the same international trade and those data are irreconcilable.  One must be incorrect.  In

---

[15] *Id.*

[16] *Issues and Decision Memorandum*, Comment 13, page 55.

[17] *Id.*

order to determine which set of data is accurately reflecting the quantity and value of nitrogen traded, Commerce should have attempted to determine which dataset was more reliable. Again, both sets of data could not have reasonably been considered reliable. Considering that the U.S. ITC Dataweb export data to Thailand is squarely within the range of the other prices on the record ranging from $0.06 to $0.19 per kilogram, the only reasonable conclusion is that the U.S. ITC Dataweb information is correct and the Thai data resulting in an average price of $9.36 per kilogram is flawed and unreliable.[18]

Other alternative surrogate values and sources on the record detract from the reliability of the Thai GTA import value. In its brief, Trina provided a summary of the information on the record of this review regarding the value of nitrogen.[19] The unreliability of the Thai import value for nitrogen is evident when comparing it to the other information on the record. SolarWorld submitted a Thai import value total of $1,244,402 and a total import quantity of only 132,940 kilograms, resulting in an astoundingly overstated price of **$9.36/kg** for nitrogen.[20] In comparison, Trina provided <u>actual</u> invoices for nitrogen in Thailand to three different companies in different locations in Thailand with a total value of $4598.61 and total quantity of 38,739.09 kilograms, thus demonstrating an average price of **$0.12/kg**.[21] Trina also provided a separate price quote for nitrogen in Thailand that listed a price of **$0.07/kg**.[22] The import statistics for the

---

[18] Trina's Case Brief, page 18, PR 531.

[19] Trina's Case Brief, page 18, PR 531, and PR 533 **Enclosure 1** includes two sections – SOURCES and TABLES. The SOURCES section contains citations to the record for each entry.

[20] *Id.,* Source 1.

[21] *Id.,* Source 2.

[22] *Id.,* Source 3.

five other countries identified as economically comparable amount to a total of 45,384,242 kilograms at an average price of **$0.19/kg**.[23] Finally, the U.S. export price for nitrogen exported to Thailand based on 788,319 kilograms exported (discussed above) was **$0.15/kg**.[24]

The average prices evidenced in the three alternative surrogate value sources other than the Thai import data on the record are tightly clustered from $0.07/kg - $0.19/kg. And the U.S. export price to Thailand during the POR approximates this range of prices. At the same time, the Thai import price is **4907% higher** than the average price from the three other sources on the record to value nitrogen.[25]

Commerce did not confront these facts. Rather, they simply stated that they do not find these to be appropriate benchmarks.[26] Ignoring all other information on the record, Commerce continued to rely on the Thai import price for nitrogen solely based on the recognition that other country's import prices for nitrogen where higher than the price purportedly imported into Thailand.[27] However, those countries reporting extremely high prices for nitrogen, South Africa, Ecuador, and Thailand, account for only 0.33% of all imports from the six economically comparable countries during the period of review.[28] In other words, the Thai import value for nitrogen is more than **5100%** higher than 99.67% of all imports into the 6 countries identified as

---

[23] *Id.*, Source 4.

[24] *Id.*, Source 5.

[25] *Id.*, Table 2.

[26] Issues and Decision Memorandum, Comment 13, page 53.

[27] *Id.*

[28] *Id.*, Table 4.

economically comparable to China.[29]

Given the unreliability of the Thai GTA import data for nitrogen, Commerce must use other information on the record to value Trina's nitrogen consumption. In its brief, Trina proposed three alternatives.[30] Each of those alternatives are corroborated by reliable information on the record and would more accurately establish Trina's antidumping margin, which is the purpose of the surrogate valuation of factors of production.[31]

### B. Commerce's Surrogate Value for Coated Glass Was Not the Best Available Information

In the *Final Results*, Commerce valued Trina's coated glass factor of production using imports into Thailand under classification 7007.19.90000.[32] Trina had proposed that the Department value its coated glass using 7005.29. 90001.[33] The classification proposed by Trina covers float glass…other…other…for a glass of a thickness not exceeding 5 mm.[34] The classification used by the Department covers safety glass consisting of toughened (tempered) glass…other…other.[35]

---

[29] *Id.*, Table 4, Thai Price of $9.36/kg is a 5,118 percent increase over the average price of $0.1829/kg into Mexico, Bulgaria, and Romania, which represent 99.67% of all imports into the 6 countries.

