Slip Op. 19-47

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CANADIAN SOLAR INTERNATIONAL LIMITED ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| **and** | |
| **SHANGHAI BYD CO., LTD. ET AL.,** | |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 17-00173** |
| **UNITED STATES,** | **PUBLIC VERSION** |
| **Defendant,** | |
| **and** | |
| **SOLARWORLD AMERICAS, INC. ET AL.,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's determination in the third administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: April 16, 2019

Craig Anderson Lewis and Jonathan T. Stoel, Hogan Lovells US LLP, of Washington, DC, for Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Solar Power (China) Inc.; CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd.; CSI Cells Co., Ltd.; and Canadian Solar (USA) Inc.  With them on the brief was Michael G. Jacobson.

David John Craven, Sandler, Travis & Rosenberg, PA, of Washington, DC, for Ningbo Qixin Solar Electrical Appliance Co., Ltd.

Craig Anderson Lewis, Hogan Lovells US LLP, of Washington, DC, for Shanghai BYD Co., Ltd.

Jonathan M. Freed, Trade Pacific, PLLC, of Washington, DC, argued for Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science & Technology Co., Ltd.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; Hubei Trina Solar Energy Co., Ltd.; and Trina Solar (U.S.) Inc.  With him on the brief was Robert George Gosselink.

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, DC, for SolarWorld Americas, Inc. With him on the brief were Laura El-Sabaawi and Usha Neelakantan.

Neil R. Ellis, Sidley Austin, LLP, of Washington, DC, for Yingli Green Energy Holding, Co., Ltd.; Baoding Tianwei Yingli New Energy Resources Co., Ltd.; Tianjin Yingli New Energy Resources Co., Ltd.; Hengshui Yingli New Energy Resources Co., Ltd.; Lixian Yingli New Energy Resources Co., Ltd.; Baoding Jiasheng Photovoltaic Technology Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd.; Hainan Yingli New Energy Resources Co., Ltd.; Shenzhen Yingli New Energy Resources Co., Ltd.; Yingli Green Energy International Trading Co., Ltd.; Yingli Green Energy Americas, Inc.; and Yingli Energy (China) Co., Ltd.  With him on the brief were Richard L.A. Weiner, Rajib Pal, David P. Lyons, Shawn M. Higgins, and Justin R. Becker.

Tara Kathleen Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Assistant Director.  Of Counsel on the brief was Mercedes C. Morno, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:  Before the court are several motions for judgment on the agency record challenging various aspects of the U.S. Department of Commerce's ("Commerce" or "the Department") determination in the third administrative review of the antidumping duty ("ADD") order on crystalline silicon photovoltaic products, whether or not assembled into modules, from the People's Republic of China ("the PRC").  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic

of China, 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017) (final results of [ADD] administrative review and final determination of no shipments; 2014–2015) ("Final Results") and accompanying Issues and Decision Mem. for the Final Results of the 2014–2015 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From [the PRC], A-570-979, (June 20, 2017), ECF No. 44-5 ("Final Decision Memo").

For the reasons that follow, the court sustains Commerce's selection of surrogate values for aluminum frames, nitrogen, polysilicon ingots and blocks, and financial ratios. The court also sustains Commerce's decision to include import data with reported zero quantities in its calculation of surrogate values and its decision to exclude Trina U.S.'s debt restructuring income as an offset to its indirect selling expenses. The court remands Commerce's selection of surrogate value for module glass, Commerce's application of an adverse inference in calculating Canadian Solar's dumping rate, and Commerce's rejection of Ningbo Qixin Solar Electrical Appliance Co., Ltd.'s ("Qixin") separate rate application.

## BACKGROUND

On February 9, 2016, Commerce initiated the third administrative review of the ADD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, for which the period of review would be December 1, 2014 through November 30, 2015. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 6,832, 6,835 (Dep't Commerce, February 9, 2016). On March 28, 2016, after determining that it would not be practicable to examine

individually each company for which a review was initiated, Commerce selected Canadian

Solar International Limited[1] and the collapsed entity of Trina Solar, comprised of

Changzhou Trina Energy Co., Ltd. and Trina Solar (Changzhou) Science and Technology

Co., Ltd.[2] as mandatory respondents.  See Respondent Selection Mem. at 6, PD 155, CD

104, bar code 3452853-01 (Mar. 28, 2016).[3]

On December 22, 2016, Commerce published the preliminary results of the third

administrative review.  See Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, From [the PRC], 81 Fed. Reg. 93,888 (Dep't Commerce Dec.

22, 2016) (preliminary results of [ADD] administrative review and preliminary

---

[1] Commerce initially selected Canadian Solar International Limited, Respondent Selection Mem. at 5–6, PD 155, CD 104, bar code 3452853-01 (Mar. 28, 2016), but subsequently determined that the following companies were affiliated and should be treated as a single entity for the purposes of the administrative review: Canadian Solar International Limited, Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., and CSI Solar Power (China) Inc.  See Decision Mem. for Preliminary Results of the 2014–2015 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From [the PRC] at 6, A-570-979, PD 499, bar code 3530538-01 (Dec. 16, 2016) ("Prelim. Decision Memo"); see also Affiliation & Single Entity Mem. for Canadian Solar International Limited at 8, PD 516, CD 582, bar code 3533001-01 (Dec. 16, 2016).

[2] Commerce initially selected the collapsed entity of Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science and Technology Co., Ltd., but subsequently determined the following companies were affiliated and treated them as a single entity: Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science and Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd.  Final Decision Memo at 2 n.3; see also Prelim. Decision Memo at 1.

[3] On October 26, 2017, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF No. 44-2–3.  Citations to the administrative record documents in this opinion are to the numbers assigned to the documents by Commerce in these indices.  References to the public administrative record are in the form of "PD," and references to the confidential administrative record are in the form of "CD."

determination of no shipments; 2014–2015) ("<u>Preliminary Results</u>") and accompanying

Decision Mem. for Prelim. Results of the 2014–2015 [ADD] Administrative Review of

Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From [the

PRC], A-570-979, PD 499, bar code 3530538-01 (Dec. 16, 2016) ("Prelim. Decision

Memo").

On June 27, 2017, Commerce published the final determination.  <u>See</u> <u>Final</u>

<u>Results</u>, 82 Fed. Reg. at 29,033.  Commerce selected Thailand as the primary surrogate

country for valuing the mandatory respondents' factors of production ("FOP"), <u>see</u>

<u>generally</u> Final Decision Memo, and adopted surrogate values for, <u>inter alia</u>, semi-finished

polysilicon ingots and blocks, aluminum frames, module glass, nitrogen, and overhead

and financial expenses.  Final Decision Memo at 21–22, 35–38, 45–50, 52–55, 66–71.

Commerce applied partial AFA in calculating Canadian Solar International Limited's

antidumping margin due to the failure of unaffiliated solar cell and solar module suppliers

to provide FOP information.  Final Decision Memo at 15–18.  Commerce excluded Trina

U.S.'s debt restructuring income from its calculation of Trina's U.S. indirect selling

expense ratio.  <u>Id.</u> at 84–85.  Commerce included in the average unit surrogate value

calculations import data with reported quantities of zero, finding "no basis to conclude that

the zero quantity import data . . . are errors or that these zero quantity imports result in

unreliable and distortive [surrogate values]."  Final Decision Memo at 86–87.  Finally,

Commerce rejected Qixin's separate rate application and assigned it the China-wide rate.

Final Decision Memo at 90–92.

**PUBLIC VERSION**

On July 7, 2017, Plaintiffs Canadian Solar International Limited; Canadian Solar (USA), Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Cells Co., Ltd.; CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd.; and CSI Solar Power (China) Inc. (collectively, "Canadian Solar") commenced this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).[4]  Summons, July 7, 2017, ECF No. 1; Compl., July 7, 2017, ECF No. 8.   Canadian Solar moves for judgment on the agency record, challenging three aspects of the Final Results.  Specifically, Canadian Solar challenges: 1) Commerce's application of partial AFA with respect to missing supplier information; 2) Commerce's use of import data under Thai Harmonized Tariff Schedule ("HTS") 7007.19.90000 to value Canadian Solar's module glass consumption; and 3) Commerce's use of import data under Thai HTS 2804.30.00000 to value its nitrogen consumption.  See Mem. Points & Authorities Supp. Mot. J. Agency R. at 10–41, Mar. 7, 2018, ECF No. 54-1 ("Canadian Solar's Br.").

This action was consolidated with actions brought by Qixin, Shanghai BYD Co., Ltd. ("BYD"), Changzhou Trina Solar Energy Co., Ltd. et al. ("Trina"),[5] SolarWorld

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[5] The following parties are plaintiffs in the action Changzhou Trina Solar Energy Co., Ltd. v. United States, Ct. No. 17-00197, which has been consolidated with the present action: Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science & Technology Co., Ltd.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; Hubei Trina Solar Energy Co., Ltd.; and Trina Solar (U.S.) Inc.

Americas, Inc. ("SolarWorld"),[6] and Sunpreme Inc.  See Order, Sept. 26, 2017, ECF No.

41.[7]  Consolidated Plaintiffs and Plaintiff-Intervenors filed motions for judgment on the

agency record, Mot. J. Agency R., Mar. 7, 2018, ECF No. 52; Pls.' R. 56.2 Mot. J. Agency

R., Mar. 7, 2018, ECF No. 55; Mot. J. Agency R., Mar. 7, 2018, ECF No. 56; [SolarWorld's]

Mot. J. Agency R., Mar. 7, 2018, ECF No. 57; Mot. J. Agency R., Mar. 7, 2018, ECF No.

60, each challenging various aspects of Commerce's Final Results.  See Mem. Supp.

Mot. J. Agency R. Submitted by Pl. Pursuant to R. 56.2 R. U.S. Ct. Int'l Trade, Mar. 7,

2018, ECF No. 52-1 ("Qixin's Br."); Mem. Supp. Mot. [Trina] J. Agency R., Mar. 7, 2018,

ECF 55-1 ("Trina's Br."); [SolarWorld's] Mem. Supp. R. 56.2 Mot. J. Agency R., Mar. 8,

2018, ECF No. 63 ("SolarWorld's Br.").  Specifically, Qixin challenges Commerce's denial

of its separate rate application in the Final Results after omitting any reference to Qixin in

the Preliminary Results.  Qixin's Br. at 6–15.  Trina challenges: 1) Commerce's use of

Thai import data to value nitrogen; 2) Commerce's use of Thai import data to value

module glass; 3) Commerce's decision to include in its calculation of surrogate values

import data with no corresponding quantities; and 4) Commerce's exclusion of Trina

U.S.'s debt restructuring income in its calculation of Trina's U.S. indirect selling expense

---

[6] SolarWorld is a Defendant-Intervenor in the present action, as well as each of the consolidated actions other than SolarWorld Americas, Inc. v. United States (Ct. No. 17-00200), in which it is the plaintiff.

[7] The court's September 25, 2017 order consolidated the following cases under the present action: Ningbo Qixin Solar Electrical Appliance Co., Ltd. v. United States, Ct. No. 17-00187; Shanghai BYD Co., Ltd. v. United States, Ct. No. 17-00193; Changzhou Trina Solar Energy Co., Ltd. et al. v. United States, Ct. No. 17-00197; SolarWorld Americas, Inc. v. United States, Ct. No. 17-00200; and Sunpreme Inc. v. United States, Ct. No. 17-00201.  Order, Sept. 26, 2017, ECF No. 41. Sunpreme Inc.'s action was severed from the present consolidated case on March 8, 2018.  See Order, Mar. 8, 2018, ECF No. 61 (severing Ct. No. 17-00201 from Consol. Ct. No. 17-00173).

ratio. Trina's Br. at 4–19.[8] SolarWorld challenges: 1) Commerce's selection of Thai HTS 7604.29.90001 data to value the respondents' aluminum frames; 2) Commerce's surrogate value selection for module glass; 3) Commerce's selection of Styromatic's 2015 financial statements as best available information to calculate the respondents' overheard, selling, general and administrative expenses, and profit; and 4) Commerce's surrogate value selection for respondents' semi-finished polysilicon ingots and blocks. SolarWorld's Br. at 10–32.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an [ADD] order. "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[8] As separate rate respondents in the third administrative review, Consolidated Plaintiff-Intervenors Yingli Green Energy Holding Co., Ltd.; Yingli Green Energy Americas, Inc.; YIngli Energy (China) Co., Ltd.; Baoding Tianwei Yingli New Energy Resources Co., Ltd.; Tianjin Yingli New Energy Resources Co., Ltd.; Hengshui Yingli New Energy Resources Co., Ltd.; Lixian Yingli New Energy Resources Co., Ltd.; Baoding Jiasheng Photovoltaic Technology Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd.; Hainan Yingli New Energy Resources Co., Ltd.; Shenzhen Yingli New Energy Resources Co., Ltd.; and Yingli Green Energy International Trading Co., Ltd. (collectively "Yingli") and Plaintiff-Intervenor and Consolidated Plaintiff-Intervenor BYD support the arguments made by Canadian Solar and Trina. Mot. J. Agency R. at 2, Mar. 7, 2018, ECF No. 56; Mem. Supp. R. 56.2 Mot. J. Agency R. Pl.-Intervenor & Consol. Pl.-Intervenor [BYD] at 9–10, Mar. 7, 2018, ECF No. 60-1.

