UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE: HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED ET AL., <br>       Plaintiffs and Consolidated Plaintiffs, <br><br> and <br><br> SHANGHAI BYD CO., LTD. ET AL., <br>       Plaintiff-Intervenors and <br>       Consolidated Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br>       Defendant, <br><br> and <br><br> SOLARWORLD AMERICAS, INC. ET AL., <br>       Defendant-Intervenor and <br>       Consolidated Defendant-Intervenors. | Consol. Court No. 17-00173 |

**COMMENTS OF CANADIAN SOLAR INTERNATIONAL LIMITED, *ET AL.,* AND SHANGHAI BYD CO., LTD. IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Craig A. Lewis, Esq.
Jonathan T. Stoel, Esq.
Lindsay K. Brown, Esq.

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Phone: +1.202.637.5600
Fax: +1.202.637.5910

*Counsel to Canadian Solar International Limited, et al. and Shanghai BYD Co., Ltd.*

February 24, 2021

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

I.  BACKGROUND ................................................................................................... 2

    A.  The Initial Agency Determination and First Remand ............................................ 2

    B.  The Federal Circuit's Opinion in the Appeal of the Second Review Results (*SolarWorld*) ....................................................................................................... 5

    C.  Commerce's Third Remand Determination ............................................................ 7

II.  THERE IS NO LEGAL JUSTIFICATION FOR COMMERCE'S STUBBORN RELIANCE ON THE DISTORTED AND UNREPRESENTATIVE THAI IMPORT DATA FOR NITROGEN GAS ....................................................................................... 9

    A.  Commerce's "Extreme Outlier" Standard Suffers the Same Fatal Flaw of Ignoring Representativeness as Evidenced by Relative Volumes ........................................ 9

    B.  Commerce's Other Rationales for Rejecting the AUV Data from Mexico, Bulgaria and Romania are Illogical and/or Unsupported .................................... 13

    C.  Commerce Failed to Explain How the Thai GTA Data Can Be Reconciled with the ITC Data on the Record ............................................................................... 16

    D.  Commerce May Not Avoid its Duty to Confirm the Reliability of Surrogate Data Simply Because the Agency Claims it is "Burdensome" to Do So ...................... 18

    E.  Commerce's Criticism of the CAFC is Misplaced .............................................. 19

III. CONCLUSION .................................................................................................... 21

**Cases**

*Canadian Solar Int'l Ltd. v. United States*,  448 F. Supp. 3d 1333 (CIT 2020) ............................ 5

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d. 1292 (CIT 2019) ............................ 5

*Canadian Solar Int'l Ltd. v. United States*, 471 F. Supp. 3d 1379 (CIT 2020) ......................... 7, 8

*Peer Bearing Company-Changshan v. United States*, 752 F.Supp.2d 1353 (CIT 2011) ............. 17

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)....................................... 18

*Shakeproof Assembly Components Div. of Illinois Tool Works v. United Sates*, 59 F. Supp. 2d 1354 (CIT 1999) ................................................................................................................................... 19

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ..................... passim

*Tri Union Frozen Food Prods. v. United States*, 227 F. Supp.3d 1387 (CIT 2017)............. 8, 9, 10

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 35 I.T.R.D. (BNA) 1136 (Ct. Int'l Trade 2013) ................................................................................................................................. 13

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............ 18

**Administrative Determinations**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014*-15, 82 FR 29,033 (Jun. 27, 2017), and accompanying Issues and Decision Memorandum................................................................................. 4, 17, 20

# INTRODUCTION

On January 13, 2021, Defendant, the United States (the "Government"), submitted the Final Results of Redetermination Pursuant to Court Remand ("*Third Remand Determination*") issued by the U.S. Department of Commerce ("Commerce") in the above-captioned consolidated action (CM/ECF 180).  Canadian Solar International Limited, Canadian Solar (USA), Inc., Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., and CSI Solar Power (China) Inc. (collectively, "Canadian Solar"), in their roles as plaintiffs and consolidated plaintiffs, and Shanghai BYD Co., Ltd. ("Shanghai BYD"), in its role as plaintiff-intervenor and consolidated plaintiff-intervenor, respectfully and timely submit the following comments in opposition.

Commerce's *Third Remand Determination* should be reversed and remanded.  Commerce has failed to address the errors identified by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit" or "CAFC") and this Court with respect to the proposed use of Thai import data to value the consumption of nitrogen gas used in the manufacture of solar cells.  As discussed below, while Commerce has contrived several new arguments in an unsuccessful effort to justify its continued use of the Thai surrogate value, the fact remains that – by any standard – the $9.36 per kilogram average unit value ("AUV") of nitrogen is distorted and utterly non-representative of a broad-based market value for nitrogen.  Whether the available data is viewed across countries or within countries, the Thai AUV reflects an extraordinarily small volume of imports and is, as such, clearly unrepresentative of the average value of the input being measured in the surrogate countries selected by Commerce.  In a last-ditch effort to salvage its untenable position, Commerce speculates for the first time that the extraordinarily high price and low volume data on which the agency seeks to rely may somehow be reflective of the allegedly specialized nature or purity of

the nitrogen used by Canadian Solar.  However, Commerce points to no record evidence to support this new theory—and, indeed, there is no factual basis for it.