[30] Trina's Case Brief, page 18, PR 531.

[31] *See e.g., Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

[32] *Issues and Decision Memorandum*, Comment 12, page 45.

[33] *See e.g.,* Trina's Case Brief, page 14, PR 531.

[34] *Id.*

[35] *Id.*

Trina described its glass factors as being of float glass that were tempered and provided detailed specifications regarding the glass thickness.[36] As indicated in Trina's response, all of Trina's glass was less than 5 mm in thickness.[37] So, while the coated glass consumed by Trina was tempered, the 7005.29.90001 classification is more specific to the glass consumed by Trina because the classification is more closely aligned with the thickness of glass consumed by Trina.

However, in the *Final Results*, Commerce dismissed the lack of specificity of its chosen surrogate value asserting, "the lack of specificity regarding thickness in HTS category 7007.19.90000 indicates that this HTS category covers all thickness levels including the thickness of Trina's module glass."[38] Thus, although Commerce agreed that the classification proposed by Trina was more specific to the coated glass consumed by Trina with regard to glass thickness, Commerce did not consider the degree to which the superior specificity on this point outweighed its reasons for selecting the overly-broad classification of "toughened (tempered) glass…other…other." The thickness of the material is such a fundamental characteristic that it should be considered when assessing the specificity of competing surrogate value choices.[39]

The superior glass thickness specificity of the classification proposed by Trina, together with the general unreliability of the information contained in Thai GTA import classification for

---

[36] *Id., citing,* Trina 3rd Supplemental Response, page 4 and Exhibit 8 (July 8, 2016), CR 332 and CR 342.

[37] *Id.,* at Exhibit 8, CR 342.

[38] *Issues and Decision Memorandum*, Comment 12, page 46.

[39] *See e.g.*, *CS Wind Vietnam Co., Ltd. v. U.S.,* 36 ITRD 1164, 2014 WL 5510084, Slip-Op. 14-128, page 4 (CIT 2014), (wherein, the Court sustained Commerce's remand determination to rely on data other than GTA data, in part, because the surrogate value source chosen was specific to the thickness of the steel plate consumed by the respondent).

7007.19.90000 as argued by other respondent interested parties, should have caused Commerce to select 7005.29.90001 as the appropriate surrogate value for Trina.

Plaintiffs in this consolidated action, Canadian Solar International Limited; Canadian Solar (USA), Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Cells Co., Ltd.; CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd.; and CSI Solar Power (China) Inc. (collectively, "Canadian Solar"), are filing today a USCIT Rule 56.2 motion for judgment upon the agency record and memorandum in support of the motion seeking an order from Court that Commerce's reliance on HTS classification to value the solar glass with HTS classification 7007.19.90000 lacks a basis in substantial evidence and is otherwise contrary to law. In the interest of judicial economy, Trina hereby joins and incorporates by reference the arguments made by Canadian Solar with respect to unreliability of the data under classification 7007.19.90000 and the suggested alternatives that are better supported by evidence in the record. Trina requests that the Court apply those arguments to the issues raised by Trina with respect to the proper valuation of solar glass.

### C. Commerce Should Not Have Included Import Data in Its Calculation of Surrogate Values Where Import Values Were Reported With No Corresponding Import Quantities

Plaintiffs challenge again Commerce's determination to include import data for which no import quantities existed in the calculation of surrogate values based on import data. Trina raised the same issue in the civil action contesting the final results of the second administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from China and the first administrative review of the antidumping

duty order covering photovoltaic products from China.[40]  In *Solarworld Americas, Inc. v. United States*, the Court remanded the issue back to Commerce concluding,

> There may be a reasonable explanation as to why the zero-quantity imports have values that are not within range of low-quantity inputs elsewhere in the database. But Commerce has not provided such an explanation here. Without further explanation, Commerce's assumption that the zero quantities were the result of rounding is not reasonable.

*Solarworld Americas, Inc.*, CIT Slip-Op 17-143, page 34.