**DISCUSSION**

Plaintiffs and Consolidated Plaintiffs challenge a total of five of Commerce's surrogate value determinations in the <u>Final Results</u> and raise four additional challenges. The court first addresses the arguments that Commerce's surrogate value selections for module glass, aluminum frames, nitrogen, semi-finished polysilicon ingots and blocks, and overhead, selling, general and administrative expenses, and profit are contrary to law and/or unsupported by substantial evidence.   The court then addresses the arguments regarding the application of partial AFA, the decision to include import data with reported zero quantities in the calculation of surrogate values, the exclusion of Trina's debt restructuring income in its calculation of Trina's U.S. indirect selling expense ratio, and the rejection of Qixin's separate rate application in the <u>Final Results</u>.

### I.  Surrogate Value Selection

Plaintiff and Consolidated Plaintiffs challenge Commerce's surrogate value selection for module glass, aluminum frames, nitrogen, semi-finished polysilicon ingots and blocks, and overhead, selling, general and administrative expenses, and profit as unsupported by substantial evidence.   The court addresses each of these challenges in turn.

### A.  Module Glass

Trina argues that Commerce's selection of tempered glass under Thai HTS 7007.19.90000 over float glass under Thai HTS 7005.29.90001 to value Trina's module glass was unsupported by substantial evidence because the float glass classification specified the thickness of module glass consumed by Trina.  <u>See</u> Trina's Br. at 2, 12–14.

**PUBLIC VERSION**

SolarWorld argues that Commerce's selection of Thai import data for tempered glass over

laminated glass was unsupported by substantial evidence because tempered glass fails

to account for the additional surface treatments of module glass. See SolarWorld's Br. at

3, 19–21.[9]   Canadian Solar argues that Commerce's selection of the Thai data for

tempered glass is unsupported by substantial evidence because the Thai data used by

Commerce was aberrational.   See Canadian Solar's Br. at 3, 19–31.[10]   Defendant

responds that Commerce's decision is reasonable, as the Thai import data for tempered

glass satisfied all of Commerce's surrogate value criteria and was not aberrational. See

Def.'s Resp. Opp'n Pl.'s Mot. J. Agency R. at 6, 12–21, July 30, 2018, ECF No. 71 ("Def.'s

Br.").   For the reasons that follow, Commerce's selection of tempered glass over float

glass and laminated glass is reasonable.   Commerce's decision to use the Thai import

data for tempered glass, however, is unsupported by substantial evidence and is

remanded to Commerce for further consideration.

---

[9] In SolarWorld's response to the arguments of the plaintiffs and consolidated plaintiffs that Commerce's valuation of module glass was unreasonable, SolarWorld states that it "believes Commerce's surrogate valuation of module glass should be affirmed." See Resp. Br. of Def.-Int. SolarWorld Americas, Inc. at 29, July 31, 2018, ECF No. 73 ("SolarWorld's Resp."). SolarWorld does not clarify whether in making this statement it intended to abandon its claim that the laminated glass subheading should have been used to value the respondents' module glass input. As SolarWorld restates in its reply its argument that Commerce's selection of tempered glass subheading to value module glass "substantially undervalued this input," the court understands SolarWorld to not have abandoned its challenge to Commerce's use of the tempered glass subheading. See Reply Br. of Pl. SolarWorld Americas Inc. at 9–10, Oct. 5, 2018, ECF No. 84.

[10] Trina joined and incorporated Canadian Solar's arguments with respect to the unreliability of Commerce's selected surrogate value data. See Trina's Br. at 14.

Where the subject merchandise is exported from a nonmarket economy country, Commerce calculates normal value based on FOPs.   19 U.S.C. § 1677b(c)(1). Commerce uses "the best available information" to value the FOPs, id., and has discretion to determine what constitutes the best available information, as this term is not defined by statute.   QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011). However, Commerce must ground its determination in the objective of the statute: to calculate accurate dumping margins.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also Parkdale Int'l v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).    Commerce generally selects surrogate values that are publicly available, are product specific, reflect a broad market average, and are contemporaneous with the period of review.   Qingdao Sea–Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Apr. 11, 2019) ("Policy Bulletin 04.1").  Commerce's practice is to avoid using aberrational values as surrogate values.  See generally Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997).

In this review, Canadian Solar reported using solar module glass, and Trina reported using coated glass and tempered glass (collectively, "module glass"), as FOPs. See Final Decision Memo at 45.  The record contained Thai import data for tempered glass (HTS 7007.19.90000), float glass (HTS 7005.29.90001), and laminated glass (HTS 7007.29.90).   Id.   Here, Commerce reasonably selected tempered glass as the best

available information to value the respondents' module glass inputs because record information and the respondents' descriptions indicated the module glass consumed by the respondents was tempered.   See Final Decision Memo at 45–46.  Commerce reasonably determined the laminated glass subheading was not the best available information because laminated glass is composed of "multiple layers of glass and plastic" and there was no evidence that such properties are present in the respondents' module glass inputs.   See Final Decision Memo at 46–47.

SolarWorld maintains that Commerce's choice of tempered glass as a surrogate value substantially undervalued the module glass input because only laminated glass captures the additional costs associated with the surface treatments used on the respondents' module glass to increase its strength, safety, and durability.   See SolarWorld's Br. at 19–21.  SolarWorld's argument fails, however, as SolarWorld does not provide any evidence establishing that this surface treatment is comparable to the layering of laminated glass.   See Final Decision Memo at 47.

Commerce also reasonably selected tempered glass over float glass to value Trina's module glass input because, although the float glass subheading more closely aligned with the thickness of Trina's input, the tempered glass subheading's lack of specification as to thickness indicated that it covered all thicknesses, including that consumed by Trina.   Final Decision Memo at 46.  Trina maintains Commerce failed to weigh the comparative importance of thickness against other factors in favor of selecting tempered glass.   See Trina's Br. at 13.  However, it is clear from Commerce's explanation that Commerce gave significant weight to the description by the parties that their module

glass was tempered. See Final Decision Memo at 45–46. It is also clear that Commerce gave weight to the fact that the tempered glass subheading did not exclude the products with a thickness matching Trina's input. See Final Decision Memo at 45–46. The court will not reweigh the evidence, and Trina's argument thus fails.

However, while Commerce's choice of the tempered glass subheading to value Trina's and Canadian Solar's module glass is supported by substantial evidence, Commerce failed to provide a reasonable explanation as to why the Thai import data for tempered glass was not distorted by a small quantity of unusually costly imports from Hong Kong. Hong Kong imports accounted for only 0.4% of the total volume of Thai import data but constituted 60.2% of the total value of Thai imports during the period of review. See Final Decision Memo at 49; see also Thai Tempered Glass [attached as Ex. FR-1 to Canadian Solar's Oct. 31, 2016 Submission], PD 463–64, bar code 3518110-01 (Oct. 31, 2016). The average unit value ("AUV") for tempered glass imported into Thailand was $2.79 with the Hong Kong data, whereas excluding the Hong Kong data results in an AUV of only $1.11. Id.

The court addressed this same issue in SolarWorld II in the proceedings concerning the second administrative review of the ADD order covering crystalline silicon photovoltaic cells. See Canadian Solar's Br. at 22–24; see also Canadian Solar's Reply Br. at 5; see also SolarWorld Americas, Inc. v. United States, 42 CIT __, 320 F. Supp. 3d 1341 (2018) ("SolarWorld II"). In SolarWorld II the Court ordered Commerce to further explain on remand why Commerce's selection of Thai import data for tempered glass was reasonable in light of record evidence that imports from Hong Kong made up only 1.6%

of the total volume but accounted for 75% of the total value.  See <u>SolarWorld II</u>, __ CIT

at __, 320 F. Supp. 3d at 1354–55.  The court held that it was not clear that Commerce

had established a consistent practice of only assessing whether a surrogate value was

aberrant in the aggregate, and that regardless, even if it was a consistent practice,

Commerce had failed to explain how that practice was reasonable in light of the concerns

raised by the Hong Kong imports as to the accuracy of the Thai data as a whole.  See <u>id.</u>,

320 F. Supp. 3d at 1352–56 (noting Commerce's reliance on Issues and Decision Mem.

For the Final Results of the 2012–2013 Admin. Review of Multilayered Wood Flooring

from    [the    PRC]    at    41–43,    A–570–970    (July    8,    2015),    <u>available    at</u>

https://enforcement.trade.gov/frn/summary/prc/2015-17368-1.pdf  (last  visited  Apr.  11,

2019) ("Wood Flooring")).  Commerce's remand redetermination abandoning the use of

the Thai data for tempered glass was later sustained.  See <u>SolarWorld Americas, Inc. v.</u>

<u>United States</u>, 42 CIT __, 355 F. Supp. 3d 1306 (2018).  The reasoning in <u>SolarWorld II</u>

applies with equal force to the present proceedings.[11]

---

[11] SolarWorld argues that <u>SolarWorld II</u> is not relevant because in that case "the court appears to
have been principally concerned with Commerce's citation of, and reliance on, [Wood Flooring],
which did not appear to support the agency's characterization of its practice of considering AUV
data in the aggregate."  <u>See</u> SolarWorld's Resp. at 25.  In the remand results considered in
<u>SolarWorld II</u>, Commerce sought to rely on Wood Flooring as evidence that it was Commerce's
practice only to consider the aggregate AUV of a data source in assessing whether it is
aberrational.  <u>See</u> <u>SolarWorld II</u>, 42 CIT at __, 320 F. Supp. 3d at 1353.  The court observed,
however, that Wood Flooring did not evidence a practice of assessing allegedly aberrational data
only in the aggregate, because in Wood Flooring Commerce explained why the allegedly
aberrational inputs were representative of market prices by assessing the share each input
represented of the aggregate data.  <u>See</u> <u>SolarWorld II</u>, 42 CIT at __, 320 F. Supp. 3d at 1353.

(footnote continued)

Commerce argues that the "relevant test is to determine whether the AUV in aggregate is aberrational,"[12] as otherwise "parties would advocate the manipulation of data by removing one or more lines they find objectionable."  Final Decision Memo at 47. As in <u>SolarWorld II</u>, although this approach may be reasonable in other cases, it is not reasonable on this record without further explanation.[13]  <u>See</u> <u>SolarWorld II</u>, 42 CIT at __, 320 F. Supp. 3d at 1355.

---

SolarWorld correctly notes that in these proceedings Commerce does not seek to rely on Wood Flooring as evidence of a practice of only assessing allegedly aberrational data in the aggregate.  SolarWorld's Resp. at 25.  SolarWorld America's argument fails, however, as the court in <u>SolarWorld II</u> was not solely concerned with Commerce's reliance on Wood Flooring. Here, as in Wood Flooring, it is not clear what reliance Commerce sought to place on this claimed practice of exclusively reviewing allegedly aberrational data in the aggregate because in these proceedings Commerce did, in fact, analyze the component elements of the Thai data to determine that the Hong Kong imports were not distortive.  <u>See</u> Final Decision Memo at 49. In <u>SolarWorld II</u> the court also expressed concern with Commerce's failure to address the apparent tension between Commerce's stated preference to base surrogate values on broad data reflective of the surrogate country's market as a whole and the fact "that the Hong Kong data skews the Thai AUV in a way that renders the Thai AUV unrepresentative of the Thai market."  <u>See</u> <u>SolarWorld II</u>, 42 CIT at __, 320 F. Supp. 3d at 1354.