This is not a situation where the record is lacking in viable alternatives.  Commerce is not facing a hard choice here.  The record includes several alternative sources for the nitrogen gas surrogate value that are unquestionably reliable and do not suffer from the defects identified by the Federal Circuit and this Court.  Representative and broad-based surrogate value data exists on the record for nitrogen gas imports into Bulgaria, Romania, or Mexico – all of them being alternative surrogate countries selected by Commerce.  Any one of these sources could be used to determine an accurate margin of dumping for Canadian Solar.  Given the multiple and generous opportunities Commerce has been provided to render a reasoned determination on this issue – and given Commerce's demonstrated inability to support the continued use of the Thai data – we urge this Court to remand this issue again with clear instructions to use one of these viable alternatives.

## I.      BACKGROUND

Currently before this Court is a single question – whether it is reasonable and supported by substantial evidence for Commerce to continue using a $9.36 per kilogram AUV of Thai imports (as reported in Global Trade Atlas ("GTA") ("Thai GTA data" or "Thai import data") under Harmonized Tariff Schedule ("HTS") subheading 2804.30) as the surrogate value ("SV") for Canadian Solar's consumption of nitrogen gas in the manufacture of solar cells.  This question must be answered in the *negative* since the record shows that this value (1) reflects an isolated and extremely limited volume of nitrogen imports into the surrogate countries under consideration, and (2) is entirely non-representative of the market-wide average price of nitrogen in those countries.

### A.      The Initial Agency Determination and First Remand

In the underlying administrative review, Canadian Solar and Shanghai BYD demonstrated that the Thai import data was not the best information available to value nitrogen because the AUV

of the Thai import data is both aberrational and unreliable. *See* Canadian Solar Rule 56.2 Br. at 31-41 (Mar. 7, 2018) (CM/ECF 54); Shanghai BYD Co., Ltd. Rule 56.2 Br. (Mar. 7, 2018) (CM/ECF 60). Among other things, Canadian Solar and Shanghai BYD explained that the $9.36 per kilogram value diverges violently from other reliable benchmark prices on the record for nitrogen gas under the same HTS number from economically comparable countries of $0.07 per kilogram for Bulgaria, $0.25 per kilogram for Mexico, and $0.08 for Romania. As the following table demonstrates, this amounts to a difference of between 3,744 and 13,371 percent—moreover, the volume of imports into Thailand (merely 136,545 kilograms) is miniscule compared to the multiple *millions* of kilograms of imports into these alternative surrogate countries selected by Commerce.

| Source | Nitrogen Price (USD per kilogram) | Nitrogen Volume (Kilograms) | Thai Value as a Percent of Alternate Value | Alternate Volume as a Percent of Thai Volume |
|---|---|---|---|---|
| Thailand Import Data | $9.36 | 136,545 | N/A | N/A |
| Bulgaria Import Data | $0.07 | 10,734,975 | *13,371%* | *7,862%* |
| Romania Import Data | $0.08 | 6,584,800 | *11,700%* | *4,822%* |
| Mexico Import Data | $0.25 | 28,057,590 | *3,744%* | *20,548%* |

*See* Canadian Solar Rule 56.2 Br. at 31-36 (citing Letter from Howard Smith, Program Manager, AD/CVD Operations, Office IV, "Antidumping Duty Review of Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Request for Surrogate Country and Surrogate Value Comments and Information" (Dep't Commerce, May 24, 2016); P.R. 244; Canadian Solar's Surrogate Value Rebuttal Comments at Exhibit SVR-6; P.R. 391, C.R. 474).

Indeed, so aberrantly high is the $9.36 per kilogram SV for nitrogen that this single, otherwise insignificant, overhead item ended up accounting for between 13 and 19 percent of Canadian Solar's total cost of manufacturing. Canadian Solar Rule 56.2 Br. at 32-33. In other words, the application of this aberrant SV for nitrogen gas transformed a minor overhead item into an element of cost that is on par with the two largest inputs of Canadian Solar's subject merchandise—polysilicon and wafers—*combined*. *See id.* This is self-evidently absurd and points to a serious defect in the data used by Commerce. Canadian Solar and BYD demonstrated to the Court that the source of the distortion is the Thai SV data for nitrogen.

Canadian Solar and BYD also detailed for Commerce that the AUVs for nitrogen imports into Ecuador and South Africa ($17.16 and $26.27 per kilogram, respectively) – the "bookends" relied upon by Commerce – are likewise based on extraordinarily small volumes: a vanishingly small 6,498 kilograms for Ecuador, and an equally miniscule 12,894 kilograms for South Africa. *See id.* at 37. As with the Thai data, the extremely small volume of imports into those two countries correlates to a very high AUV. There is therefore a *clear pattern* among the surrogate country data for nitrogen imports that calls into question Commerce's decision to use the Thai value. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-15*, 82 FR 29,033 (Jun. 27, 2017), and accompanying Issues and Decision Memorandum at 54 ("*Final Decision Memo*"). P.R. 569. In fact, the AUVs for the three surrogate countries with *import volumes of at least 6.5 million kilograms* span a consistent range of only 18 cents. On the other hand, the three surrogate countries with *import volumes under 150,000 kilograms* have wildly divergent AUVs that are all much higher than the AUVs of the countries with large import volumes.

This Court's first remand order sustained Commerce's decision to use the Thai GTA data for nitrogen gas. *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d. 1292, 1310-13 (CIT 2019) (CM/ECF 98). On June 15, 2020, this Court also sustained Commerce's second remand redetermination and judgment entered accordingly. *Canadian Solar Int'l Ltd. v. United States*, 448 F. Supp. 3d 1333 (CIT 2020) (CM/ECF 158).