In the *Final Results*, Commerce relied on the same conclusion it reached in *Solar Cells AR2*: that zero quantity imports are attributable to rounding small import quantities to zero.[41] But like its decision in *Solar Cells AR2,* Commerce's decision did not provide any explanation or reference to facts to support its assumption.

In the *Final Results*, Commerce further explained its decision **not** to exclude import values with zero import quantities from its surrogate value calculations with its conclusion that "there are no imports in the data with a zero value."[42]  But Commerce's conclusions are not based on substantial evidence.  There is no information on the record showing that shipments of "small import quantities" or even just shipments of only less than 0.49 kilograms were rounded down to zero.  In fact, it is anyone's guess as to whether the zero quantities represent mistakes, omissions, rounding down of quantities, or something else entirely.  At a minimum, it is reasonable to conclude that importations cannot occur with value but no quantity – even Commerce has not gone so far as to make that assumption – but any other conclusion is speculation, and Commerce determinations may not be based on conjecture.  Commerce claimed

---

[40] *See Solarworld Americas, Inc. v. United States*, 2017 WL 4844276, CIT Slip Op. 17-143, (Oct 17, 2017).
[41] *Decision Memorandum*, Comment 23, page 86.
[42] *Id.*

that "if the zero quantities were the result of errors, we would expect such errors to also occur with respect to the reported *value* in at least some instances,[43] but Commerce provides no support for this assumption, either.

Trina demonstrated that instances of observations being expressed with zero quantity were far more prevalent than other low quantity observations and, thus, were likely not to be attributable to rounding.[44] But rather than identify evidence to confront the evidence that Trina presented, Commerce simply stated, "we do not believe this line of reasoning demonstrates that rounding cannot explain the zero quantity imports."[45]

As in *Solar Cells AR2*, the record in this review cannot support a determination that all, or even most, of the zero quantity imports are attributable to rounding. Therefore, Commerce should have excluded all instances of zero import quantities from the surrogate value calculations. Even if some of the instances of zero quantity imports are attributable to rounding, excluding those data from the surrogate value calculation would not distort the resulting average calculations because the impact of excluding zero quantities attributable to rounding is negligible and therefore does not distort the overall AUV calculated. In contrast, **including** reported zero quantities and corresponding positive values when the import quantities are not reported for some other (unknown) reason can have a significant impact on the resulting surrogate values calculations. Therefore, when Commerce calculated surrogate values using import statistics, it should have excluded all instances of zero quantity imports with corresponding values from its

---

[43] *Id.*

[44] Trina's Case Brief, pages 21-22, (Jan 25, 2017), PR 531-534, relevant pages at PR 532 and in Excel data of Enclosure 3 at PR 534.

[45] *Decision Memorandum*, Comment 23, page 87.

calculations. Commerce's failure to do so resulted in the import data-generated surrogate values used by Commerce to value factors of production not being based on substantial evidence.

> **D.  Commerce Should Have Included the Debt-Restructuring Line Item in the Calculation of TUS's U.S. Indirect Selling Expense Ratio**

Commerce's decision to exclude TUS's debt restructuring income as an offset to its indirect selling expenses (in the calculation of TUS's indirect selling expense ratio) was arbitrary and contrary to established agency practice. When considering a U.S. affiliate that is engaged only in selling activities, it is Commerce's long-standing practice to treat all of its selling, G&A, and financial expenses and income as related to sales.

For more than 25 years, Commerce consistently has held that all activities of an entity that functions solely as a selling entity are related to sales. In *Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 Fed. Reg. 49622 (Sept. 28, 2001), the Department explained that "because this affiliate ... is a selling entity, it is appropriate to include G&A expenses incurred by the entity in the selling expense calculation."[46]  Accordingly, because Commerce includes all G&A expenses, as well as interest income and expenses, of a U.S. sale's arm in the calculation of U.S. indirect selling expenses, all of TUS's non-direct selling expenses and non-sales income related to company operations – including interest income and debt restructuring income – are appropriately treated as indirect selling expenses. This practice does not reflect a finding that all expenses and income for all U.S. companies are invariably indirect selling expenses. Instead, it reflects the common-sense proposition that the expenses for administering a