[12] Commerce cites <u>Certain Hot-Rolled Carbon Steel Flat Products from Romania</u> as a case "where the Department explained that to test the reliability of [surrogate values] alleged to be aberrational, it is appropriate to compare the selected [surrogate value] to the AUVs calculated for the same period using data from the other designated surrogate countries." <u>See</u> Final Decision Memo at 47 (citing <u>Certain Hot-Rolled Carbon Steel Flat Products from Romania: Final Results of [ADD] Administrative Review</u>, 70 FR 34448 (June 14, 2005) and accompanying Issues and Decision Mem. at 8–23, A-485-806, (June 6, 2005), <u>available at</u> https://enforcement.trade.gov/frn/summary/romania/E5-3067-1.pdf (last visited Apr. 11, 2019 ("Hot-Rolled Carbon").  This determination responded to challenges to data sources used in the preliminary results to calculate surrogate values for a wide range of FOPs.  <u>See</u> Hot-Rolled Carbon at 19–23.  It did not, however, directly address the question of whether the distortive impact of component items on the total average cost of a surrogate value can be considered if that component is alleged to be aberrational.  Hot-Rolled Carbon does not, therefore, evidence a consistent practice of exclusively considering allegedly aberrational data in the aggregate.

[13] In this case, imports from Hong Kong account for only 60.2% of the total value of Thai imports

(footnote continued)

Commerce unreasonably found that the Hong Kong imports were not low in quantity because Hong Kong ranged fourth in terms of quantity out of 22 countries from which Thailand imported tempered glass.   Final Decision Memo at 49.   Hong Kong imports account for only 0.4% of the total volume of imports of tempered glass into Thailand.  The mere fact that there are other countries which represent an even smaller fraction of the imports into Thailand does not impact whether the imports from Hong Kong are of low volume.

Commerce also unreasonably concluded that the Hong Kong imports were not aberrational through reliance on benchmarks based on imports of negligible quantity from Denmark, France, Switzerland, and Mexico.  Final Decision Memo at 49.   These four other countries exported tempered glass to Thailand at prices equivalent to, or greater than, the Hong Kong imports.  Id.  The total import quantities from Denmark and France in the period of review were only 12 kilograms or less, while an import quantity of zero was recorded for Mexico and Switzerland.  Id.  These amounts are a negligible component of the total of approximately 2.26 million kilograms of tempered glass imported into

---

of tempered glass, as opposed to 75% in SolarWorld II.  See SolarWorld II, 42 CIT at __, 320 F. Supp. 3d at 1354; see also Canadian Solar's Br. at 24.  However, the component of imports from Hong Kong accounts for only 0.4% of the total quantity of imports of tempered glass into Thailand, as against 1.6% in SolarWorld II.  See SolarWorld II, 42 CIT at __, 320 F. Supp. 3d at 1354; see also Canadian Solar's Br. at 24.  As such, on a per-unit basis the Hong Kong imports in the present proceeding show a much greater deviation from the AUV than in SolarWorld II.  In this case the Hong Kong imports have an AUV of $413.10 as against a total AUV of $2.79, Canadian Solar's Reply at 3, while in SolarWorld II the Hong Kong imports had an AUV of $191.47 as against a total AUV of $4.14.  See SolarWorld II, 42 CIT at __, 320 F. Supp. 3d at 1352 n.11; see also SolarWorld Americas, Inc. v. United States, 273 F.Supp.3d 1254, 1263 (CIT 2017) (stating the AUV of the component of imports from Hong Kong was $191.47).  Accordingly, the distortive impact of Hong Kong imports is more significant on a per-unit basis in the present proceedings than in SolarWorld II.

Thailand in the period of review.  <u>See</u> Thailand Import Data [attached as Ex. 2 to SolarWorld's Initial Surrogate Value Comments] at 2, PD 365–382, CD 424–436, bar code 3489132-01 (July 19, 2019).  Substantial evidence requires Commerce to address evidence that supports its finding as well as that which "fairly detracts from its weight." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477–78 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).   Commerce notes the negligible volume of imports from these countries but fails to address the potentially distortive effect of the benchmarks' minuscule import quantities.  Final Decision Memo at 49.  It is unreasonable to rely on benchmarks that are exclusively based on negligible import quantities without addressing the impact this negligible volume has on the reliability of the benchmarks.  <u>See</u> <u>Blue Field (Sichuan) Food Industrial Co., Ltd. v. United States</u>, 37 CIT __, __, 949 F. Supp. 2d 1311, 1327–28 (2013) (holding as unsupported by substantial evidence a finding by Commerce that a surrogate value was not aberrational because, inter alia, that finding was made in reliance on benchmarks based on "miniscule import volumes").[14]

---

[14] Commerce used Thai data from the second administrative review as a benchmark against which to assess the Thai data for tempered glass from the present period of review.  Final Decision Memo at 47–8 (citing Decision Mem. for the Final Results of the 2013–2014 [ADD] Admin. Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from     [the     PRC],     A-570-979,     (June     13,     2016)     <u>available     at</u> https://enforcement.trade.gov/frn/summary/prc/2016-14532-1.pdf (last visited Apr. 11, 2019) ("Solar Cells AR2 Memo")).  Canadian Solar argues that it was unreasonable for Commerce to use Thai data from the prior administrative review as a benchmark because Commerce's use of this value was remanded by the Court.  <u>See</u> Canadian Solar's Br. at 26–27; <u>see also</u> <u>SolarWorld II</u>, 42 CIT at __, 320 F. Supp. 3d at 1354–55.  Defendant responds that the Court did not conclude in <u>SolarWorld II</u> that the relevant Thai import data was aberrational or otherwise unusable for benchmarking purposes.  Def.'s Br. at 20.  As discussed above, <u>SolarWorld II</u> ordered Commerce

(footnote continued)

_____

to provide further explanation as to why its use of Thai import data for tempered glass as a surrogate value was reasonable in light of record evidence that imports from Hong Kong made up only 1.6% of the total volume but accounted for 75% of the total value.  See SolarWorld II, 42 CIT at __, 320 F. Supp. 3d at 1354–55.  In those proceedings the Court did not face the question of whether it was appropriate to use such data as a benchmark.  The judgment sustaining Commerce's later remand redetermination abandoning the use of the Thai data for tempered glass is currently under appeal.  See Appeal No. 2019-1591, Feb. 26, 2019, ECF No. 165 (SolarWorld Americas, Inc. v. United States, Consol. Ct. No. 16-00134); Appeal No. 2019-1593, Feb. 26, 2019, ECF No. 166 (SolarWorld Americas, Inc. v. United States, Consol. Ct. No. 16-00134).  The court cannot say that it is unreasonable for Commerce to use Thai data from the prior administrative review as a benchmark in this review.

Nonetheless Canadian Solar also argues it was unreasonable of Commerce to only use Thai data from the second administrative review ($4.14 per kilogram) as a benchmark without also considering historical data from the first administrative review ($0.98 per kilogram) and initial investigation ($0.86 per kilogram).  See Canadian Solar's Br. at 26–27 (citing Solar Cells AR2 Memo at 29–31).  Defendant responds that Canadian Solar waived this argument because it failed to raise it at the administrative level.  Def.'s Br. at 19.  Defendant further argues that a comparison with the earlier administrative proceedings does not indicate that the Thai data for the present proceedings is aberrational.  Id.  When assessing whether surrogate value data is aberrational, Commerce's practice is to compare the surrogate value data with record data from other potential surrogate countries, as well as to examine "data from the same HTS category for the surrogate country whose data are allegedly aberrational over multiple years to determine if the current data appear aberrational compared to historical values."  Final Decision Memo at 47.  Commerce did not consider the data available in the Solar Cell AR2 Memo for the first administrative review and initial investigation.  See Solar Cells AR2 Memo at 29–30 & n.144-45.  "The determinative question [regarding administrative exhaustion] is whether Commerce was put on notice of the issue."  Trust Chem Co. v. United States, 35 CIT __, __ n.27, 791 F. Supp. 2d 1257, 1268 n.27 (2011).  In its case brief Canadian Solar argued that the Thai data is aberrational and stated it is Commerce's "normal practice to examine relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question."  Case Brief of [Canadian Solar] at 29, PD 560, CD 594, bar code 3561659-01 (Apr. 10, 2017) ("Canadian Solar's Case Br.").  Canadian Solar only sought to compare the Thai data to data from Bulgaria during the period of review and to Canadian Solar's market economy purchases of module glass.  Id. at 29–32.  The issue of a comparison with historical data from Thailand was not waived, however, because in responding to Canadian Solar's argument Commerce stated its practice is to examine data from the surrogate country "over multiple years."  Final Decision Memo at 47.  While Commerce only referred to price data from the second administrative review, it cited the Solar Cells AR2 Memo which also contained price data for the first administrative review and the initial investigation.  See Final Decision Memo at 47 n.237.  Commerce did not provide any explanation as to why it chose to compare the Thai data for the period of review of the present investigation only against the second administrative review and omit consideration of earlier historical data.

(footnote continued)

**PUBLIC VERSION**

Commerce's finding that tempered glass imports from Hong Kong are not aberrational through comparison with improperly vetted benchmarks based on negligible quantities is thus unsupported by substantial evidence.

Commerce's selection of the Thai data is remanded for further explanation of why its selection is reasonable in light of the fact that imports from Hong Kong only accounted for 0.4 % of the total volume of Thai imports, but constituted 60.2 % of the average import value during the period of review.  The AUV of imports of tempered glass from Hong Kong into Thailand ($413.10 per kilogram) is nearly 150 times greater than the AUV of all tempered glass imports into Thailand (including imports from Hong Kong) ($2.79 per kilogram).  See Canadian Solar's Reply at 3.  Commerce's current explanation for not disaggregating data is that it simply does not do so as a matter of policy.  It justifies its policy on the grounds of administrative burden and to avoid potentially distortive manipulation of import data.  Final Decision Memo at 47, 54 (citing Polyethylene Terephthalate Film, Sheet, and Strip from [the PRC]: Issues and Decision Mem. for the Final Results of the 2011–2012 Admin. Review at 12, A-570-924, (June 5, 2013), available at   https://enforcement.trade.gov/frn/summary/prc/2013-13985-1.pdf   (last

---

See Final Decision Memo at 47–48.  Commerce's failure to explain why it did not consider data from the first administrative review and the initial investigation is unreasonable and appears inconsistent with its stated practice.  Commerce's apparent inconsistency with past practice is not cured by Defendant's argument that the earlier data does not establish that the Thai data for tempered glass in the present period are aberrational.  On remand Commerce is directed to explain its decision not to consider data from the first administrative review and initial investigation.

visited Apr. 11, 2019); see also SolarWorld II 42 CIT at __, 320 F. Supp. 3d at 1354–

1355.  Commerce's justification may be sufficient for most cases. At some point, however,

input data may diverge so significantly from other input data that it renders the data set,

as a whole, unreliable.  Ideally, Commerce, not the court, should identify where that point

lies.  For module glass, the distortive input data has reached the point where the court

cannot say that Commerce selection is reasonable.[15]

### B. Aluminum Frames

SolarWorld challenges Commerce's valuation of the respondents' aluminum

frames using Thai HTS 7604.29.90001, which covers non-hollow aluminum profiles.  See

SolarWorld's Br. at 11–19; see also Final Decision Memo at 35–38.  SolarWorld contends

that Commerce's selection is contrary to law and not supported by substantial evidence,

arguing that the selection is not in accordance with the HTS, fails to account for the

additional manufacturing processes that the frames in question undergo, and runs

contrary to CBP rulings on the merchandise in question.  SolarWorld's Br. at 11–19.

---

[15] Commerce also reasonably declined to compare the Thai import data for module glass against Canadian Solar's market economy purchases.  Final Decision Memo at 48.  Canadian Solar argues that Commerce unreasonably rejected this data even though it was the best available information on the record to act as a benchmark and Commerce had not identified any evidence that undermined its reliability.  Canadian Solar's Br. at 31.  Canadian Solar's argument fails as Commerce reasonably explained that its practice is to not use a respondent's market economy purchase price as a benchmark because such information is not public and not necessarily reflective of industry-wide prices.  Final Decision Memo at 49.