**B.    The Federal Circuit's Opinion in the Appeal of the Second Review Results (*SolarWorld*)**

Virtually the identical facts and legal issues regarding Commerce's use of distorted and non-representative Thai GTA import data for nitrogen were raised during the immediately preceding 2013-14 administrative review and appealed to this Court. On June 24, 2020, the Federal Circuit held that Commerce failed to justify sufficiently its reliance on the Thai GTA import data to value Trina's nitrogen input in that case. *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1357-59 (Fed. Cir. 2020) ("*SolarWorld*"). Accordingly, the CAFC remanded to this Court for Commerce to "either adequately explain why the Thai GTA data is not aberrational or to adopt an alternative surrogate value for Trina's nitrogen input." *Id.* at 1358-59.

Specifically, the Federal Circuit found that there was "unrebutted evidence" of the "unreliability" of the Thai import data. *Id.* at 1357. The CAFC found that Commerce had employed a "bookend methodology" in the Second Review to justify its use of the Thai GTA data, noting that the Thai AUV of $11.68 per kilogram in the Second Review period was between the overall average AUVs for the same HTS number for imports into Bulgaria ($0.09 per kilogram) and Romania ($0.13 per kilogram), on the one hand, and the AUVs for South Africa ($5.46 per kilogram), Ecuador ($4.84 per kilogram), and Ukraine ($78.75 per kilogram) on the other hand. The CAFC rejected this methodology as "illogical":

> In essence, the government argues that Commerce reasonably relied
> on a "bookend" methodology to find the Thai data reliable because

its average unit value was neither the highest nor the lowest of the potential surrogate countries. But the use of a bookend methodology here is illogical because it fails to account for the fact that countries on one end of the bookend (Bulgaria and Romania) account for the vast majority (99.22%) of the recorded nitrogen imports, that these countries have a substantially lower average unit value than that of Thailand, and that the other countries to which Commerce compares the Thai average unit value (the other end of the bookend) together represent only a fraction of a percent of the quantity (about 0.40%) recorded in the GTA.

*Id.* at 1357-58. The CAFC further held that Commerce's application of the bookend methodology was inconsistent with Commerce's longstanding practice to "disregard small-quantity import data {from the primary surrogate country} when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other {potential surrogate} countries." *Id.* at 1358. The CAFC noted that (1) the Thai GTA data was "small-quantity" (0.39% of the total imports), and (2) the per-unit value of the Thai GTA data ($11.68/kg) was "substantially different" from the per-unit values GTA data for the two countries with "larger quantity imports", i.e., Bulgaria ($0.09/kg) and Romania ($0.13/kg). The CAFC found that, "{u}nder these circumstances, the use of Thai data appears to be inconsistent with Commerce's own approach in past cases." *Id.*

Finally, the Federal Circuit considered evidence presented by the respondents that the Thai GTA import data was inconsistent with official U.S. export data for the same period published by the U.S. International Trade Commission ("ITC"). Specifically, the CAFC observed that:

The ITC data indicated that about 136 times more nitrogen was exported from the United States into Thailand (roughly 586,305 kg) than the GTA data indicated was imported into Thailand from the United States (4,298 kg). And the ITC data indicated an average unit value for nitrogen of $0.16/kg, as opposed to the GTA value of $11.68/kg.

The ITC data and the Thai GTA data cannot both be correct, as Commerce appears to admit. *See* Oral Argument, 35:55-36:04 (when asked whether the Thai GTA data and the ITC data can both

be correct, the government stated "probably not"). Commerce has not explained why the Thai GTA data is a more accurate record of these transactions than the ITC data, admitting that it "just do{es}n't know" which is accurate. Oral Argument, 36:40-49.

*Id.* The CAFC rejected Commerce's claim that this enormous discrepancy could be ignored simply because Commerce has a preference to use the GTA import data, finding that this preference "does not excuse {Commerce's} failure to reconcile the admitted inconsistency." *Id.*

## C. Commerce's Third Remand Determination

Following the CAFC's decision in *SolarWorld*, Canadian Solar filed a motion for reconsideration of this Court's decision sustaining Commerce's use of Thai GTA data to value nitrogen gas in the Third Review. *See* Canadian Solar's Motion for Reconsideration & Memo. Supp. 59(e) Mot. For Reconsideration or 60(b) Mot. for Relief from Judgment (July 14, 2020) (CM/ECF 160). Canadian Solar filed this motion for reconsideration in recognition of the fact that the legal issues and facts in the two cases are substantially similar with respect to the valuation of nitrogen.

This Court granted Canadian Solar's request for reconsideration and remanded the case to Commerce to reconsider its surrogate value selection for nitrogen, "consistent with the {CAFC's} instruction" in *SolarWorld*. *Canadian Solar Int'l Ltd. v. United States*, 471 F. Supp. 3d 1379, 1383 (CIT 2020) ("*Canadian Solar*") (CM/ECF 171). Specifically, this Court held that the CAFC's holding in *SolarWorld* implicated its prior decision in the underlying Third Review:

> the Court of Appeals questioned Commerce's practice of determining whether the Thai import data was aberrational, likening it to a bookend that unreasonably fails to account for considerable differences in import volume between surrogate countries . . . Moreover, the Court of Appeals questioned Commerce's refusal to consider the U.S. International Trade Commission's export data relating to the same imports reported in the Global Trade Atlas data, noting significant disparities between the two sources, and holding that Commerce's cited regulatory preference not to rely on export

> data does not sufficiently address the fact that both sources cannot
> be correct.