---

[46] *See also Melamine Institutional Dinnerware Products from the People's Republic of China*, 62 Fed. Reg. 1708, 1710 (Jan. 13, 1997) (Comment 18) (all expenses not treated as direct selling or movement expenses should be included in indirect selling expenses); *Sweaters Wholly or in Chief Weight of Man-Made Fiber from the Republic of Korea*, 55 Fed. Reg. 32659 (August 19, 1990).

sales operation are necessarily sales administration costs, which the Department routinely classifies as indirect selling expenses in any market.[47]

Indirect selling expenses are expenses which neither result from, nor bear a direct relationship to, a particular sale and because they are not directly related to a particular sale, indirect selling expenses "do not vary with the quantity sold."[48]  Because such expenses cannot be tied to a particular sale, indirect selling expenses in general are allocated to all sales in a particular market.  In the *Final Results*, Commerce agreed with Trina's basic proposition that debt-restructuring income should be considered as an offset to indirect selling expenses.[49]  But, Commerce concluded that it was not possible to determine the current portion of the debt-restructuring income covering only the period of review.[50]  Commerce thus disallowed any portion of the debt-restructuring income as an offset indirect selling expenses.  As an initial matter, Commerce's conclusion that the debt-restructuring line-item was not related to the current period was based on speculation and thus lacks a basis in substantial evidence.  Moreover, having agreed that it is appropriate to offset indirect selling expenses with debt-restructuring income, Commerce's decision to disallow the offset entirely was arbitrary and unreasonable.

---

[47] *See, e.g., Orange Juice from Brazil*, 74 Fed. Reg. 40167 (August 11, 2009) (Issues and Decision Memorandum, Comment 4, available at https://enforcement.trade.gov/frn/summary/BRAZIL/E9-19223-1.pdf) (wherein, Commerce recalculated the respondent's "indirect selling expenses to include financing expenses, offset by interest income").

[48] *Zenith Electronics v. United States*, 77 F.3d 426, 431 (Fed. Cir. 1996).

[49] *Decision Memorandum*, Comment 22, page 85.

[50] *Id.*

In its first supplemental questionnaire on Section C, Commerce asked Trina about the debt-restructuring income line-item, but never inquired to determine the extent to which the debt-restructuring was properly attributable to the current period. Instead, Commerce requested that Trina respond to the following,

> If you believe it is correct to reduce reported indirect selling costs by the costs of debt restructuring please state why this is the case. However, in doing so, please address the Department's concern that the reported adjustment is indirect selling costs and the costs of debt restricting do not appear to be related to indirect selling costs.

Trina Supplemental Section C Response, June 21, 2016, PR 286, Bar Code 3480083-01.

After receiving Trina's response, Commerce did not inquire again regarding the debt-restructuring income line item; nor did petitioners comment on the subject again until their case brief. Thus, neither Commerce nor any other interested party raised any concern that the debt-restructuring income line item on Trina US's income statement was not properly attributable to the current period. The only facts on the record as to whether the debt-restructuring line-item related to the current period is that the line-item was listed on TUS's income statement for the current period. Thus, Commerce's concern, expressed for the first time in the *Final Results*, that the income might not relate entirely to the current period is purely speculative and should not be sustained.

## IV.  CONCLUSION

For the reasons set forth above, the *Final Results* and as amended in the *Amended Final Results* issued by Commerce in the administrative review involving Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China are not supported by substantial evidence. Plaintiffs respectfully request that this Court reverse and remand this case to Commerce with instructions to recalculate Trina's margin after

making changes necessary (1) to accurately value the nitrogen consumed by Trina; (2) to accurately value the glass consumed by Trina (3) to calculate surrogate values that do not rely on import values that have no corresponding import quantities; and (4) to include the debt-restructuring line item in TUS's income statement in the calculation of indirect selling expenses.

Respectfully submitted,

/s/ Jonathan M. Freed
Robert G. Gosselink
Jonathan M. Freed

**TRADE PACIFIC PLLC**
660 Pennsylvania Avenue, SE, Suite 401
Washington, D.C.  20003
(202) 223-3760

Counsel to Consolidated Plaintiffs, Trina

March 7, 2018