Canadian Solar also asserts that Commerce should have used the AUV of the float glass subheading as a benchmark against which to assess whether the AUV for Thai imports of tempered glass were aberrational.  See Canadian Solar's Br. at 20; Canadian Solar's Reply at 9–10.  Canadian Solar's argument fails, however, as Canadian Solar did not substantiate why it was unreasonable for Commerce to decline to use data relating to an entirely different HTS subheading as a benchmark against which to assess Thai imports of tempered glass.

Defendant responds that Commerce's decision is reasonable because Thai HTS 7604.29.90001 represents the most specific proposed surrogate value on the record. Def.'s Br. at 23.  For the reasons that follow, Commerce's selection of import data under HTS 7604.29.90001 is supported by substantial evidence.

As discussed above, where the subject merchandise is exported from a nonmarket economy country, Commerce calculates normal value based on FOPs.  19 U.S.C. § 1677b(c)(1).  Commerce selects a surrogate value by which it values the FOPs and makes that selection "based on the best available information regarding the values of such factors in a market economy country or countries."  Id.  Although Commerce has broad discretion in deciding what constitutes the best available information, see QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the ADD statute), it must ground its selection of the best available information in the overall purpose of the statute, which is to calculate accurate dumping margins.  See Rhone Poulenc, Inc., 899 F.2d at 1191; see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).  Commerce considers the best available information to be (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the period of review; (4) representative of a broad market average; and (5) publicly available.  See Policy Bulletin 04.1.[16]

---

[16] To the extent possible, Commerce uses "the prices or costs of [FOPs] in one or more market economy countries that are-- (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. §§ 1677b(c)(4)(A)–(B).  Commerce also has a regulatory preference for valuing all FOPs using surrogate value data from a single surrogate country where practicable.  19 C.F.R. § 351.408(c)(2) (2014).

Here, Commerce reasonably concluded that import data under HTS 7604.29.90001, which covers non-hollow aluminum profiles, constitutes the best available information to value Trina's aluminum frames.  See Final Decision Memo at 35–38.  Commerce noted that Trina sufficiently demonstrated that the aluminum frames in question are non-hollow, aluminum profiles, and that Commerce found no evidence on the record to contradict this description.  Final Decision Memo at 35.  Moreover, as in the underlying investigation, Commerce emphasized that HTS 7604 presents the best available information to value the inputs in question because it covers alloyed aluminum profiles, whereas HTS 7616.99.90—suggested by SolarWorld—comprises an "other" subheading that includes dissimilar products.  Id.  Commerce reasoned that HTS 7616 applied to completely different products than the aluminum frames at issue because this heading includes products like "nails, tacks, staples, screws, bolts, nuts, screw hooks, rivets, cotters, cotter pins, washers, knitting needles, bodkins, crochet hooks, embroidery stilettos, safety pins, other pins and chains, and cloth, grill and netting of aluminum wire." Final Decision Memo at 37–38.  Based on the inclusion of such unrelated items, Commerce reasonably concluded that HTS 7616.99.9909 does not constitute the best available information.  Additionally, Commerce reasonably determined that HTS 7604's descriptions, such as "[a]luminum bars, rods and profiles," indicate that the subheading used—HTS 7604.29—includes non-hollow aluminum profiles, such as those listed by Trina.  Id. at 35.  Given these explanations, Commerce's determination that HTS 7604 is more specific than the available alternatives on the record is supported by substantial evidence.

SolarWorld's argument that evidence specific to this review renders the selection of HTS 7604.29 unreasonable is unpersuasive.  <u>See</u> SolarWorld's Br. at 11, n.3. SolarWorld first argues that the aluminum frames should not be valued using HTS 7604 because the HTS defines aluminum bars, rods, or profiles as having "a uniform cross section along their whole length . . ., [sic] provided that they have not thereby assumed the character of articles or products of other headings."[17]  SolarWorld's Br. at 11–12 (citing Ex. SC-17 [attached to Trina's Sec. C Suppl. Questionnaire Resp.] at SuppC-24, PD 286–287, CD 314–319, bar code 3480083-02 (June 21, 2016)).  SolarWorld cites to an exhibit showing a drawing of the frame as evidence that the frames cannot fit the definition of HTS 7604, but Commerce reasonably concluded that the drawing in question shows "a single, uniform cross section," thus countering SolarWorld's argument.  <u>See</u> Final Decision Memo at 36.  SolarWorld offers no evidence to counter this determination. Moreover, Commerce's task is not to classify the solar frame inputs for customs purposes, but to select the best available information to value the FOPs in question.  <u>See</u> 19 U.S.C. § 1677b(c)(1).  SolarWorld fails to proffer evidence detracting from Commerce's conclusion that the frames are more similar to the goods under HTS 7604 than any other data on the record.

---

[17] Specifically, SolarWorld asserts that the record demonstrates that Trina's aluminum solar frames are [[                                                                ]]  SolarWorld's Br. at 11–12.

SolarWorld also argues that the aluminum frames in question cannot be categorized as aluminum profiles due to the extent to which the product undergoes further processing.  SolarWorld's Br. at 12–14.[18]  According to SolarWorld, the fact that "Trina's aluminum frames are fabricated products that have been further manufactured into a finished and final form" makes them not properly classifiable as aluminum profiles under HTS 7604.29.90001.[19]  SolarWorld's Br. at 14.  The argument fails, however, given that HTS 7604 does not specify whether it covers finished or unfinished aluminum profiles, as Commerce explained.  Final Decision Memo at 37.  Moreover, the International Trade Commission's ("ITC") definition of aluminum profiles applies to goods "that have been <u>subsequently worked after production</u> . . . provided that they have not thereby assumed the character of articles or products of the other headings.'"  <u>See</u> Final Decision Memo at 36 (emphasis in original, quoting <u>Jiangsu</u>, 38 CIT __, __, 28 F. Supp. 3d 1317, 1337 (2014)).  It is also reasonably discernible from Commerce's reference to the ITC's definition of profiles as covering goods "which have been subsequently worked after

---

[18] For example, SolarWorld argues that the aluminum frames undergo a [[
                                                                     ]] resulting in [[
                                                                     ]], SolarWorld's Br. at 12–13, and that the frames "undergo multiple fabrication processes to complete them for final use, such as drilling, cutting, punching, bending, coating, and stamping before assembly with solar cells and backing materials."  <u>Id.</u> at 13.

[19] SolarWorld also argues that CBP rulings classifying unfinished aluminum articles under HTS 7604 detract from Commerce's conclusion that the aluminum frames in question are best valued under HTS 7604.  SolarWorld's Br. at 16–17.  The argument is unavailing, however, given that Commerce did not find that HTS 7604 applied exclusively to finished aluminum profiles.  Final Decision Memo at 37.  "The fact that HTS category 7604 has been applied in the past to unfinished articles does not support the conclusion that Thai HTS category 7604 covers solely unfinished merchandise that is different in nature and value from the aluminum frames at issue."  <u>Jiangsu</u>, 38 CIT __, __, 28 F. Supp. 3d 1317, 1337.

production," Final Decision Memo at 35, that the work performed on the profiles underscored by SolarWorld is not sufficient to render Trina's aluminum profiles more similar to the finished products covered by a different subheading.  SolarWorld proffers no evidence detracting from Commerce's determination.

Finally, SolarWorld cites two CBP rulings, N139353 and N238208, which classify aluminum frames for solar panels under HTS 7616.99.5090 and HTS 8541.90.0000, respectively, to support its argument that HTS 7604 is not the best available information.  See SolarWorld's Br. at 15–18.  Commerce correctly noted, however, that it is not bound by CBP rulings for U.S. imports when selecting import values from surrogate countries, but rather should select the best available information on the record.  Final Decision Memo at 37.  Moreover, Commerce correctly pointed out that HTS 7616.99 covers an "other" subheading, which would solely comprise aluminum articles not already identified elsewhere.  Id.  Additionally, Commerce noted that the CBP rulings did not provide explanations for why the selected headings were appropriate, thus precluding Commerce from weighing the ruling against evidence on the record.  Id.  In light of Commerce's response, as well as the evidence relied upon by Commerce, the decision to select HTS 7604.29.9001 is reasonable.

### C. Nitrogen

Commerce valued Trina's and Canadian Solar's nitrogen inputs using Thai import data under HTS 2804.30.00 (i.e, Hydrogen, rare gases and other non-metals; Nitrogen). Final Decision Memo at 52.  Trina and Canadian Solar argue that Commerce's selection of the Thai import data is unsupported by substantial evidence because this data is

aberrational and unreliable.  See Canadian Solar's Br. at 31–39; Canadian Solar's Reply Br. at 12–15; Trina's Br. at 4–12; Trina's Reply Br. at 2–11.  In the alternative, Canadian Solar argues that if Commerce uses the Thai import data, then input data from the United States and Switzerland included in the Thai data should be excluded as distortive.  See Canadian Solar's Br. at 39–41; Canadian Solar's Reply Br. at 16–17.  Defendant responds that Commerce reasonably determined that the Thai import data was not aberrational or unreliable, and that Commerce's selection is supported by substantial evidence.  See Def.'s Br. at 26–31.

When analyzing whether data is aberrational, Commerce generally compares that data to (1) the AUV of data on the record for other countries at a level of economic development comparable to the non-market economy in question, and (2) the AUV for that input in the country at issue in prior years.  Final Decision Memo at 53.  Commerce's practice is to view data based on small quantities as not inherently distorted.  Id. at 54.

Commerce's comparison of the Thai data to data from other economically comparable countries and from the past review reveals that this data is within the range of the relevant benchmarks as defined by Commerce's practice. Final Decision Memo at 53.  Commerce compared the Thai import data and the import data available on the record for five other countries economically comparable to the PRC and found the Thai data fell within the range of the other AUVs.  Id. at 53.  Specifically, the Thai AUV ($9.36) was greater than the AUVs of three other countries on the record (Bulgaria with $0.08, Romania with $0.08, and Mexico with $0.25), but lower than the remaining two countries (South Africa with $26.27, Ecuador with $17.16).  Id. at 53.  Commerce also concluded

that the mere fact that the volume of Thai imports was lower than the volume of imports from each of Bulgaria, Romania and Mexico did not, in and of itself, demonstrate distortion.  Id. at 54.

Commerce also concluded that a comparison with the nitrogen AUV in the prior administrative review did not indicate that the Thai data was aberrational.  Final Decision Memo at 54.  The AUV for nitrogen in the Thai import data in the prior administrative review was $11.68, around 19% higher than in the present review.  Id. at 54. Accordingly, Commerce's determination that the Thai import data is not aberrational is reasonable.

Canadian Solar argues that high value imports from the United States and Switzerland distort the value of Thai imports and should be excluded.  See Canadian Solar's Br. at 39–41; Canadian Solar's Reply Br. at 16–17.  Imports from these two countries account for 1.57% of imports into Thailand during the POR but comprise 22.6% of the total value of Thai imports.  Canadian Solar's Br. at 39.  Commerce reasonably declined to disaggregate the Global Trade Atlas ("GTA") data for nitrogen and exclude the imports from the United States and Switzerland on the basis of its preference for using a full dataset to avoid "cherry-picked import data in a[] [surrogate value] calculation."  Final Decision Memo at 54.  While Commerce's policy of not disaggregating data may not be reasonable in all circumstances, the court cannot say that Commerce's refusal to disaggregate the GTA data for nitrogen in this case is unreasonable.  The AUV of nitrogen imports from the United States and Switzerland is around fifteen times greater than the AUV of all nitrogen imports into Thailand (including imports from the United States and

Switzerland).  <u>See</u> Final Decision Memo at 53; <u>see also</u> Summary of Import Data for

Nitrogen & Oxygen from Economically Comparable Countries [attached as Ex. 3 to

SolarWorld's Rebuttal Surrogate Value Comments] at 2, PD 397–98, CD 482–84, bar

code 3490795-02 (July 26, 2016).  It is reasonably discernable that Commerce did not

consider this degree of price variation within the Thai data as sufficient to justify

disaggregation where it had already concluded that credible benchmarks exhibit

significant price variation.[20]  <u>See</u> Final Decision Memo at 53–54 (identifying import values

for other potential surrogate countries in this period of review as ranging between $0.08–

$27.27 per kilogram, and identifying price volatility between the present period of review

and the prior period of review in South Africa ($26.27 vs. $5.46), Romania, ($0.08 vs.