*Id.* at 1383.  Thus, the Court remanded to Commerce to "either adequately explain why the Thai

{Global Trade Atlas} data is not aberrational" or "adopt an alternative surrogate value for

{Canadian Solar's} nitrogen input{.}" *Id.*

In the *Third Remand Determination*, Commerce claims to have "reexamined" its nitrogen

SV selection.  Nevertheless, Commerce has stuck with its aberrational and unreliable Thai GTA

import data.  *Third Remand Determination* at 2.  First, Commerce relied on the CIT's decision in

*Tri Union Frozen Food Prods. v. United States*, 227 F. Supp.3d 1387, 1395 (CIT 2017), to define

a SV to be "aberrational" only if it is an "extreme outlier" – further defined by Commerce as "a

value that deviates markedly from all other values in a given data set."  *Third Remand

Determination* at 7.  Purportedly applying this standard, Commerce asserted that notwithstanding

the overall low AUVs in those countries, there are individual AUVs for imports *into* Mexico,

Bulgaria, and Romania, that range above and below the $9.36 per kilogram Thai AUV, and that

this demonstrates that the $9.36 AUV is not an "extreme outlier."  *Id*.

Second, Commerce sought to diminish the significance of the fact that the overall AUVs

for Mexico, Bulgaria, and Romania were vastly lower than the AUV for Thailand.  Commerce

claimed that because virtually all of the imports into those three countries was from neighboring

countries, these lower AUVs "may not reflect the prices experienced by other customers in those

markets" according to Commerce.  *Id*.  Commerce further suggested, absent any record evidence,

that imports into Mexico, Bulgaria, and Romania may not have been of the required "purity" for

use in solar cell production.

Finally, Commerce rejected consideration of the stark discrepancy between official U.S.

export data for nitrogen reported by the ITC, on the one hand, and the GTA-reported data for

nitrogen imported into Thailand from the United States, on the other hand. Commerce speculatively suggests that such discrepancies might be explained by such factors as "inspection requirements" and "timing." *Id*. at 13.

Canadian Solar, BYD, and Trina responded to all of these arguments. Commerce nevertheless insisted on continuing to employ the aberrational Thai data in its final results.

## II. THERE IS NO LEGAL JUSTIFICATION FOR COMMERCE'S STUBBORN RELIANCE ON THE DISTORTED AND UNREPRESENTATIVE THAI IMPORT DATA FOR NITROGEN GAS

Commerce's stubborn insistence on continuing to use the distorted and non-representative Thai GTA data to value Canadian Solar's nitrogen consumption is both unreasonable and unsupported by substantial evidence. Notwithstanding the Court's clear analysis and instructions, Commerce continues to disregard the relative import quantities associated with the AUVs from economically comparable countries during the POR and instead has invented several theories to justify its erroneous and unreasonable reliance on the Thai GTA data. None of these new theories support or justify continued reliance on the discredited Thai GTA data.

### A. Commerce's "Extreme Outlier" Standard Suffers the Same Fatal Flaw of Ignoring Representativeness as Evidenced by Relative Volumes

Commerce's first line of defense is to ratchet up the definition of "aberrational" to be an "extreme outlier" – a term Commerce further defines as "a value that deviates markedly from all other values in a given data set." *Third Remand* at 7 (citing *Tri Union Frozen Food Prods. v. United States*, 227 F. Supp.3d 1387, 1395 (CIT 2017)). Purportedly applying this standard, Commerce asserts that, notwithstanding the low *country-wide* AUV's for Mexico, Bulgaria, and Romania, there are individual AUVs for imports *within* Mexico, Bulgaria, and Romania that range above and below the $9.36 per kilogram Thai AUV. *Id.* Commerce claims that these occurrences demonstrate that the $9.36 AUV is not an "extreme outlier." *Id.*

Commerce's reference to *Tri Union* is incomplete. In describing Commerce's practice, the Court in *Tri Union* did not define "aberrational" as limited only to a "value that deviates markedly from all other values in a given data set." Rather, the *Tri Union* court actually defined "aberrational" more broadly and flexibly so as to include also AUVs that are "distortive or misrepresentative, or 'somehow incorrect.'" *Tri Union*, 227 F. Supp.3d at 1395. Moreover, the court described Commerce's practice as including comparing "the prices for an input from all countries found to be at a level of economic development comparable to the {non-market economy ("NME")} whose products are under review from the {period of review} and prior years." *Id.* at 1398 n.13. Nothing in the *Tri Union* court's description of Commerce's practice indicates that the import quantity an AUV reflects is irrelevant when comparing the prices from other surrogate countries. Put simply, Commerce's restricted definition of aberrational as being an "extreme outlier" – "a value that deviates markedly from all other values in a given data set" – is unreasonably self-restraining and illogical.