$0.13) and Ecuador ($17.16 vs. $4.84)).[21]

---

[20] Further, the price multiple of the U.S. and Swiss nitrogen imports is many times lower than that represented by the imports of tempered glass from Hong Kong discussed above, which were nearly 150 times the AUV for all imports of tempered glass into Thailand.  <u>See</u> Section A above.

[21] Canadian Solar argues that the South African and Ecuadorian data are unsuitable as benchmarks because they have lower volumes and higher values than the data from Romania, Bulgaria and Mexico.  <u>See</u> Canadian Solar's Br. at 37–39; Canadian Solar's Reply at 12–15.  The South African data provides an AUV of $26.27 based on imports of 12,894 kilograms of nitrogen, while the data from Ecuador provides an AUV of $17.16 based on 6,498 kilograms of imports.  <u>See</u> Summary of Import Data for Nitrogen & Oxygen from Economically Comparable Countries [attached as Ex. 3 to SolarWorld's Rebuttal Surrogate Value Comments] at 1, PD 397–98, CD 482–84, bar code 3490795-02 (July 26, 2016).  In contrast, the data from Bulgaria, Romania and Mexico all provide an AUV between $0.08–25 and are drawn from volumes of between approximately 6.5–28 million kilograms.  <u>Id.</u> at 1–2.  Canadian Solar argues that this court has recognized that "a very small relative quantity triggers an obligation for Commerce to explain why data is not aberrational," and that Commerce did not provide any such explanation.  Canadian Solar's Br. at 38; Canadian Solar's Reply at 15 (quoting <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 37 CIT __, __, Slip Op. 13–30 at 13 (2013)).  Defendant argues that Canadian

(footnote continued)

Trina argues that Commerce unreasonably declined to use certain price quotes

and invoices as benchmarks against which to assess whether the Thai import data was

---

Solar waived the argument that the South African and Ecuadorian data are unsuitable as benchmarks by failing to raise it at the administrative level. <u>See</u> Def.'s Br. at 28. The arguments as to South Africa's and Ecuador's low volumes put Commerce on notice that the reliability of those data sources was under question due to their low volumes. <u>See</u> Canadian Solar's Reply at 13 (citing Canadian Solar's Case Br. at 38–40).

Nonetheless, Commerce explained why it did not consider the Ecuadorian and South African data aberrational. Commerce explained that where there are low import volumes but no other indication that a value is aberrational, Commerce will not treat the relevant data as aberrational. As discussed below, Commerce reasonably decided not to employ price quotes and invoices as benchmarks and reasonably decided to use the South Africa and Ecuador data as benchmarks. Final Decision Memo at 54 (citing Decision Mem. for the Final Results of the 2013–2014 [ADD] Admin. Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from [the PRC] at 29–34, A-570-979, (June 13, 2016) <u>available at</u> https://enforcement.trade.gov/frn/summary/prc/2016-14532-1.pdf (last visited Apr. 11, 2019)). It is reasonably discernible from Commerce's reasoning that it did not consider there to be any other indication that the Ecuadorian or South African data were aberrational. It is also reasonably discernible from Commerce's discussion of how Thai data falls "within the range" of other AUVs that it did not consider the mere fact that the South African and Ecuadorian data were the highest on the record to indicate those data were aberrational. Final Decision Memo at 53. Commerce thus reasonably determined that the South African and Ecuadorian data were not aberrational and were appropriate to use as benchmarks to assess the reliability of the Thai import data.

Canadian Solar further argues that the Thai data should be treated as aberrational because it diverges from credible benchmarks to a greater degree than did the data in <u>Frozen Warmwater Shrimp</u>. Canadian Solar's Br. at 33 (citing <u>Admin. Review of Certain Frozen Warmwater Shrimp from [the PRC]: Final Results, Partial Rescission of Sixth [ADD] Administrative Review and Determination Not to Revoke in Part</u>, 77 Fed. Reg. 53,856 (Sept. 4, 2012)). In <u>Frozen Warmwater Shrimp</u> Commerce found that a comparison of the AUV of shrimp feed in the relevant period of review for Thailand, the Philippines and Indonesia as against two prior administrative reviews demonstrated the Thai data was considerably more volatile than other countries for which there was record data. <u>See</u> Sixth Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China: Issues and Decision Mem. for the Final Results at 49, A-570-893, (Aug. 27, 2012), <u>available at</u> https://enforcement.trade.gov/frn/summary/prc/2012-21734-1.pdf (last visited Apr. 11, 2019)). Canadian Solar's comparison with <u>Frozen Warmwater Shrimp</u>, however, relies entirely on the use of price quotes and invoices as benchmarks, and the rejection of South Africa and Ecuadorian data as benchmarks. <u>Id.</u> at 53–54. As discussed above, Commerce reasonably declined to use price quotes and invoices as benchmarks, and reasonably made use of the South African and Ecuadorian data as benchmarks.

aberrational.  See Trina's Br. at 6–7; Trina's Reply at 10.[22]  Commerce stated that it

generally does not use price quotes because it cannot verify the conditions under which

the quotes were solicited and whether they have been selected from within a broader

range of quotes, and because price quotes do not represent actual prices or broad ranges

of data.  Final Decision Memo at 52–53.  Commerce also stated that it considered

individual prices to be unrepresentative of broad market averages.  Id. at 53.  Commerce's

reasoning for declining to use the price quotes and prices as benchmarks is reasonable.

Id. at 53.

Trina further argues that the Thai data should be treated as unreliable due to a

"significant and inexplicable discrepancy" between the quantity and value of nitrogen

imports reported from the United States into Thailand, and nitrogen exports recorded from

the United States to Thailand by the ITC Dataweb.  See Trina's Br. at 7–10; Trina's Reply

Br. at 9–10.  The ITC data shows that the United States exported 788,319 kilograms of

nitrogen to Thailand during the period of review.  See Analysis of U.S. Origin Nitrogen

Included in Thai Imports of Nitrogen [attached as Enclosure 2 to Trina's Administrative

Case Br.], PD 533, CD 588, bar code 3538946-01 (Jan. 25, 2017).  By contrast, the Thai

data shows that only 2,070 kilograms of nitrogen were imported from the United States

during the period of review.  Id.  The U.S. data contains an AUV of approximately $0.15

---

[22] Trina submitted three invoices for the purchase of nitrogen in Thailand which reflect an average
price of $0.1187 per kilogram (derived from a total value of $4,598.61 and total quantity of
38,739.09 kilograms).  See Summary of Nitrogen Values on the Record [attached as Enclosure
1 to Trina's Administrative Case Br.], PD 533, CD 588, bar code 3538946-01 (Jan. 25, 2017).
Trina further provided a price quote for nitrogen in Thailand that offered a price of $0.0679 per
kilogram.  Id.

per kilogram, while the AUV for the U.S. component of the Thai import data contains an

AUV of approximately $140 per kilogram.   Id.   Commerce reasonably concluded,

however, that country-specific export data are an inappropriate benchmark by which to

evaluate corresponding import values.   Final Decision Memo at 55.   As Commerce

explained, this is because different reporting and inspection requirements mean that each

shipment of merchandise is likely to be treated differently.   Id. (quoting Certain Activated

Carbon from [the PRC]: Issues and Decision Mem. for the Final Results of the First [ADD]

Admin.   Review   at   32,   A-570-904,   (Nov.   3,   2009),   available   at

https://enforcement.trade.gov/frn/summary/prc/E9-27083-1.pdf   (last   visited   Apr.   11,

2019)).   Trina's argument fails as Commerce has provided a reasonable explanation for

the divergence between the U.S. export data and Thai import data, and a reasonable

justification for not using the U.S. export data as a benchmark by which to evaluate the

Thai import data.

### D.  Semi-Finished Polysilicon Ingots and Blocks

In the Final Results, Commerce determined that the best available information by

which to value the respondents' semi-finished polysilicon ingots was the international

price for solar-grade polysilicon.   Final Decision Memo at 21–22.   SolarWorld challenges

Commerce's decision, arguing that the surrogate value does not reflect the substantial

additional processing and value added by turning raw polysilicon into an ingot or block.

SolarWorld's Br. at 29–32.   SolarWorld proposes that Commerce instead construct a cost,

starting with the world-market price of raw polysilicon and adding the costs required to

produce a unit of ingot or block.   Id. at 31–32.   Defendant responds that, considering the

available data on the record, Commerce reasonably chose to value respondents' ingots

and blocks using a surrogate for the primary raw input.  Def.'s Br. at 21–23.  For the

reasons that follow, Commerce's determination to value respondents' semi-finished

polysilicon ingots and blocks with the world market price for raw polysilicon is reasonable.

Here, Commerce determined that the world market price for raw polysilicon

constituted the best available information for valuing respondents' semi-finished

polysilicon ingots and blocks.  Final Decision Memo at 21–22.  In the absence of data

values for ingots and blocks, Commerce used a value for raw polysilicon because

respondents' ingots and blocks are primarily composed of polysilicon.  Id.  With respect

to SolarWorld's contention that the world market price for polysilicon is missing certain

processing costs, Commerce explained that most of the processing required to produce

ingots and blocks from raw polysilicon is performed by large, expensive machinery and

is thus accounted for in the manufacturing costs.  Id.  Indeed, Commerce stated that the

record did not present sufficient evidence to show that the additional processing stages

add a significant amount of value beyond the original cost of polysilicon.  Id.  Given

Commerce's decision to use a value for the main component of the good, it is reasonably

discernible that Commerce viewed the option as imperfect but recognized that it would

result in a more accurate surrogate value than would a value for a component that is not

the main component of the good.  See Rhone Poulenc, Inc., 899 F.2d at 1191.  It is also

reasonably discernible that Commerce determined, consistent with its practice, that the

world market price for raw polysilicon is as specific as possible to the input (lacking data

for the input itself), is contemporaneous, publicly available, and represents a broad

market average.  See Policy Bulletin 04.1.  Commerce's determination that this value

constitutes the best available information is reasonable.

### E. Respondents' Surrogate Financial Ratios

In the Final Results, Commerce determined that Styromatic's 2015 financial

statements constituted the best available information to calculate respondents' overhead,

selling, general and administrative expenses, and profit.  Final Decision Memo at 66–71.

SolarWorld challenges Commerce's decision, arguing that Commerce should have

selected the available financial statements of Thai company Ekarat Engineering Public

Company Limited ("Ekarat") because Ekarat is a producer of identical merchandise, thus

making it the best available information.  SolarWorld's Br. at 21.  Defendant responds that

Commerce reasonably selected Styromatic's 2015 financial statements, as they

constituted the best available information considering they were complete and

contemporaneous with the period of review, and Styromatic's primary business is the

production of comparable merchandise.  Def.'s Br. at 34.  For the reasons that follow,

Commerce's determination is supported by substantial evidence.

As discussed, Commerce determines the normal value of the subject merchandise

based on the FOPs utilized.  19 U.S.C. § 1677b(c)(1).  Commerce values the FOPs using

the best available information, to which it adds "an amount for general expenses and

profit."  Id.  Commerce selects a surrogate value for each input from a source in a market

economy country that is economically comparable to the NME country and a significant

producer of the merchandise in question.  Id. §§ 1677b(c)(4)(A)–(B); 19 C.F.R. §

351.408(b).  Commerce determines the amount for manufacturing overhead, general

expenses, and profit using publicly available financial data from a producer of identical or comparable merchandise.  19 C.F.R. § 351.408(c)(4).  In choosing which surrogate data to use, Commerce considers "the quality and specificity of the statements, as well as whether the statements are contemporaneous with the data used to calculate production factors."  Final Decision Memo at 67.  Additionally, where Commerce "has reason to believe or suspect that a company may have received countervailable subsidies, financial ratios derived from that company's financial statements may not constitute the best available information."  Id.