Building on its unreasonably narrow definition of aberrational, Commerce argues that the Thai AUV used to value nitrogen, $9.36/kg, is not "unusually high" when compared to the ranges of individual import prices *into* the potential SV countries with the highest import volumes during the POR: Mexico (i.e., $0.24/kg to $1,025.40/kg), Bulgaria (i.e., $0.05/kg to $9.72/kg), and Romania (i.e., $0.06/kg to $80.36/kg). *Third Remand Determination* at 7. From this false premise, Commerce concludes that the Thai AUV is not an outlier compared to the individual import prices observed in these other markets and, given such price ranges, "a customer in any of these markets would not find a price of $9.36/kg for nitrogen to be unusual, an 'extreme outlier,' or 'somehow incorrect.' " *Id.*

However, Commerce's attempt to validate the aberrational $9.36/kg Thai AUV by comparing it to the range of individual import prices *into* Mexico, Bulgaria, and Romania suffers from the same fatal defect identified by the CAFC and which necessitated this Court's remand order. Specifically, Commerce's new analysis of individual imports into the surrogate countries completely ignores the relative volume of those imports and thus their representativeness of prices in those markets. As shown in the table below, for the Mexican data, the high end of the AUV price range cited by Commerce (i.e., $1,025.40/kg) – imports from the Netherlands – accounted for just 0.00017% (48,072 kg of 28,045,077 kg) of the total nitrogen imports into Mexico during the POR, whereas the low end (i.e., $0.24/kg) – from the United States – accounted for 99.97% (28,035,964 kg out of 28,045,077 kg) of total imports into Mexico. *See* Letter from Wiley Rein LLP to the U.S. Department of Commerce, Case No. A-570-979 (July 26, 2016)("Petitioner's Rebuttal SV Comments"), Exh. 3. P.R. 397-398.

### NITROGEN IMPORTS INTO MEXICO – HTS 2804.30

|  | Value (USD) | Quantity (kgs) | AUV (USD/kg) | % of Total Import Quantity |
|---|---|---|---|---|
| **Mexico Total** | **6,958,348** | **28,045,077** | **$ 0.25** | **100.00%** |
| *United States* | *6,767,766* | *28,035,964* | *$ 0.24* | *99.96772%* |
| Germany | 123,453 | 8,317 | $ 4.84 | 0.02966% |
| Israel | 29 | 4 | $ 7.25 | 0.00001% |
| Italy | 1,943 | 131 | $ 14.83 | 0.00047% |
| United Kingdom | 5,701 | 350 | $ 16.29 | 0.00125% |
| France | 7,451 | 223 | $ 33.41 | 0.00080% |
| Denmark | 600 | 16 | $ 37.50 | 0.00006% |
| Japan | 1,911 | 19 | $ 100.58 | 0.00007% |
| Canada | 1,319 | 6 | $ 219.83 | 0.00002% |
| *Netherlands* | *48,072* | *47* | *$ 1,022.81* | *0.00017%* |
| Sweden | 1 | 0 | NA | 0.00000% |
| Switzerland | 102 | 0 | NA | 0.00000% |

Only imports of insignificantly small quantities exhibit price levels anywhere near the Thai AUV.

The same is true for imports into Bulgaria – the high end of the AUV price range – imports from Italy - (i.e., $9.72/kg) represented just 0.01% (833 kg of 10,734,975 kg) of total imports while

the low end of the AUV – imports from Romania and Serbia – accounted for no less than 99.3% of total imports (10,658,881 kg of 10,734,975 kg).  *Id.*

**NITROGEN IMPORTS INTO BULGARIA – HTS 2804.30**

| | Value (USD) | Quantity (kgs) | AUV (USD/kg) | % of Total Import Quantity |
|---|---|---|---|---|
| **Bulgaria Total** | **800,073** | **10,734,975** | **$ 0.07** | **100.00%** |
| *Romania* | *283,038* | *5,106,706* | *$ 0.06* | *47.57%* |
| *Serbia* | *418,400* | *5,552,175* | *$ 0.08* | *51.72%* |
| Macedonia | 4,007 | 18,539 | $ 0.2 2 | 0.17% |
| Austria | 17,594 | 21,270 | $ 0.83 | 0.20% |
| Greece | 29,062 | 20,461 | $ 1.42 | 0.19% |
| Germany | 15,926 | 10,893 | $ 1.46 | 0.10% |
| Netherlands | 418 | 250 | $ 1.67 | 0.00% |
| *Italy* | *8,098* | *833* | *$ 9.72* | *0.01%* |

Finally, the same pattern is observed for imports into Romania where the high end of the AUV range – imports from Russia (i.e., $80.36/kg) – accounted for a mere 0.00005% (3 kg of 6,584,798 kg) of total imports into Romania, and the low end of the AUV – from Bulgaria and Hungary – accounted for more than 99% (6,520,418 kg of 6,584,798 kg) of the import volume into Romania during the POR.  *Id.*

**NITROGEN IMPORTS INTO ROMANIA – HTS 2804.30**

| | Value (USD) | Quantity (kgs) | AUV (USD/kg) | % of Total Import Quantity |
|---|---|---|---|---|
| **Romania Total** | **537,708** | **6,584,798** | **$ 0.08** | **100.00%** |
| *Bulgaria* | *262,704* | *4,374,574* | *$ 0.06* | *66.43%* |
| *Hungary* | *228,681* | *2,146,844* | *$ 0.11* | *32.60%* |
| Austria | 9,307 | 48,616 | $ 0.19 | 0.74% |
| Germany | 9,586 | 4,970 | $ 1.93 | 0.08% |
| Italy | 9,657 | 4,283 | $ 2.25 | 0.07% |
| Czech Republic | 7,284 | 3,033 | $ 2.40 | 0.05% |
| Serbia | 9,496 | 2,476 | $ 3.84 | 0.04% |
| *Russia* | *201* | *3* | *$ 67.00* | *0.00005%* |
| Turkey | 792 | 0 | NA | NA |

In summary, Commerce's attempt to validate the aberrational $9.36/kg Thai AUV by comparison to the purported "range" of individual AUVs *into* Mexico, Bulgaria, and Romania fails to comply with the remand order.  Commerce did not reasonably consider the absurdly low and unrepresentative volumes imported.  In each case, the high-end of the AUV range Commerce

compared to the Thai AUV is associated with an extremely low and non-representative volume of imports.