Commerce selected Styromatic's 2015 financial statements as the best available information because they were contemporaneous, audited, and came from a company that produced merchandise comparable to the subject merchandise during the period of review.  Final Decision Memo at 71.  SolarWorld asserts that Ekarat's financial statements are the best available information because the company is the only Thai manufacturer that produces identical merchandise.  SolarWorld's Br. at 21.  Defendant responds that Commerce reasonably explained that the majority of Ekarat's revenue comes from distribution transformers and services, which are not comparable to the subject merchandise.  Def.'s Br. at 32–33.[23]

[23] Specifically, Commerce concluded that "Ekarat's financial statements support that more than 99 percent of its revenue came from sales of distribution transformers and services, and the remaining revenue came from sales of electricity."  Final Decision Memo at 68.

Commerce reasonably concluded that Styromatic's 2015 financial statements constituted the best available information.  Although Commerce acknowledged that Ekarat's 2015 consolidated financial statements indicate that Ekarat is a manufacturer of solar modules, Commerce reasonably concluded that Ekarat is primarily a manufacturer of distribution transformers.  Final Decision Memo at 68.  First, Ekarat's 2015 financial statements indicate that "[m]ost of the company's revenue came from the sale of Distribution Transformer," thus establishing that Ekarat was primarily engaged in the manufacturing of non-comparable merchandise during the POR.  Ekarat 2015 Financial Statements [attached as Ex. 11 to SolarWorld's Initial Surrogate Value Comments] at 18, PD 365–382, CD 424–436, bar code 3489062-01 (July 18, 2016) ("Ekarat Financial Statements").  Second, the same statements indicate that in 2015, "the company had the sale revenue from sales of Distribution Transformer to the Metropolitan Electric Authority and the Provincial Electric Authority . . . in the amount of . . . Baht 267.60 million or . . . 12.92%, . . . of the Transformer revenue and Services revenue of the company."  Ekarat Financial Statements at 18.  From this figure, it is discernible that Ekarat made a total of 2,071.21 million baht in transformer revenue and services revenue (267.60 divided by 0.1292).  The financial statements also indicate that Ekarat's total revenue for every customer sector was 2,092.12 million baht in 2015.  Id.  So, 2,071.21 million—Ekarat's 2015 transformer revenue and services revenue—is 99% of 2,092.12 million—the company's total 2015 revenue for customer sectors.  Although SolarWorld argues that Ekarat can produce solar cells, see SolarWorld's Br. at 21–22 (citing Ekarat Financial Statements at 11), Commerce reasonably concluded that the vast majority of Ekarat's

revenue comes from the sale of non-comparable merchandise and thus Ekarat should

not be considered a producer of identical merchandise. [24]  Final Decision Memo at 68.

As Ekarat's financial statements indicate, "[m]ost of the company's revenue came from

the sale of" distribution transformers.  Ekarat Financial Statements at 18.[25]

Moreover, Commerce's practice is to decline to use financial statements of

companies that are not profitable, and Ekarat Solar Co., Ltd., Ekarat's subsidiary

described as a solar cell producer, operated at a loss in 2015.  See Final Decision Memo

at 69 (citing Canadian Solar Rebuttal Surrogate Value Comments at Ex. SVR-1, PD 391,

CD 474, bar code 3490637-01 (July 25, 2016)).  Accordingly, Commerce's conclusion

that Styromatic's 2015 financial statements—rather than those of Ekarat—represented

the best available information is reasonable.

---

[24] SolarWorld argues that Commerce's assertion that the majority of Ekarat's revenue came from distribution transformer sales is not supported by the record.  SolarWorld's Br. at 22–23. SolarWorld points out that Commerce cites to page 113 of Ekarat's financial statements, which does not clearly support Commerce's assertion.  Id. at 23.  However, Commerce's assertion is reasonably discernible from the record.  As described above, Ekarat's financial statements make clear that Ekarat made a total of 2,071.21 million baht in transformer revenue and services revenue in 2015.  Ekarat Financial Statements at 18.  Ekarat's total revenue for every customer sector was 2,092.12 million baht in 2015, id., meaning that its transformer revenue and services revenue constituted 99% of its total 2015 revenue.  Thus, SolarWorld's attempt to undermine Commerce's assertion that the majority of Ekarat's revenue comes from the sale of non-comparable merchandise is unavailing.

[25] SolarWorld also points to evidence that Ekarat's assets for cell manufacturing totaled 646.31 million baht, whereas its assets for transformer sales and services and for electricity were lower. SolarWorld's Br. at 22.  However, Ekarat's assets for solar cell production do not establish that it is primarily a manufacturer of identical merchandise, particularly in light of evidence showing that the vast majority of revenue comes from elsewhere.

## II. Commerce's Application of Partial AFA to Value Canadian Solar's Unreported FOPs

Canadian Solar challenges Commerce's application of partial AFA as unlawful and unsupported by substantial evidence.  Canadian Solar's Br. at 10–19.  Canadian Solar argues that because it cooperated with Commerce in the administrative proceedings, application of partial AFA was unlawful.  Id. at 12–13.  Canadian Solar further contends that Commerce's determination that Canadian Solar could have induced cooperation from its unaffiliated suppliers to provide FOP data was not supported by substantial evidence.  Canadian Solar's Br. at 11, 13–17; see also Final Decision Memo at 15–18.  Commerce reasoned that because the suppliers failed to cooperate by not providing the FOP information, 19 U.S.C. § 1677e(a) and (b) permit Commerce to apply AFA to account for the missing information.  Final Decision Memo at 15–18.  Commerce explained its use of AFA as necessary because Canadian Solar was "in a position to exercise leverage to induce cooperation from its uncooperative solar cell and solar module suppliers."  Final Decision Memo at 16.  For the reasons that follow, Commerce's application of partial AFA in calculating Canadian Solar's dumping margin is neither in accordance with law nor supported by substantial evidence.

To calculate accurate dumping margins, Commerce requests information from respondents.  Where information necessary to calculate a respondent's dumping margin is not available on the record, Commerce applies "facts otherwise available" in place of the missing information.  See 19 U.S.C. § 1677e(a).  Where Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply

with a request for information," Commerce may apply "an inference that is adverse to the

interests of that party in selecting among the facts otherwise available."[26] Id. § 1677e(b).

A respondent complies "to the best of its ability" where it "put[s] forth its maximum effort

to provide Commerce with full and complete answers to all inquiries in an investigation."

Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The Court of

Appeals has held that Commerce may, under certain circumstances, apply AFA in

calculating a cooperative respondent's antidumping margin where it finds that the

respondent could have induced an uncooperative supplier's cooperation.     Mueller

Comercial de Mexico S. De R.L. de C.V. v. United States, 753 F.3d 1227, 1233–34 (Fed.

Cir. 2014).

In Mueller, Mueller was a cooperative respondent but did not possess all the

production cost information Commerce needed to calculate its antidumping margin.  753

F.3d at 1230.  Commerce requested data directly from Mueller's two main suppliers, but

only one supplier provided the information.  Commerce used facts otherwise available

pursuant to 19 U.S.C. § 1677e(a), concluding that the unavailable production cost data

was related to acquisition cost data on the record.  Id.  Commerce explained

> Although premised on the adverse inference that [Mueller's uncooperative
> supplier's] actual cost information would not be favorable – otherwise [the
> supplier] may not have elected to withhold it from the Department – the

---

[26] Although the statute provides separately for the use of facts otherwise available and the
subsequent application of an adverse inference regarding those facts, parties often use the term
"adverse facts available" or "AFA" to refer to the application of the "facts otherwise available" and
"adverse inferences" provisions of 19 U.S.C.  § 1677e.  See, e.g., Final Decision Memo at 15
(explaining Commerce's approach to applying AFA when an interested party fails to cooperate by
not acting to the best of its ability in responding to Commerce's requests for information).

>   selected facts available are intended to produce an accurate, non-punitive,
>   dumping margin for Mueller.

Issues and Decision Mem. for Final Results of [ADD] Administrative Review: Certain

Circular Welded Non-Alloy Steel Pipe from Mexico at 16, A-201-805, June 13, 2011, ECF

No. 59 (Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States, Ct. No. 11-

00319) ("Mueller IDM").  Commerce selected the most discounted transaction data from

the responsive supplier, inferring that all merchandise sold to Mueller by the

uncooperative supplier came at such a discount.  Mueller, 753 F.3d at 1230.  This

selection enabled Commerce to calculate the uncooperative supplier's cost of production,

and ultimately resulted in a higher dumping rate for Mueller.  Id.  Commerce justified its

decision, in part, based on a finding that Mueller "could and should have induced" the

cooperation of the uncooperative supplier, and that an adverse inference affecting Mueller

was necessary to induce the uncooperative supplier's cooperation since it "could

otherwise evade its antidumping rate by funneling its goods through Mueller."  Id. at 1233.

Mueller challenged the final results at the U.S. Court of International Trade ("CIT"),

arguing that Commerce's application of AFA was improper, given Mueller's cooperation.

Id. at 1230–31.  After the CIT sustained Commerce's determination, Mueller appealed to

the Court of Appeals for the Federal Circuit.

The Court of Appeals examined whether Commerce's determination could be sustained under 19 U.S.C. § 1677e(a).[27]  It held that Commerce may, under subsection (a), rely on inducement or evasion rationales where reasonable under the circumstances, and where "the predominant interest in accuracy is properly taken into account."  Id. at 1233.  The Court of Appeals explained that its holding was "justified and required, even if Commerce is viewed as acting entirely under subsection (a) in determining Mueller's rate."  Id.  The Court of Appeals' use of "even if" is properly read as "assuming, as we do here," given that Commerce indeed acted under the authority of subsection (a) in the administrative proceeding, and the Court undertook no prior analysis of subsection (b) in Mueller.  Moreover, the Court's phraseology demonstrates the Court's subtle recognition of the importance of its holding—that policy rationales are permissible under subsection (a)—in light of the fact that subsection (b) has traditionally called for policy rationales, such as deterrence.  See, e.g., Gallant Ocean (Thailand) Co., Ltd. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (quoting F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (an AFA rate should be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance")).  The Court of Appeals noted that such considerations could be reasonable in Mueller's case, given that Mueller had an existing relationship with its supplier and thus "could potentially have refused to do

---

[27] The Court of Appeals acknowledged that Commerce justified its determination of Mueller's margin "primarily under subsection (a)."  Mueller, 753 F.3d at 1232.  The Court of Appeals also explained that "Commerce used 'facts otherwise available' to calculate Mueller's margin under 19 U.S.C. § 1677e(a) of the statute."  Id. at 1230.

business" as a tactic to induce cooperation.  <u>Mueller</u>, 753 F.3d at 1234–35.  As for the

evasion rationale, the Court of Appeals explained that the uncooperative supplier—itself

a mandatory respondent in the administrative proceeding—could potentially evade its

own AFA rate by exporting its goods through Mueller if Mueller were assigned a favorable

antidumping rate.  <u>Id.</u> at 1235.

A close reading of section 1677e(b) and <u>Mueller</u> reveals that application of an

inference adverse to the interests of a cooperating respondent under subsection (b) is not

contemplated by the statute nor the Court of Appeals.  First, the plain language of section

1677e(b) expressly limits Commerce's application of an adverse inference to the interests

of the party that failed to cooperate.  19 U.S.C. § 1677e(b)(1) (where an interested party

fails to cooperate, Commerce "may use an inference that is adverse to the interests of

that party").  Second, in the determination giving rise to <u>Mueller</u>, Commerce expressly

disavowed imposing an adverse inference against a cooperating party:

> The Department has found that the necessary information is absent from
> the record because [Mueller's uncooperative supplier] failed to cooperate,
> and has not made a finding that Mueller failed to cooperate. Accordingly,
> the Department has not applied an adverse inference against the interest
> of Mueller. Instead, the Department has selected from the facts otherwise
> available, the best information to use in place of [the uncooperative
> supplier's] withheld cost data.

Mueller IDM at 16.  The Court of Appeals did not reject Commerce's selection of facts

available under subsection (a) despite its adverse effect on Mueller.  The Court of

Appeals' key observation—that subsection (a) "does not provide for the specific facts that

should be used as a gap-filling mechanism"—set the stage for Mueller's lasting insight—

that policy rationales are not reserved exclusively for the realm of subsection (b).  <u>See</u>

Mueller, 753 F.3d at 1234.  "The statute on its face does not preclude Commerce from

relying on the same considerations under subsection (a) for an AFA determination as

used under subsection (b)."[28]  Id.