Indeed, if the country-by-country summaries provided above demonstrate anything, it is that the overwhelmingly predominant (i.e., representative) 1/ values for imports of nitrogen into all of these surrogate countries combined are in the range of $0.25/kg or less. In fact, more than 99.6% of all recorded nitrogen imports during the POR are less than $0.25/kg. These vastly lower values are clearly, and inarguably, the only values that are "non-aberrational" and representative of the value of imports into these countries. In contrast, selected imports of values at, or exceeding, the $9.36/kg Thai AUV, without exception represent extremely low volume imports and are therefore "abnormal" in every sense of the word. This is the very definition of "misrepresentative" (and therefore "aberrational") identified by the court in *Tri Union*. Indeed, the CIT has confirmed that "a very small relative quantity of imports triggers an obligation for Commerce to explain why the data is not aberrational." *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 35 I.T.R.D. (BNA) 1136 (Ct. Int'l Trade 2013) at *5.

B.    **Commerce's Other Rationales for Rejecting the AUV Data from Mexico, Bulgaria and Romania are Illogical and/or Unsupported**

In addition to ignoring the lack of representativeness of the AUV data, Commerce has also sought to invalidate the lower AUVs for Mexico, Bulgaria and Romania, compared with Thailand, on the grounds that (1) the imports into these countries are almost exclusively from neighboring countries, and (2) the nitrogen imported into these countries may not be of the "purity levels that would be used in solar cell production." *Third Remand Determination* at 7, 22-23.

_____

1/    The online Cambridge Dictionary defines "representative" as "typical of, or the same as, others in a larger group of people or things." https://dictionary.cambridge.org/us/dictionary/english/representative (last accessed 12/3/2020).

1.      **There is Nothing Unreliable About Imports Being from Neighboring Countries**

Commerce notes that, by quantity, 99.9 percent of the imports into Mexico came from the United States, 99.4 percent of the imports into Bulgaria came from Romania and Serbia, and more than 99 percent of the imports into Romania came from Bulgaria and Hungary.  *Third Remand Determination* at 7.  Commerce concludes from this that

> {T}he overall AUV of imports of nitrogen into these countries may be more reflective of prices between certain suppliers (the suppliers in one or two exporting countries) and certain customers (the customers of those suppliers) and may not reflect the prices experienced by other customers in those markets.

*Id.*  Commerce offers no supporting citation for these factual assertions because there is no such support.  The import data on the record identifies only quantities, values, and country of export.  *See* Letter from Wiley Rein LLP to the U.S. Department of Commerce, Case No. A-570-979 (July 26, 2016)("Petitioner's Rebuttal SV Comments"), Exh. 3.  P.R. 397-398.  The import data does not list the supplier or customer.  *Id.*  Additionally, Commerce's record does not contain any information about the number of producers or suppliers in the exporting "bordering" countries (i.e., the United States for imports into Mexico; Romania and Serbia for imports into Bulgaria; and Hungary and Bulgaria for imports in Romania).

Indeed, the only logical inference from the very large volumes of imports from these neighboring countries is not that these imports are unrepresentative and reflective of only one or a few suppliers and a few buyers.  Rather, it is the exact opposite – these data are broadly representative of the market for nitrogen gas in the importing countries as a whole (after all, they represent over 99 percent of all such imports) and likely represent multiple suppliers and buyers.  The exceedingly small volumes of imports from other sources – i.e., those imports Commerce stubbornly insists upon relying – lead to the opposite inference, that they likely represent at most

one or a few specialized transactions, not a broad-based market average of the kind Commerce

claims to be seeking for its surrogate values. In other words, Commerce has pointed to no evidence

on the record to support its allegation that a large percentage of imports coming from one or two

bordering country indicates that imports from that country may be more reflective of prices

between certain suppliers and certain customers and may not reflect prices experienced by other

customers in those markets.

> ### 2. Commerce's Arguments Concerning the Alleged "Purity" of Nitrogen and Solar Cell Production is Rank Speculation

In yet another creative attempt to discard the valid Mexican, Bulgarian, and Romanian

import data, Commerce observes that liquid nitrogen can be used in many industries ranging from

the medical industry, food industry, laboratory work, and cooling of astronomical instruments.

*Third Remand Determination* at 22-23. Commerce further asserts that "{t}here is no evidence of

solar producers in Bulgaria, Romania, or Mexico. However, there is evidence that solar cells were

produced in Thailand." *Third Remand Determination* at 23. From this, Commerce concludes that:

> {i}n order to ensure that the surrogate value that we are using covers
> nitrogen of the purity levels that would be used in solar cell
> production, we find it reasonable to use the AUV of nitrogen
> imported into a potential surrogate country for which there is
> evidence of solar cell producers therein.

*Id.* at 23.

Commerce notably cites no record evidence to support its conclusion that there is

something (allegedly) special or unique about the type or "purity" of nitrogen used in solar cell

product, as compared to the nitrogen imported for use by other industries in the countries at issue.

Furthermore, no party participating in the review, including the Petitioner, has made arguments or

placed evidence on the administrative record to this effect. Finally, Canadian Solar and BYD have

been constrained from rebutting these new factual assertions because Commerce elected to make

these claims only in its final remand determination, *after* the close of the comment period. In sum, any reliance Commerce places on these assertions must be considered speculative and therefore fails to meet the substantial evidence standard.