Here, several of Canadian Solar's unaffiliated suppliers of solar modules did not

report information on their FOPs, information Commerce needed to calculate Canadian

Solar's antidumping rate.[29]  Final Decision Memo at 15.  Commerce applied "partial AFA"

in place of the missing information.  Final Decision Memo at 17.  First, it noted that section

1677e(a) "provides that the Department shall apply 'facts otherwise available' if an

interested party or any other person withholds information that has been requested."  Id.

at 15.  Next, Commerce stated that subsection (b) "provides that the Department may use

an adverse inference in applying the facts otherwise available when a party has failed to

---

[28] After explaining Commerce's authority to act under subsection (a), the Court of Appeals notes that its ruling in Mueller is consistent with its precedents applying subsection (b) (which it describes as "properly directed to non-cooperating parties"), referring to those cases as constituting a separate body of law.  See Mueller, 753 F.3d at 1234 (citing De Cecco, 216 F.3d at 1032; Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1379 (Fed. Cir. 2012); Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1370–71 (Fed. Cir. 2014)).  The Court of Appeals sought to ensure that developing law under (a) would exist harmoniously with the law under (b), and to preserve the appropriate balance between accurately estimating respondents' antidumping rates, see Rhone Poulenc, Inc., 899 F.2d at 1191 (Fed. Cir. 1990), and relying on policy rationales.  See Mueller, 753 F.3d at 1233; see also Changzhou, 701 F.3d at 1379 (holding that Commerce may not exclusively apply a deterrence rationale in the case of a cooperating party and must conduct a case-specific factual analysis).  Indeed, in the case of a cooperating respondent, Commerce may consider policy rationales in making a facts otherwise available determination, but those considerations must reasonably be based in the facts of the case.  See Xiping Opeck Food Co., Ltd. v. United States, 38 CIT __, __, 34 F. Supp. 3d 1331, 1351 (2014) (holding that, on remand, Commerce must explain the relevance of any inducement or evasion considerations and must address how using AFA to calculate a cooperating party's rate where that rate has no impact on the non-cooperating party is reasonable).

[29] The unaffiliated suppliers are interested parties for purposes of the statute.  See 19 U.S.C. § 1677(9)(A) (defining "interested party" as, inter alia, a foreign manufacturer of subject merchandise).

cooperate by not acting to the best of its ability to comply with a request for information."

Id.  Thereafter it selected Canadian Solar's highest consumption rates for FOPs for solar

cells and modules sold in the United States "because the suppliers in question failed to

cooperate by not acting to the best of their abilities to comply with a request for

information." Id. at 18.  In other words, Commerce used an adverse inference invoking

1677e(b) based on the suppliers' lack of cooperation to calculate Canadian Solar's rate.

      Commerce's application of an adverse inference under subsection 1677e(b) is

contrary to law.  The plain meaning of the statute, as confirmed by Mueller, does not

provide for an adverse inference against a cooperative respondent under subsection

1677e(b).  It is undisputed that Canadian Solar cooperated in the administrative review.

See Canadian Solar's Br. at 10; Def.'s Br. at 34–41; Oral Arg. at 00:14:45–00:15:00

(Defendant agreeing that Canadian Solar was a cooperative respondent); See also

Unreported [FOPs] Mem. at 5, PD 517, CD 585, bar code 3533043-01 (Dec. 16, 2016)

(stating that Commerce may apply AFA in determining a cooperative respondent's

dumping margin to induce cooperation of the uncooperative party).  As discussed, the

statute allows Commerce to select facts available under subsection (a), not apply an

adverse inference against a cooperating party under subsection (b).  Commerce may

consider inducement and evasion rationales in selecting amongst facts available under

subsection (a), so long as accuracy remains the predominant concern.  Mueller, 753 F.3d

at 1233.  The Court of Appeals in Mueller explained that Commerce is not prohibited "from

drawing adverse inferences against a non-cooperating party that have collateral

consequences for a cooperating party," but that was not the set of facts presented.[30] Id.

at 1236.  Generally, Commerce's decision to rely on subsection (a) versus (b) (or vice

versa) is critical, as the two subsections involve varying levels of review and trigger

separate lines of jurisprudence.  Id. at 1232 ("[t]hese two subsections have different

purposes."), 1234 (discussing the jurisprudence under subsection (b) separately).  In the

case of a cooperating party, selection of facts available under subsection (a) where

Commerce considers an inducement or evasion rationale necessarily involves a more

searching review.  Commerce must conduct "a case-specific analysis of the applicability

of deterrence and similar policies," placing a "greater emphasis on accuracy" where the

decision affects a cooperating party.  Id. at 1234 (citing Changzhou Wujin Fine Chem.

Factory Co., Ltd. v. United States, 701 F.3d 1367, 1379 (Fed. Cir. 2012)).  Here,

Commerce purports to impose "partial AFA" pursuant to section 1677e(b), relying

principally on Mueller.  As explained, Mueller addressed a determination Commerce

made under subsection (a), and its lessons thus apply to the selection of facts available

under subsection (a).  Commerce's application of an adverse inference—purportedly

under subsection 1677e(b)—is therefore contrary to law.

---

[30] The Court of Appeals referred specifically to the situation where Commerce makes an adverse inference to calculate the rate of a non-cooperating party, and that rate may be used in calculating the rate of a cooperating party.  Mueller, 753 F.3d at 1236 (citing KYD, Inc. v. United States, 607 F.3d 760, 768 (Fed. Cir. 2010)).  That is not the case here, where Commerce had no reason to calculate a rate for the uncooperative suppliers.

To the extent Commerce purports to rely on 19 U.S.C. § 1677e(a) for its application

of partial AFA, its determination that Canadian Solar could have potentially induced its

uncooperative suppliers to cooperate is unsupported by substantial evidence.  Commerce

cites both subsections 1677e(a) and (b) in its determination, but found, "pursuant to

[section 1677e(b)] of the Act, that the application of partial AFA is warranted."   Final

Decision Memo at 18.  The statute makes clear that Commerce must invoke subsection

(a) to reach subsection (b).  Therefore, Commerce's invocation of subsection (a) would

seem to be solely in service of its subsection (b) analysis.   Nonetheless, in its

determination Commerce discusses and purports to rely upon Mueller throughout, see

Final Decision Memo at 16–17, a case that relies on a subsection (a) analysis.  See

Mueller, 753 F.3d at 1230, 1232.  It is therefore possible that Commerce also attempts to

rely upon subsection (a) or some combination of subsection (a) and (b).  In any event, the

record does not support Commerce's determination pursuant to an analysis under

subsection (a), as Commerce fails to show that Canadian Solar had the type of long-

standing relationships with its suppliers that would give it leverage in the marketplace.

Although the Court of Appeals in Mueller does not expound upon what constitutes

an "existing relationship," surely more is required than what is present here.  753 F.3d at

1235; see also Changzhou, 701 F.3d at 1379 (holding that there was no justification for

an AFA rate based in deterrence where the rate would affect only the cooperating party).

Here, Commerce based its determination that Canadian Solar has long-term relationships

with its suppliers on the fact that it maintains "supplier-specific accounts in the accounting

system" and corporate divisions dedicated to the purchasing of solar cells.  Final Decision

Memo at 16.   Such facts do not reasonably indicate the presence of a long-term

relationship creating leverage.   Indeed, corporate practices such as those listed by

Commerce are equally consistent with short-term, unimpactful business relationships

falling short of the type that would indicate that one party holds undue influence.  Without

more evidence showing leverage, Commerce's determination that Canadian Solar could

have induced cooperation is unreasonable.[31]

---

[31] Defendant invokes this court's review of Commerce's final determination in the second administrative review ("AR2") of the ADD order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, as support for the argument that Canadian Solar could have induced its suppliers to cooperate.   Def.'s Br. at 36 (quoting SolarWorld Americas, Inc. v. United States, 41 CIT __, __, 273 F. Supp. 1254, 1277–78 (2017) ("SolarWorld I").   SolarWorld I is inapposite because (1) it did not involve a challenge that Commerce's application of partial AFA was contrary to law, and (2) the facts were distinguishable from those of the current action.   In AR2, Commerce applied partial AFA to value Trina's unreported FOPs from Trina's unaffiliated solar cell suppliers. See Decision Mem. for the Final Results of the 2013– 2014 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From [the PRC] at 52, A-570-979, (June 13, 2016), available at https://enforcement.trade.gov/frn/summary/prc/2016-14532-1.pdf (last visited Apr. 11, 2019) ("AR2 IDM").   Trina argued that Commerce's determination was arbitrary and unsupported by substantial evidence because Commerce did not explain what percentage of a respondent's FOPs must be unreported for Commerce to consider the missing information significant enough to warrant AFA. SolarWorld I, 41 CIT at __, 273 F. Supp. 3d at 1276; Mem. Supp. Mot. [Trina] J. Agency R. at 19, Jan. 25, 2017, ECF No. 40 (SolarWorld Americas, Inc. v. United States, Consol. Ct. No. 16-00134).   The CIT sustained Commerce's determination, noting that Commerce reasonably explained that the percentage of solar cell inputs provided by Trina's unaffiliated suppliers was significant, and thus could not be excused.   SolarWorld I, 41 CIT at __, 273 F. Supp. 3d at 1277–78 (quoting AR2 IDM at 52).   Trina thus did not challenge Commerce's determination as contrary to law, as Canadian Solar does here. See Canadian Solar's Br. at 10. Second, the facts of SolarWorld I differed from those of the present action.  There, the CIT upheld Commerce's determination that Trina could induce cooperation from its suppliers based on "what Trina acknowledged were long-standing business relationships between Trina and the suppliers." SolarWorld I, 41 CIT at __, 273 F. Supp. 3d at 1278 (citing AR2 IDM at 56).  Here, by contrast, Canadian Solar disputes that it has long-term relationships with the uncooperative suppliers, and Commerce's determination on this issue is unsupported by substantial evidence, as explained above.  Defendant's reliance on this court's decision in SolarWorld I is therefore unavailing.

Defendant argues that <u>Mueller</u> does not require certainty—but mere potentiality—

that the cooperating respondent could induce cooperation, and that Canadian Solar's

relationships with its suppliers meet the relevant bar.[32]  Def.'s Br. at 36 (citing <u>Mueller</u>,

753 F.3d at 1235).  Defendant asserts that Commerce made three conclusions that

demonstrate Canadian Solar's ability to potentially induce cooperation: 1) that "Canadian

Solar is a significant producer in the solar market with significant sales in 2014" and that

it was one of the largest two exporters of subject merchandise to the United States during

the relevant period; 2) that Canadian Solar continues to grow rapidly; and 3) that

Canadian Solar "purchased a substantial quantity of solar cells and solar modules from

its suppliers."  Def.'s Br. at 37–38 (citing Final Decision Memo at 16).  Such observations

hardly establish that Canadian Solar possessed leverage over its suppliers, particularly

under the more searching subsection (a) analysis.  <u>See</u> <u>Mueller</u>, 753 F.3d at 1235

(explaining that unlike <u>Changzhou</u>, Mueller potentially had a mechanism to force the non-

---

[32] Defendant points out that "Canadian Solar does not aver that it ever threatened to end its business relationship with any of these suppliers." Def.'s Br. at 37. Although the Court of Appeals in <u>Mueller</u> contemplated a threat to end business as a mechanism for exercising leverage, the Court did not require it. <u>See</u> <u>Mueller</u>, 753 F.3d at 1235. Canadian Solar attempted to induce the cooperation of its suppliers. Indeed, Canadian Solar contacted the suppliers in question repeatedly over a period of up to four months, requesting FOP data from each supplier, in some cases up to eleven times. Canadian Solar's Br. at 10 (citing Canadian Solar's June 8, 2016 Sec. A Suppl. Questionnaire Resp. at Ex. SA-14 & SA-16, PD 263, CD 281–285 (June 8, 2016); Canadian Solar's July 8, 2016 Sec. D Suppl. Questionnaire Resp. at Ex. SD-13, PD 330, CD 358–365 (July 8, 2016); Canadian Solar's Sept. 2, 2016 Suppl. Questionnaire Resp. at Revised Ex. SD2-1, PD 428, CD 518 (Sept. 2, 2016)). Canadian Solar even expressed that cooperation was an "urgent" matter but was unable to persuade the suppliers. <u>See</u> <u>id.</u> Moreover, Defendant correctly acknowledges that Commerce did not base its decision on Canadian Solar not threatening its suppliers, but rather on the three conclusions listed below. Def.'s Br. at 37. Canadian Solar's lack of a threat to cease doing business is therefore not dispositive of the issue at hand—its ability to induce cooperation.

cooperating parties to cooperate); cf. Xiping Opeck Food Co., Ltd. v. United States, 41

CIT __, __, 222 F. Supp. 3d 1141, 1158–59 (2017) (upholding Commerce's determination

that cooperative respondent was in a position to induce cooperation of non-cooperative

entity because the non-cooperative entity "was not in a position to evade a dumping

margin assigned to [the cooperative respondent] by sourcing from a different supplier,"

given "the nature of their relationship and . . . [the cooperative respondent's] statement

that it dominated and set prevailing prices in the U.S. market").  Further, as Commerce

noted, the record contains no information regarding Canadian Solar's share of its

uncooperative suppliers' business.  Final Decision Memo at 16.  Commerce stated that,

although the record contained no such information, it could not conclude, "based on the

lack of such information, that Canadian Solar's refusal to do business with its

uncooperative suppliers would not serves [sic] as a mechanism to induce cooperation."