### C. Commerce Failed to Explain How the Thai GTA Data Can Be Reconciled with the ITC Data on the Record

As noted, one of the principal bases for the CAFC's reversal of Commerce's use of the Thai data for nitrogen was Commerce's refusal to consider the large disparities between the ITC's export data relating to the same imports reported in the Global Trade Atlas data. *See SolarWorld*, 962 F.3d at 1358. The CAFC rejected Commerce's claim that the enormous discrepancy between these data sets could reasonably be ignored simply because Commerce has a preference to use the GTA import data, finding that this preference "does not excuse {Commerce's} failure to reconcile the admitted inconsistency." *Id.*

Substantially the same disparities exist in the record of the third administrative review. Yet, Commerce has dismissively chosen to deal with the documented mismatch in the data by simply reciting its original decision in the *AR3 Final Results. Third Remand Determination* at 13-14 (quoting *Final Decision Memo* at 54). Commerce then, as now, refuses to consider the significance of the disparity in the data sets. Instead, Commerce claims that such differences are unsuitable to test the validity of selected surrogate value data because, for various possible reasons (*e.g.*, "timing" and "reporting and inspection requirements"), "it is unrealistic to expect export statistics to correspond one-for-one with import statistics for any given shipment of merchandise." *Id.*

Of course, there has never been a claim by Plaintiffs or Plaintiff-Intervenors that the data must match "one-for one." That isn't necessary here – the discrepancy at issue isn't a moderate difference that might easily be explained by timing or reporting requirements. The ITC data show

that *roughly 380 times more* nitrogen was exported from the United States to Thailand (approximately 788,319 kg) than the Thai GTA data indicated was imported into Thailand from the United States (2,070 kg) during the period of review. The significance of this discrepancy may not reasonably be ignored in assessing the reliability of the Thai GTA data or attributed to "timing." In fact, the CAFC pointed to very similar data from the Second Review:

> {t}he ITC data indicated that about ***136 times more*** nitrogen was exported from the United States into Thailand (roughly 586,305 kg) than the GTA data indicated was imported into Thailand from the United States (4,298 kg). And the ITC data indicated an average unit value for nitrogen of $0.16/kg, as opposed to the GTA value of $11.68/kg.
>
> The ITC data and the Thai GTA data cannot both be correct, as Commerce appears to admit. See Oral Argument, 35:55-36:04 (when asked whether the Thai GTA data and the ITC data can both be correct, the government stated "probably not"). Commerce has not explained why the Thai GTA data is a more accurate record of these transactions than the ITC data, admitting that it "just do{es}n't know" which is accurate.

*SolarWorld Americas*, 962 F.3d at1358 (emphasis added). As noted above, the disparity is even greater in the Third Review.

Furthermore, it is highly noteworthy – and again ignored by Commerce – that the $0.15/kg AUV for nitrogen of the much larger U.S. export volume (788,319 kg) reported in the official ITC data actually reasonably aligns with *every one* of the larger volume import AUVs for Mexico ($0.25/kg), Bulgaria ($0.07/kg), and Romania ($0.08/kg). The only reasonable inference is that the AUV derived from the Thai GTA data of $9.36/kg is likely incorrect and unreliable. *Peer Bearing Company-Changshan v. United States*, 752 F.Supp.2d 1353, 1372 (CIT 2011) (finding that the "absence of evidence corroborating the price reflected by the {SV} is evidence that detracts from, rather than supports, a finding that this price is based on the best available information"). In

short, Commerce has yet again failed to adequately consider whether a discrepancy of this order of magnitude does not undermine the Thai GTA data's reliability.

> **D.** **Commerce May Not Avoid its Duty to Confirm the Reliability of Surrogate Data Simply Because the Agency Claims it is "Burdensome" to Do So**

As the agency has done previously, Commerce also argues that it should be permitted to ignore information on the relative volume of import data because doing so would be "unreasonably burdensome." *Third Remand Determination* at 13. Commerce notes that there were some 150 different inputs to value in the review, and five potential surrogate countries, meaning that the agency potentially would have been asked to assess the suitability of 750 different surrogate values. *Id*. Commerce further complains that such an analysis "would invite subjective arguments from interested parties based on the relative quantities of imports used to calculate the AUVs that could involve 'distortive cherry picking of data' to suite their objectives." *Id*.

Commerce's fears are unfounded and, in any event, provide no excuse for the agency not to confirm that the data it employs in its AD margin calculations, including SVs, are accurate. It is firmly established in CAFC jurisprudence that Commerce has an obligation to calculate margins of dumping as accurately as possible. *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Commerce is not permitted to jettison that obligation for expediency.

Equally important, there is no reason to conclude that the burden of fulfilling this obligation of accuracy would be "unreasonable." The review at issue here amply illustrates this fact. While there were, by Commerce's own count, 150 different inputs at issue in the review, the parties actually contested relatively few of them. Indeed, the Issues and Decision Memorandum for the original final results of the 2014-15 administrative reviews indicates that the parties disputed the valuation of only 11 material inputs, inclusive of nitrogen gas. *See Final Decision Memo* at 2.

Moreover, given the adversarial nature of the administrative review proceedings, the burden of developing the factual record and arguing the relative merits of the data falls principally to the private interested parties (who are themselves circumscribed by the roles (*e.g.*, U.S. producer, U.S. importer, or foreign producer/export) set forth in the governing statute). The burden on Commerce to consider the data and arguments proffered by the participants in the proceedings in which it exercises oversight is not an "unreasonable burden" – it is Commerce's statutorily mandated role in the administrative process.