Id.  While Commerce may be able to avoid further inquiry where it acts pursuant to its

authority under subsection (b), it cannot point to a lack of evidence to satisfy its obligations

under a subsection (a) analysis.  Under the more searching "case-specific analysis of the

applicability of deterrence and similar policies," Commerce's reasoning here cannot

support its determination.  Accordingly, Commerce's application of partial AFA in

calculating Canadian Solar's antidumping margin is remanded for further explanation or

reconsideration.

### III. Commerce's Decision to Include Zero Quantity Import Data

In its final determination, Commerce opted to include in the average unit surrogate value calculations import data with quantities of zero, finding "no basis to conclude that the zero quantity import data included in our [surrogate value] calculations are errors or that these zero quantity imports result in unreliable and distortive [surrogate values]." Final Decision Memo at 86. Rather, Commerce found these imports attributable to rounding small import quantities down to zero. Final Decision Memo at 86. Trina argues the record contains no evidence that shipments of low quantities were rounded down to zero, and that including such data is distortive. Trina's Br. at 14–17. Defendant responds that Commerce reasonably determined that the record lacked any basis to conclude that the zero quantity data were the result of errors. Def.'s Br. at 41–42. For the reasons that follow, Commerce's determination is supported by substantial evidence.

Commerce found in its final determination that the zero quantity imports in the data set were attributable to rounding small import quantities down to zero. Final Decision Memo at 86. Commerce addressed Trina's counter argument that if the zeros were attributable to rounding that one would expect a greater number of quantities rounded to one than to zero because quantities from 0.5 units to 1.49 would round to one. Trina's Br. at 16 (citing Trina's Administrative Case Br. at 21–22, PD 531–532, CD 588, bar code 3538943-02 (Jan. 25, 2017)). Commerce found no reason to expect such a neat distribution of data as Trina describes. Trina's argument regarding how the data points should distribute does not detract from Commerce's otherwise reasonable determination that the zero quantity data are the result of rounding. Further, Commerce explained that

**PUBLIC VERSION**

if the zero quantity entries constituted error, it would expect similar errors to occur with respect to the reported import values, and the record contained no such errors.  Final Decision Memo at 86.  Additionally, if the entries were error, Commerce reasoned, such errors would suggest serious flaws with the GTA data Commerce utilized, and no party suggested that such fundamental flaws existed.  Id.  Commerce's explanation is reasonable and its determination is thus sustained.  See Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"); see also Daewoo Electronics Co., Ltd. v. Int'l Union of Electronic Elec., Tech, Solaried, & Mach. Workers, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that the inquiry is whether the record reasonably supports an agency's decision, not whether some other reasonable inference exists).

## IV. Calculation of TUS's U.S. Indirect Selling Expense Ratio

In calculating Trina's constructed export price, Commerce declined to use debt restructuring income reported by Trina to offset Trina's indirect selling expenses.  Final Decision Memo at 84.  Trina challenges this decision as unsupported by substantial evidence and arbitrary.  Trina's Br. at 18.  Trina also argues that Commerce failed to alert Trina to its concerns about the claimed debt restructuring income during the administrative proceeding.  Id. at 19.  Defendant responds that Commerce reasonably determined not to offset Trina's indirect selling expense by the claimed debt restructuring income.  Def.'s Br. at 43–44.

The antidumping statute requires Commerce to make certain adjustments to a respondent's reported constructed export price.   See 19 U.S.C. § 1677a(c)–(d).  One of the adjustments made to constructed export price is to deduct indirect selling expenses. See Final Decision Memo at 83–84; see also 19 U.S.C. § 1677a(d)(1)(D).  Indirect selling expenses are those costs that "would be incurred by the seller regardless of whether the particular sales in question are made, but reasonably may be attributed (at least in part) to such sales," while direct selling expenses are expenses that "bear a direct relationship to" the particular sales in question.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, at 823–4 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4164.  It is Commerce's practice to allow income gained through debt restructuring to be used to offset indirect selling expenses (thus minimizing the reduction in constructed export price).  Final Decision Memo at 84.

Commerce reasonably declined to offset Trina's indirect selling expense by the claimed debt restructuring income because there was insufficient information available on the record for Commerce to determine what portion of the gain was attributable to the period of review.  Final Decision Memo at 84–85.  Commerce's stated practice is to only allow such an offset for gain attributable to the period of review.  Id. (citing Issues and Decision Mem. for the Final Determination in the [ADD] Investigation of Structural Steel Beams from South Korea at Comment 26, A-580-841, (July 5, 2000) available at https://enforcement.trade.gov/frn/summary/korea-south/00-16952-1.txt (last visited Apr. 11, 2019); Issues and Decision Mem. for the Final Determination in the [ADD] Investigation of Light-Walled Rectangular Pipe and Tube from Mexico at 69–70, A-201-

832, (Aug. 26, 2004) <u>available at</u> https://enforcement.trade.gov/frn/summary/mexico/E4-2045-1.pdf (last visited Apr. 11, 2019)).   Trina's claim for debt restructuring income is based solely on a single line item in its 2015 income statement.   <u>See</u> Trina's Sec. C Questionnaire Resp. at Ex. C-10, PR 232–34, CD 188–205, bar code 3468547-01 (May 12, 2016) ("Trina's Sec. C Questionnaire Resp.").   Trina complains that Commerce made no further inquiry regarding whether "income might not relate entirely to the current period" and therefore argues that Commerce's determination is purely speculative. Trina's Br. at 19.   However, "Commerce prepares its questionnaires to elicit information that it deems necessary to conduct a review, and the respondent bears the burden to respond with all of the requested information and create an adequate record." <u>ABB Inc. v. United States</u>, 42 CIT __, at __, 355 F. Supp. 3d 1206 at 1222 (2018) (citing <u>Nan Ya Plastics Corp. v. United States</u>, 810 F.3d 1333, 1337 (Fed. Cir. 2016); <u>QVD Food Co. v. United States</u>, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).   Trina did not provide an explanation of the debt restructuring agreement, evidence of its terms, or information as to the maturity of the related loan or loans, that would have allowed Commerce to determine whether the income recorded in 2015 was related entirely to that year or to a number of years.   <u>See</u> Final Decision Memo at 85.   Trina's argument accordingly fails as Commerce's determination was not speculative but rather reasonable and based on substantial evidence.[33]

---

[33] Trina further argues that it was arbitrary of Commerce to acknowledge that debt restructuring

(footnote continued)

### V. Commerce's Rejection of Qixin's Separate Rate Application

In this administrative review, Qixin was not selected as a mandatory respondent.

On March 10, 2016, Qixin submitted a separate rate application.  See Qixin's Separate

Rate Application, PD 107–109, bar code 3447985 (Mar. 10, 2016).  Commerce issued a

first and second supplemental questionnaire to Qixin, see First Suppl. Questionnaire to

Qixin, PD 300, bar code 3481536-01 (June 24, 2016); Second Suppl. Questionnaire to

Qixin, PD 474, bar code 3521534 (Nov. 10, 2016), to which Qixin timely submitted

responses.  See Qixin's First Suppl. Questionnaire Resp., PD 332, CD 392, bar code

3486020-01 (July 12, 2016); Qixin's Second Suppl. Questionnaire Resp., PD 481, CD

553, bar code 3523945-01 (Nov. 21, 2016).  Commerce issued the Preliminary Results

on December 16, 2016, which did not mention Qixin.  See Preliminary Results.  Qixin filed

an administrative brief on January 25, 2017 challenging the Preliminary Results and

requesting an explanation for Commerce's omission of Qixin from the Preliminary

Results.  See Qixin Administrative Case Brief, PD 536, bar code 3538956-01 (Jan. 25,

2017).  Commerce did not respond to Qixin's request for an explanation, and on June 20,

2017, Commerce published the Final Results, in which Commerce explained that Qixin's

separate rate application had been rejected.  See Final Decision Memo at 90–92.

---

income can be used to offset indirect selling expenses, but then to disallow the offset in the
entirety.  Trina's Br. at 18.  This argument fails for the same reason that Commerce's
determination is supported by substantial evidence.  Commerce acknowledged that Trina's debt
restructuring income could potentially be used to offset its indirect selling expenses.  Final
Decision Memo at 85.  However, Commerce did not have sufficient record evidence to determine
what portion, if any, of the recorded income from debt restructuring related to the period of review.
Id.; see also Trina's Sec. C Questionnaire Resp. at Ex. C-10.  It is not inconsistent or arbitrary of
Commerce to recognize it would make an offset for debt restructuring income, but to decline to
do so where there is insufficient evidence to determine that deduction in a particular instance.

Commerce acknowledged that it "inadvertently omitted a discussion of [Qixin's] separate rate status from the Preliminary Results," but reasoned that Qixin "became aware of the issue through the Department's supplemental questionnaires."   Final Decision Memo at 91.   Commerce further explained that the fact that it did not mention Qixin in the Preliminary Results should have served as an indicator to Qixin that its application had been rejected.   Id.   Qixin now argues that Commerce erred in not mentioning Qixin in the Preliminary Results, and that Commerce must provide reasonable notice of a decision and the reasons behind that decision to enable the party to effectively take part in the administrative process.   Qixin's Br. at 8–9 (quoting NEC Corp. v. United States, 151 F.3d 1361, 1374 (Fed. Cir. 1998)).

Defendant now acknowledges that Qixin had no opportunity to respond to Commerce's denial of its separate rate application and, likewise, Commerce lacked the opportunity to respond to the arguments Qixin may have made, had it had the opportunity. Def.'s Br. at 44–45.   Defendant accordingly requests that the court remand the issue to Commerce for reconsideration.   Id.

The court has discretion in deciding whether to grant a request for remand.   See SFK USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).   By failing to include Qixin in the Preliminary Results, Commerce deprived Qixin of the opportunity to respond substantively to the Department's position, and thus Qixin did not have an adequate opportunity to participate in the administrative process.   The court therefore remands the issue to Commerce to reconsider Qixin's separate rate application.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's surrogate value selections for valuing respondents' aluminum frames, nitrogen, polysilicon ingots and blocks, and financial ratios are sustained; and it is further

**ORDERED** that Commerce's decision to include import data with reported quantities of zero in the surrogate value calculations is sustained; and it is further

**ORDERED** that Commerce's decision to deny an offset for Trina U.S.'s debt restructuring income is sustained; and it is further

**ORDERED** that Commerce's surrogate value selection for valuing respondents' module glass is remanded to the agency for reconsideration or further explanation; and it is further

**ORDERED** that Commerce's application of an adverse inference in calculating Canadian Solar's dumping rate is remanded to the agency for reconsideration; and it is further

**ORDERED** that Commerce's decision to reject Qixin's separate rate application is remanded to the agency for reconsideration; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand determination; and it is further

Consol. Court No. 17-00173                                                    Page 56
**PUBLIC VERSION**

      **ORDERED** that the parties shall have 30 days thereafter to file a reply to comments

on the remand determination.


                 /s/ Claire R. Kelly
                Claire R. Kelly, Judge

Dated:April 16, 2019
      New York, New York