### E. Commerce's Criticism of the CAFC is Misplaced

Finally, for reasons that are not entirely clear, Commerce devotes substantial space in the *Third Remand Determination* to a critique of the CAFC's discussion of Commerce's practice in this area as reflected in *Shakeproof Assembly Components Div. of Illinois Tool Works v. United Sates*. See *Third Remand Determination* at 8-12 (citing *Shakeproof Assembly Components Div. of Illinois Tool Works v. United Sates*, 59 F. Supp. 2d 1354, 1359-60 (CIT 1999)). Commerce's critique is misplaced. The CAFC correctly identified that Commerce's "longstanding administrative practice" is to "disregard small-quantity import data {from the primary surrogate country} when the per-unit value is substantially different from the per unit values of the larger quantity imports of that product from other potential surrogate' countries." *SolarWorld*, 962 F.3d at 1358. In the *Third Remand Determination*, Commerce asserts that the practice identified by the CAFC only relates to evaluating the comparative AUVs of imports *into* a single surrogate country, not comparing *overall average* AUVs *across* surrogate countries. Commerce asserts, moreover, that its "current practice" is "to determine whether a particular potential surrogate country's AUV for a product, in the aggregate, is aberrational by examining whether it is in the range of AUVs for

that product from other economically comparable potential surrogate countries . . . ." *Third Remand Determination* at 10-11.

Commerce's claims are a straw man—the agency is merely repackaging the very same practice that it applied in the final results of the Second Review condemned by the Federal Circuit, as well as the Third Review at issue here. Commerce then, as now, elected to evaluate whether the Thai AUV was aberrational by blindly comparing the overall Thai AUV to the overall AUVs of the other surrogate countries, without any consideration of (1) the related quantities imported into Thailand or the other surrogate countries, and (2) the significance of the consistent positive correlation that exists in the data between extremely low volumes and extremely high AUVs. That is the very error the CAFC identified with respect to the second review and that resulted in this Court's remand order with respect to the third review. Specifically, the CAFC's primary objection in the Second Review was that Commerce could not ignore:

> the fact that countries on one end of the bookend {Bulgaria and Romania} account for the *vast majority* (99.22%) of the recorded nitrogen imports, that these countries have a substantially lower {AUV} than that of Thailand, and that the other countries to which Commerce compares the Thai {AUV} (the other end of the bookend) together represent only a fraction of a percent of the quantity (about 0.40%) recorded in the GTA.

*SolarWorld*, 962 F.3d at 1357-58 (emphasis added).

In short, the CAFC accurately concluded that Commerce's comparison of AUVs, absent reference to the relative quantities those AUVs reflect, is illogical. One of the CAFC's primary basis for its finding that Commerce's determination was not supported by substantial evidence or in accordance with law – the agency's methodology of ignoring relative volumes is illogical because it fails to consider significantly detracting evidence – remains entirely correct. In sum, the purpose of the CAFC's reversal and remand order was to compel Commerce to conduct the

appropriate analysis of relative SV import volumes—this was not done in the *Third Remand Determination* and this continued error requires correction.

## III. CONCLUSION

For all of the foregoing reasons, Canadian Solar and Shanghai BYD respectfully request that this Court reverse and remand this case again to Commerce with instructions to recalculate Canadian Solar's margin of dumping (and derivatively, Shanghai BYD's margin of dumping) after making necessary changes to rely on an alternative surrogate for nitrogen gas from Bulgaria, Romania, or Mexico, not Thailand.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis
Jonathan T. Stoel
Lindsay K. Brown

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Canadian Solar International Limited, et al. and Shanghai BYD Co., Ltd.*

Dated: February 24, 2021

# CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure section 2(B)(1), the undersigned counsel at Hogan Lovells US LLP hereby certifies that this reply brief complies with the word-count limitation requirement. The reply brief contains 6,420 words as computed by Hogan Lovells US LLP's word processing system (Microsoft Word 2010).

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis, Esq.
Jonathan T. Stoel, Esq.
Lindsay K. Brown, Esq.

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Canadian Solar International Limited, et al. and Shanghai BYD Co., Ltd.*

Dated: February 24, 2021

# CERTIFICATE OF SERVICE

I, Lindsay K. Brown, hereby certify that copies of the attached confidential and public submissions have been served by the Court's CM/ECF system, on February 24, 2021, addressed to the following parties:

On Behalf of the United States:

Joshua E. Kurland, Esq.
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

On Behalf of Changzhou Trina Solar Energy Co., Ltd. et al.:

Robert G. Gosselink, Esq.
TRADE PACIFIC, PLLC
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20003

On Behalf of Ningbo Qixin Solar Electrical Appliance Co., Ltd.:

Adams Lee, Esq.
HARRIS BRICKEN MCVAY SLIWOSKI, LLP
600 Stewart Street
Suite 1200
Seattle, WA 98101

On Behalf of SolarWorld Americas, Inc.:

John R. Magnus
TRADEWINS LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

On Behalf of Yingli Green Energy Holding Co., Ltd. et al.:

Richard L.A. Weiner, Esq.
SIDLEY AUSTIN, LLP
1501 K Street, NW
Washington, DC 20005

/s/ Lindsay K. Brown
Lindsay K. Brown, Esq.
HOGAN LOVELLS US LLP