IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                          )
CANADIAN SOLAR INTERNATIONAL              )
LIMITED ET AL.,                           )
                                          )
                Plaintiffs,               )
       v.                                 )
                                          )
UNITED STATES,                            )
                                          )        Consol. Court No. 17-00173
                Defendant,                )
                                          )
       and                                )        PUBLIC DOCUMENT
                                          )
SOLARWORLD AMERICAS, INC. ET AL.,         )
                                          )
                Defendant-Intervenors and )
                Consolidated Defendant-   )
                Intervenors.              )
_____  )

**DEFENDANT'S RESPONSE TO**
**COMMENTS ON THE REMAND REDETERMINATION**

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director
Of Counsel:                          Commercial Litigation Branch
                                     Civil Division
BRENDAN S. SASLOW                    United States Department of Justice
Attorney                             P.O. Box 480
Office of the Chief Counsel          Ben Franklin Station
   for Trade Enforcement and Compliance   Washington, D.C. 20044
United States Department of Commerce Tel: (202) 616-2228

March 26, 2021                       Attorneys for Defendant United States

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii

DEFENDANT'S RESPONSE TO COMMENTS ON THE REMAND
REDETERMINATION .............................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 2

    I.     Background ...................................................................................................... 2

    II.    Remand Redetermination ............................................................................... 5

ARGUMENT .............................................................................................................................. 8

    I.     Standard of Review ........................................................................................ 8

    II.    Commerce's Continued Reliance On Thai GTA Import Data To Value Nitrogen
        Is Supported By Substantial Evidence And In Accordance with Law ................... 8

        A.    Commerce Further Explained Its Practice Regarding When It Will
              Disregard Data As Aberrational ................................................................ 9

        B.    Consistent With Its Practice And The Federal Circuit's Order,
              Commerce Provided A Reasoned Explanation For Its Conclusion That
              The Thai AUV Is Not Aberrational .......................................................... 16

        C.    Commerce's Explanations Regarding Why Both The Thai GTA Import
              Data And Dataweb Data May Be Correct Is Supported by Substantial
              Evidence .................................................................................................. 22

    III.    Commerce's Determination Not To Recalculate The Separate Rate for Companies
         That Were Not Individually Examined Is in Accordance With Law Because It Has
         Continued to Rely On The Thai Import Data for Nitrogen Inputs ............................ 24

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017)......................................................................................... 21

*Canadian Solar Int'l Ltd. v. United States*,
2020 Ct. Int'l Trade LEXIS 140 (Ct Int'l Trade Sept. 14, 2020) ......................................... 4, 5, 22

*Canadian Solar Int'l Ltd. v. United States*,
378 F. Supp. 3d 1292 (Ct Int'l Trade 2019) .............................................................. 3, 9

*Clearon Corp. v. United States*,
Slip op. 13-22, Ct. Int'l Trade LEXIS 27 (Ct Int'l Trade Feb. 20, 2013) ...................................... 9

*Ferro Union, Inc. v. United States*,
44 F. Supp. 2d 1310 (Ct Int'l Trade 1999) ................................................................. 21

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)........................................................................................... 8

*Jacobi Carbons AB v. United States*,
313 F. Supp. 3d 1344 (Ct Int'l Trade 2018) ................................................................. 20

*Jacobi Carbons AB v. United States*,
422 F. Supp. 3d 1308 (Ct Int'l Trade 2019) ................................................................. 9

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016)........................................................................... 15, 20

*Laizhou Auto Brake Equip. Co. v. United States*,
32 C.I.T. 711 (2008) ........................................................................................................ 22

*Nachi-Fujikoshi Corp. v. United States*,
890 F. Supp. 1106 (Ct. Int'l Trade 1995) ................................................................. 15

*Peer Bearing Co. v. United States*,
12 F. Supp. 2d 445 (Ct Int'l Trade 1998) .................................................................. 21

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011)........................................................................................ 21

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*,
102 F. Supp. 2d 486 (Ct Int'l Trade 2000) ................................................................. 11

*Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*,
59 F. Supp. 2d 1354 (Ct Int'l Trade 1999) ........................................................ 4, 10, 11

*Solarworld Americas Inc. v. United States*,
962 F.3d 1351 (Fed. Cir. 2020)............................................... 3, 4, 10, 11, 19

*Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*,
125 F. Supp. 3d 1337 (Ct. Int'l Trade 2015) .................................................. 8

*Tianjin Magnesium Int'l Co., Ltd. v. United States*,
836 F. Supp. 2d 1377 (Ct. Int'l Trade 2012) .............................................. 8

*Tri Union Frozen Prods. v. United States*,
227 F. Supp. 3d 1387 (Ct Int'l Trade 2017) ................................................ 5, 6, 12, 13

*Trust Chem Co. Ltd. v. United States*,
791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) ............................................ 14, 17, 18, 22

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
Slip op. 13-30, 2013 Ct Int'l Trade LEXIS 34, *20 (Ct Int'l Trade Mar. 11, 2013) ................... 13

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011)............................................................. 16, 19

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(I) ........................................................................... 8

## RULES AND OTHER AUTHORITIES

United States Court of International Trade Rule 56.2(h)(3) ........................................ 1

NME Surrogate Country Policy Bulletin 04.1 (Mar. 1, 2004)................................... 15

## ADMINISTRATIVE DETERMINATIONS

*Activated Carbon from China*,
82 Fed. Reg. 51,607 (Dep't of Commerce Nov. 7, 2017)........................................... 12

*Activated Carbon from China*,
74 Fed. Reg. 57,995 (Dep't of Commerce Nov. 10, 2009)........................................... 23

*Antidumping Duties; Countervailing Duties*,
62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ........................................ 9

*Chlorinated Isocyanurates from China*,
80 Fed. Reg. 4,539 (Dep't of Commerce Jan. 28, 2015) .................................... 12, 14

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*,
82 Fed. Reg. 29,033 (Dep't of Commerce Jun. 27, 2017) ........................................................... 25

*Fabricated Structural Steel from China*,
85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020) ........................................................... 11

*Frozen Warmwater Shrimp from China*,
78 Fed. Reg. 56,209 (Dep't of Commerce Sept. 12, 2013) ................................................... 14, 18

*Glycine from China*,
77 Fed. Reg. 64,100 (Dep't of Commerce Oct. 18, 2012).................................................... 14, 18

*Heavy Forged Hand Tools from China*,
62 Fed. Reg. 11,813 (Dep't of Commerce March 13, 1997) ...................................................... 10

*Lightweight Thermal Paper from China*,
73 Fed. Reg. 57,329 (Dep't of Commerce Oct. 2, 2008)........................................................... 22

*Multilayered Wood Flooring from China*,
80 Fed. Reg. 41,476, (Dep't of Commerce July 15, 2015).................................................... 12, 14

*Multilayered Wood Flooring from China*,
76 Fed. Reg. 64,318 (Dep't of Commerce Oct. 18, 2011) .......................................................... 13

*Steel Wire Garment Hangers from China*,
80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015)................................. 10, 13, 14, 17, 18

*Steel Threaded Rod from China*,
79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014) ........................................................... 17

*Tapered Roller Bearings from Romania*,
62 Fed. Reg. 37,194 (Dep't of Commerce July 11, 1997)........................................................... 10

*Uncoated Paper from China*,
81 Fed. Reg. 3,112 (Dep't of Commerce Jan. 20, 2016) ........................................................... 12

*Wooden Cabinets and Vanities from China*,
85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020) .......................................................... 13

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                              )
CANADIAN SOLAR INTERNATIONAL                  )
LIMITED ET AL.,                               )
                                              )
              Plaintiff and Consolidated      )
              Plaintiffs,                     )
                                              )
       and                                    )
                                              )
SHANGHAI BYD CO., LTD. ET AL.,                )
                                              )
              Plaintiff-Intervenors and       )
              Consolidated Plaintiff-Intervenors, )
                                              )
       v.                                     )
                                              )
UNITED STATES,                                )
                                              )    Consol. Court No. 17-00173
              Defendant,                       )
                                              )
       and                                    )    PUBLIC DOCUMENT
                                              )
SOLARWORLD AMERICAS, INC. ET AL.,             )
                                              )
              Defendant-Intervenors and       )
              Consolidated Defendant-         )
              Intervenors.                     )
_____  )

**DEFENDANT'S RESPONSE TO**
**COMMENTS ON THE REMAND REDETERMINATION**

Pursuant to the United States Court of International Trade Rule 56.2(h)(3) and this

Court's orders dated September 14, 2020, and December 9, 2020, defendant, the United States,

respectfully submits its response to Canadian Solar, BYD and Trina.[1]  The Department of

---

[1] The Canadian Solar companies include Canadian Solar International Limited, Canadian
Solar (USA) Inc., Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar

Commerce has complied with the remand order by providing the required explanation for its finding that import data from Thailand is reliable and not aberrational. Because the remand redetermination is supported by substantial evidence and otherwise is in accordance with law, the Court should sustain the remand redetermination and enter judgment in favor of the United States.

## STATEMENT OF FACTS

### I.    Background

In the final results of this administrative review, Commerce selected Thailand as the primary surrogate country. PDM at 14-17 (unchanged in IDM). Commerce relied on Global Trade Atlas (GTA) import data from Thailand to value surrogate nitrogen inputs. IDM at 52-55. Commerce addressed a comment that the Thai average unit value (AUV) for nitrogen was aberrational and should not be used. Commerce found that the Thai AUV for nitrogen was within the price range of the nitrogen AUVs from other potential surrogate countries. Specifically, the Thai AUV for nitrogen, from the primary surrogate country, during the period of review was $9.36 per kilogram, while the AUVs for nitrogen from the other potential surrogate countries ranged from $0.08 per kilogram, for Bulgaria and Romania, to $26.27 per kilogram, for South Africa. IDM at 53. The other AUVs were $0.25 per kilogram for Mexico, and $17.16 per kilogram for Ecuador. *Id.* The Thai GTA AUV was larger than the AUVs from Bulgaria, Romania, and Mexico, but significantly smaller than the AUVs from South Africa and

---

Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., and CSI Solar Power (China) Inc. (collectively, Canadian Solar). BYD is a single company, Shanghai BYD Co., Ltd. (BYD). The Trina companies include Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science and Technology Co., Ltd., Trina Solar (U.S.) Inc., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Hubei Trina Solar Energy Co., Ltd. (collectively, Trina).

Ecuador. Commerce determined that the data did not demonstrate that the Thai nitrogen AUV was aberrational based on the AUV value. IDM at 52-54.

In its first opinion, this Court remanded Commerce's determination with respect to three issues, but sustained, among other issues, Commerce's reliance on GTA import data from Thailand to value surrogate nitrogen inputs. *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292, 1310-13 (Ct Int'l Trade 2019). The Court held that Commerce's determination that the Thai import data is not aberrational is reasonable because the Thai data was "within the range of the relevant benchmarks as defined by Commerce's practice." *Id.* at 1310. The Court also held that it is "reasonably discernible" that Commerce did not consider the degree of price variation between imports into Thailand from Switzerland and the United States compared to all other imports into Thailand as sufficient to justify disaggregation because Commerce "had already concluded that credible benchmarks exhibit significant price variation." *Id.* at 1311. Finally, the Court held that, with respect to International Trade Commission (ITC) Dataweb export data on the record, Commerce had provided reasonable explanation for the divergence between the U.S. export data and the Thai import data, and a reasonable justification for not using the U.S. export data as a benchmark by which to evaluate the Thai import data. *Id.* at 1313. Although the Court remanded three issues back to Commerce, Commerce's determination with respect to nitrogen inputs was not remanded. *Id.* at 1325.

On July 14, 2020, Canadian Solar moved for reconsideration with respect to the Court's final decision. Motion for Reconsideration, ECF Doc. No. 160. The Federal Circuit issued a decision on the administrative review immediately preceding this review. *Solarworld Americas Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020). In its decision, the Federal Circuit remanded the case for Commerce to "either adequately explain why the Thai GTA data is not

aberrational or to adopt an alternative surrogate value for Trina's nitrogen input." *Id.* at 1358-59. The Federal Circuit held that Commerce's "longstanding administrative practice with respect to aberrational data is to disregard small-quantity import data {from the primary surrogate country} when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other {potential surrogate} countries." *Id.* at 1358 (quoting *Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United* States, 59 F. Supp. 2d 1354 (Ct Int'l Trade 1999) (internal quotation marks omitted)). The court observed that: "{t}he Thai GTA data is 'small-quantity' (0.39%), and the per-unit value of the Thai GTA data ($11.68/kg) is 'substantially different' from the per-unit values GTA data for the other two countries with 'larger quantity imports': Bulgaria ($0.09/kg) and Romania ($0.13/kg)" and "the use of Thai data appears to be inconsistent with Commerce's own approach in past cases." *Id.*

The court also held that Commerce had not adequately explained why import data on the record was "a more accurate record of these transactions than" International Trade Commission (ITC) Dataweb export data, observing that counsel admitted at oral argument that Commerce "'just do{es}n't know' which is accurate." *Id.* For these reasons, the court concluded that Commerce did not provide "sufficient justification for its conclusion that the Thai GTA data was the 'best available information' from which to value Trina's nitrogen input." *Id.*

On September 14, 2020, this Court reconsidered its holding that Commerce's reliance on Thai import data is reasonable in light of the law as clarified by the Federal Circuit and remanded the determination for "further explanation or reconsideration of Commerce's selection of the Thai import data." *Canadian Solar Int'l Ltd. v. United States*, No. 17-00173, 2020 Ct Int'l Trade LEXIS 140, at *8 (Sept. 14, 2020). The Court also explained that Commerce "shall conduct its remand redetermination in accordance with § 1675(a)(2)(C), and shall explain the

lawfulness of the separate rates resulting from any changes to its methodology on remand." *Id.* at *9.

## II.       Remand Redetermination

On remand, Commerce reconsidered its selection of Thai GTA import data to value surrogate nitrogen inputs. Remand Redetermination, ECF Doc. No. 180 at 4-30. Commerce clarified that its practice is to consider data to be aberrational when it is an extreme outlier, is distorted or misrepresentative, or is somehow incorrect. *Id.* at 6-7 (citing *Tri Union Frozen Prods. v. United States*, 227 F. Supp. 3d 1387, 1394-95 (Ct Int'l Trade 2017)).

Commerce distinguished its current practice for evaluating whether data is aberrational from the Federal Circuit's characterization of its practice based on *Shakeproof*. *Id.* at 8-11. Commerce explained that its current practice is "to determine whether a particular potential surrogate country's AUV for a product, in the aggregate, is aberrational by examining whether it is in the range of AUVs for that product from the other economically comparable potential surrogate countries." *Id.* at 10-11. By contrast, in *Shakeproof*, Commerce evaluated whether subgroups of imports into a single surrogate country, from another country, comprised a low quantity relative to the quantities of imports into the same surrogate country from other countries. *Id.* at 8-10.

After further explaining its practice, Commerce evaluated the data on the record according to its practice and continued to find that the Thai GTA import data for nitrogen was not aberrational. Remand Redetermination at 6-7. Addressing the Federal Circuit's concern that the low quantity of imports into Thailand suggested that the data were aberrational, Commerce determined that the quantity of nitrogen imports into Thailand, which was 132,940 kilograms, was commercially reasonable. Remand Redetermination at 24-25 n.71, 26-27; *see* Surrogate

Value Memorandum (Dec. 18, 2015) at Attachment I, P.R. 541-43; Trina's Case Brief (Jan. 25, 2017) at 15-16, P.R. 531-32, C.R. 588.  Specifically, Commerce found that this amount of nitrogen was commercially reasonable because it accounted for over a million U.S. dollars of imports and is larger than the import quantity of data used to calculate surrogate values for a third of the inputs in this administrative review.  Remand Redetermination at 14.

Commerce further observed that the GTA import data from Bulgaria, Romania, and Mexico did not demonstrate that the Thai data were aberrational.  Remand Redetermination at 22-23.  Commerce explained that even though the AUVs for nitrogen, during the period of review, for Bulgaria, Romania, and Mexico were $0.07, $0.08, and $0.25 per kilogram, respectively, these prices represent averages of individual import prices that vary widely.  For example, the import prices paid for nitrogen in Bulgaria, during the period of review, range from $0.05 to $9.72 per kilogram, from $0.06 to $80.36 per kilogram in Romania, and from $0.24 to $1,025.40 per kilogram in Mexico.  Remand Redetermination at 6-7; Petitioner's Surrogate Value Rebuttal July 25, 2016 at Exhibit 3, P.R. 397-98, C.R. 482-84.  The Thai AUV that Commerce relied on is $9.36 per kilogram, which Commerce determined not to be an "extreme outlier" when compared to these price ranges.  Given these price ranges, Commerce concluded that a customer in any of these markets would not find the $9.36 per kilogram to be unusual, an "extreme outlier," or "somehow incorrect" because it is within the range of prices for each of the three countries.  Remand Redetermination at 6-7 (citing *Tri Union*, 227 F. Supp. 3d at 1394-95).

Commerce further reasoned that the relatively low AUVs for Bulgaria, Romania, and Mexico were more likely attributable to trade conditions in those countries, as opposed to demonstrative that there was something wrong with the Thai data.  Remand Redetermination at 7-8.  Commerce found that a large percentage of nitrogen imports into Bulgaria, Romania, and

Mexico during the period of review came from only one or two trading partners. *Id.* In Mexico, 99.9% of the imports into Mexico came from the United States. *Id.* at 6. In Bulgaria, 99.4% of the imports into Bulgaria came from Romania and Serbia, and 99% of the imports into Romania came from Bulgaria and Hungary. *Id.* Petitioner's Surrogate Value Rebuttal July 25, 2016 at Exhibit 3, P.R. 397-98, C.R. 482-84. Therefore, Commerce determined that the overall AUV of nitrogen imports into these countries may be more reflective of prices between certain suppliers, in one or two countries, and certain customers in Mexico, Bulgaria and Romania and may not reflect a broad price average experienced by all customers in those markets.

In confirming that the Thai AUV data was the best available information to value nitrogen inputs, Commerce considered the specificity of the data. Remand Redetermination at 22-23. Commerce explained that nitrogen has varied uses (including in the medical industry, the food industry, laboratory work, and as a coolant). *Id.* (citing Canadian Solar's Surrogate Value Submission (July 18, 2016) at Exhibit SV-10, P.R. 347, 362, C.R. 406, 421). Commerce found no record evidence that solar cells were produced in Mexico, Bulgaria or Romania, although there was record evidence that solar cells were produced in Thailand. *Id.*; PDM at 16. Because Commerce is seeking to value nitrogen of a purity level appropriate for use in solar cell production, Commerce determined that nitrogen in Thailand is likely to be the purity level required to produce solar cells, whereas there is no data on the record indicating the purity level of nitrogen from Mexico, Bulgaria and Romania. Remand Redetermination at 22-23

Commerce also addressed the apparent discrepancies between the ITC Dataweb export data and the Thai GTA import data. Commerce explained that it generally does not expect that import and export data will result in a one-to-one match. *Id.* at 27-28. Commerce noted

differences in transportation and insurance costs, time lags between the two sets of data, as well as goods stored in customs warehouses, and the existence of free trade zones.  *Id.* at 28-29.

Because it continued to find that the Thai GTA data was representative and reliable, Commerce found the data was appropriate to use to value the respondents' nitrogen inputs. Because Commerce continued to rely on the Thai GTA import data to value nitrogen inputs, it made no change to the rate of the mandatory respondent with an above zero margin.  As a result, Commerce also made no change to the separate rate companies' margins.  Remand Redetermination at 15.

## ARGUMENT

### I.     Standard of Review

In reviewing Commerce's determinations, the Court "must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(I)).  This standard applies equally to a remand redetermination.  *See, e.g.*, *Tianjin Magnesium Int'l Co., Ltd. v. United States*, 836 F. Supp. 2d 1377, 1380 (Ct. Int'l Trade 2012).  The Court also reviews Commerce's remand redetermination to ensure compliance with the Court's remand order.  *Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 125 F. Supp. 3d 1337, 1341 (Ct. Int'l Trade 2015).

### II.    Commerce's Continued Reliance On Thai GTA Import Data To Value Nitrogen Is Supported By Substantial Evidence And In Accordance with Law

Commerce's continued reliance on Thai GTA data to value nitrogen is supported by substantial evidence and in accordance with law.  On remand, Commerce further explained its

practice with respect to allegations of aberrational data. Applying this practice and addressing specific record evidence, Commerce determined the Thai nitrogen import data was usable.

Commerce reached its conclusion based on: (1) AUV value and (2) the commercially reasonable quantity of imports underlying the Thai GTA data. Commerce explained why the relatively lower AUV for Bulgaria, Romania and Mexico did not suggest that the Thai data were aberrational. Commerce further explained why discrepancies between the Thai GTA import data and the ITC Dataweb export data did not detract from its conclusion. Commerce has therefore complied with the remand order.

Having satisfied itself that the Thai GTA import data is usable and reliable, Commerce reasonably continued to find that it was the "best available information" to value nitrogen inputs. That conclusion is buttressed by Commerce's regulatory preference to value all inputs with data from the same surrogate country. "{D}eriving the surrogate data from one surrogate country limits the amount of distortion introduced into its calculation because a domestic producer would be more likely to purchase a product available {domestically}." *Clearon Corp. v. United States*, No. 08-0-00364, 2013 Ct Int'l Trade LEXIS 27, at *20 (Ct Int'l Trade Feb. 20, 2013). Commerce's determination that Thai surrogate value import data is supported by substantial evidence and in accordance with law.

### A. Commerce Further Explained Its Practice Regarding When It Will Disregard Data As Aberrational

Commerce will disregard surrogate input values that it determines to be aberrational. *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308, 1312 (Ct Int'l Trade 2019) (citing *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292, 1306 n.14 (Ct Int'l Trade 2019)); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't of Commerce May 19, 1997) (final rule) (stating that Commerce agrees "aberrational" surrogate

input values should be disregarded). "If a party presents sufficient evidence to demonstrate a particular {surrogate value} is aberrational, and therefore unreliable, the Department will examine all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question." *Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015) (final results) and accompanying IDM at Comment 5.

The Federal Circuit suggested that "Commerce's longstanding 'administrative practice with respect to aberrational data" is "to disregard small-quantity import data {from the primary surrogate country} when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other {potential surrogate} countries.'" *SolarWorld*, 962 F.3d at 1358 (citing *Shakeproof*, 59 F. Supp. 2d at 1360) (quoting *Heavy Forged Hand Tools from China*, 63 Fed. Reg. 16,758, 16,761 (Dep't of Commerce April 6, 1998) (citing *Heavy Forged Hand Tools from China*, 62 Fed. Reg. 11,813 (Dep't of Commerce March 13, 1997; *Tapered Roller Bearings from Romania*, 62 Fed. Reg. 37,194 (Dep't of Commerce July 11, 1997)). We respectfully submit that this is an inaccurate and outdated description of Commerce's practice and that Commerce has complied with this court's remand order by further explaining and then applying its current, reasonable practice, and explaining why the Thai GTA data is not aberrational.

In *Shakeproof*, Commerce evaluated whether the import data of the input imported into the surrogate country, India, from third countries was aberrational, not whether the aggregate AUV for the surrogate country was aberrational. 59 F. Supp. 2d at 485. A respondent argued that the Indian import data used to value steel scrap was aberrational and should have been

excluded due to distortive imports from Germany, Korea, and the United Kingdom.[2]  *Id.*  The Court remanded the case for Commerce to "recalculate the Indian steel scrap figure by making the appropriate adjustments in accordance with its administrative practice to discard any aberrational figures."  *Id.*  On remand, Commerce "eliminated the March 1996 Indian import data for steel scrap from the German Federal Republic, Korea and the United Kingdom in {its} dumping margin calculations," and the Court sustained this determination.  *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 102 F. Supp. 2d 486 (Ct Int'l Trade 2000); Remand Redetermination, Final Results of Redetermination on Remand Pursuant to *Shakeproof Assembly Components Division of Illinois Tool Works, Inc. v. United States*, Ct. No. 97-12-02066, available at https://enforcement.trade.gov/remands/99-70.htm.  The Federal Circuit's bracketed references to "primary surrogate country" and "potential surrogate country" are details that the court inserted; they were not the terms used in the *Shakeproof* opinion.  *SolarWorld IV*, 962 F.3d at 1358.

The other cases cited in *Shakeproof* similarly relied on an early iteration of Commerce's practice regarding when Commerce may disregard a surrogate AUV, or a component of one, because it accounts for a small quantity of imports.  Since *Shakeproof* was decided, Commerce has further developed its practice with respect to aberrational data.

Commerce no longer evaluates whether *subsets* of import data into a potential surrogate country are aberrational.  Rather, its "well-established practice is to use the full GTA dataset" because excluding imports from individual countries "would invite endless and distortive cherry picking."  *Fabricated Structural Steel from China*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan.

---

[2]  Steel scrap was valued as a by-product generated in the production of the subject merchandise, helical spring lock washers, and not a direct input.  Commerce relied on it as an amount to offset input costs and determine normal value.

30, 2020) (final determination) and accompanying IDM at Comment 2 (citations omitted). Correspondingly, Commerce's current practice is to determine whether an AUV is aberrational in the aggregate. *Uncoated Paper from China*, 81 Fed. Reg. 3,112 (Dep't of Commerce Jan. 20, 2016) (final results) and accompanying IDM at Comment 2 ("{T}he relevant test is to determine whether the AUV in the aggregate is aberrational."); *Multilayered Wood Flooring from China*, 80 Fed. Reg 41,476, (Dep't of Commerce July 15, 2015) (final results new shipper rev.), and accompanying IDM at Comment 11.D (same); *but see Activated Carbon from China*, 82 Fed. Reg. 51,607 (Dep't of Commerce Nov. 7, 2017), and accompanying IDM at Comment 5 (removing Thai imports exclusively from France because they were not specific to the input used by the respondents).[3]

Commerce further explained that its current practice is to consider data to be aberrational when it is an "extreme outlier," is distorted or misrepresentative, or is "somehow incorrect." Remand Redetermination at 7, 20 (citing *Tri Union*, 227 F. Supp. 3d at 1394-95). Aberrational data are data shown to deviate from the norm because such data would be unreliable. *Id.*

Canadian Solar and BYD argue that nothing in *Tri Union* indicates that import quantity is irrelevant when evaluating whether an AUV from a potential surrogate country is aberrational.

---

[3] To further complicate the relationship between quantity and input AUV, Commerce also relies on quantity as a tiebreaker in deciding between data from non-primary surrogate countries where the primary surrogate country data are unusable and data from multiple remaining potential surrogate countries satisfy Commerce's criteria. *See, e.g.*, *Chlorinated Isocyanurates from China*, 81 Fed. Reg. 1,167 (Dep't of Commerce Jan. 11, 2016) (final results) and accompanying IDM at Comment 1 (determining that Thailand was the primary surrogate country, record evidence was only available from Bulgaria, Colombia, Ecuador, and South Africa, and Commerce selected Bulgaria because it was the "largest importer" of the relevant input during the period of review); and *Activated Carbon from China*, 82 Fed. Reg. 51,607 (Dep't of Commerce Nov. 7, 2017) (final results), and accompanying IDM at Comment 4 (determining that data for the relevant input from the primary surrogate country, Thailand, was not sufficiently comparable and selecting a specific non-primary surrogate country, Brazil, because it had the largest amount of imports).

Canadian Solar/BYD Remand Comments at 9-10. *Tri Union* established a definition of aberrational data: an AUV is aberrational when it is an "extreme outlier," is distorted or misrepresentative, or is "somehow incorrect." 227 F. Supp. 3d at 1394-95. But that definition guides Commerce as it evaluates an AUV on a case-by-case basis, considering a totality of the circumstances, including evaluating small quantities.

To evaluate whether a surrogate value is aberrational, Commerce begins by considering whether a surrogate AUV falls within the range of AUVs of relevant import data from countries comparable to the non-market economy home market country in terms of economic development. *Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015), and accompanying IDM at Comment 5 (relying on a Thai surrogate value because it fell within the range of AUVs of GTA import data for countries comparable to China in terms of economic development and "within the array of values of other potential surrogate countries"); *Multilayered Wood Flooring from China*, 76 Fed. Reg. 64,318 (Dep't of Commerce Oct. 18, 2011), and accompanying IDM at Comment 24 (determining that a Philippine AUV was not aberrational because it was within the range of AUVs for the relevant harmonized tariff classification among countries economically comparable to China during the period of investigation); *Wooden Cabinets and Vanities from China*, 85 Fed. Reg. 11,953 (Dep't of Commerce Feb. 28, 2020), and accompanying IDM at Comment 6.

While "{a} very small relative quantity of imports triggers an obligation for Commerce to explain why the data is not aberrational, such data need not be 'automatically rejected.'" *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, Slip op. 13-30, 2013 Ct Int'l Trade LEXIS 34, *20 (Ct Int'l Trade Mar. 11, 2013). Commerce may disregard a surrogate import AUV where the quantity is so small that the quantity itself indicates the data is "extreme," or not

representative or unreliable. *Chlorinated Isocyanurates from China*, 80 Fed. Reg. 4,539 (Dep't of Commerce Jan. 28, 2015) (final results), and accompanying IDM at Comment 2 (finding that imports of chlorine into South Africa and Thailand were aberrational based on "extreme" quantity and AUVs). Commerce looks to whether the quantity of imports underlying an AUV is not "commercially reasonable." *Trust Chem Co. Ltd. v. United States*, 791 F. Supp. 2d 1257, 1264-65 (Ct. Int'l Trade 2011). *See, e.g.*, *Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015), and accompanying IDM at Comment 5 (determining that 19,586 kilograms of corrugated paper is a commercial volume and not the lowest volume on the surrogate country list, so it is not inherently distortive); *Frozen Warmwater Shrimp from China*, 78 Fed. Reg. 56,209 (Dep't of Commerce Sept. 12, 2013) (final results), and accompanying IDM at Comment 4 (determining that four metric tons of steel scrap is not so small a quantity as to result in a distorted AUV); *Glycine from China*, 77 Fed. Reg. 64,100 (Dep't of Commerce Oct. 18, 2012) (final results), and accompanying IDM at Comment 4 (determining that 604 metric tons of steam coal is a commercial quantity even though it is the lowest volume imported among all potential surrogate countries).[4]

Simply, Commerce's practice now is to evaluate entire datasets, which demonstrates a significant change in its practice since the Court decided *Shakeproof*. Canadian Solar and BYD contend that Commerce's explanation regarding why it evaluates AUV data in the aggregate, and not with respect to each country importing into a surrogate country, and that a requirement to evaluate each country would be unduly burdensome provides "no excuse" because Commerce is

---

[4]  Admittedly, Commerce has not always been consistent in application of its practice and has, at times, compared the percentage of import volume between potential surrogate countries. *See, e.g.*, *Multilayered Wood Flooring from China*, 80 Fed. Reg. 41,476, (Dep't of Commerce July 15, 2015) (final results new shipper rev.) and accompanying IDM at Comment 11.D. (comparing relative quantities of an input between potential surrogate countries).

required to calculate the most accurate dumping margin. Canadian Solar/BYD Remand Comments at 18-19. Commerce is merely observing that a requirement that Commerce determine whether the value of imports from each country into a surrogate country, for all potential surrogate countries would create an administrative burden. While Commerce's overarching statutory goal is accuracy, administrative burden is a legitimate driver in the selection of its methodological choices. *E.g., Nachi-Fujikoshi Corp. v. United States*, 890 F. Supp. 1106, 1110 (Ct. Int'l Trade 1995) (recognizing administrative burden of alternative methodologies in sustaining Commerce's decision to use statistical sampling). Moreover, evaluating entire datasets ensures that Commerce is using surrogate values that represent broad market averages, one of the factors Commerce uses to evaluate what constitutes the "best available information." *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016); Policy Bulletin 04.1. Commerce's aggregate approach further avoids cherry-picking of data to suit parties' preferred outcome, which would also lead to less accurate results. Further, it is reasonable for Commerce to have consistent, predictable, and objective criteria.

Commerce's analysis continues to evolve. Specifically, Commerce's evaluation of quantity when compared across cases is complex and involves various products. It does not easily lend itself to a simple conclusion that a small quantity of imports, in addition to a high or low AUV, indicates that a surrogate value is aberrational. Commerce cannot always look at an AUV and determine that its input quantity is commercially reasonable consistently across cases and inputs.

In any event, as explained below, consistent with the remand order, Commerce provided additional explanation and rationale for its conclusion that the Thai GTA import data was usable and the best available information to value nitrogen inputs.

**B.    Consistent With Its Practice And The Federal Circuit's Order, Commerce Provided A Reasoned Explanation For Its Conclusion That The Thai AUV Is Not Aberrational**

Commerce's determination to continue relying on Thai GTA import AUVs to value nitrogen corresponds with its practice regarding when to disregard aberrational data and considering the evidence on a case-by-case basis weighing the totality of the circumstances. Because the statute is silent as to what constitutes the "best available information," Commerce has "broad discretion" to determine what evidence satisfies this standard. *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  Commerce's determination should be sustained because it is consistent with Commerce's practice and reasonable in light of the record facts.

On remand, Commerce reiterated its prior finding that the Thai AUV fell within the range of AUVs from other economically comparable countries.  Remand Redetermination at 5-6. Commerce also considered whether the Thai AUV of $9.36 per kilogram was an "outlier" by considering the range of import prices comprising the AUV for Bulgaria, Romania and Mexico, the three low-end AUV comparators. *Id*. at 7-8.  Those prices ranged from $0.05 to $9.72 per kilogram in Bulgaria, $0.06 to $80.36 per kilogram in Romania, and $0.24 to $1,025.40 per kilogram in Mexico. *Id.*  Commerce concluded that the Thai AUV was "not unusually high when compared to these price ranges." *Id*.

Canadian Solar and BYD contend that the Federal Circuit's conclusion that Commerce cannot rely on the Thai GTA AUV because it accounts for a small import quantity "remains entirely correct and is separate from the Federal Circuit's separate observation that Commerce's decision 'also appears inconsistent with its usual practice.'"  Canadian Solar/BYD Remand Comments at 19-21.

Commerce, in fact, evaluated the quantities of imports into Thailand. Remand Redetermination at 26-27. With respect to surrogate import quantity, Commerce will consider whether the quantity underlying an import AUV is "commercially reasonable" and thereby not distortive. *Trust Chem Co*., 791 F. Supp. 2d at 1264-65; *see Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015), and accompanying IDM at Comment 5.

Here, the $9.36 per kilogram AUV from the Thai GTA import data is composed of 132,940 kilograms of nitrogen. Surrogate Value Memorandum (Dec. 18, 2015) at Attachment I, P.R. 541-43; Trina's Case Brief (Jan. 25, 2017) at 15-16, P.R. 531-32, C.R. 588. That amount consists of over a million U.S. dollars of imports, Remand Redetermination at 14, 25 n.71; Surrogate Value Memorandum at Attachment I, P.R. 505-6, and is larger than the import quantity of data used to calculate surrogate values for a third of the inputs in this administrative review. Remand Redetermination at 14, 27. Commerce concluded that that was a commercially reasonable quantity, Remand Redetermination at 24-25 n.71, 27, and no party challenges that finding.

While the value of a surrogate AUV, relative to other surrogate AUVs, and import quantity are two factors that Commerce considers in determining whether an AUV is aberrational, Commerce's practice is to consider aberrational claims on a case-by-case basis after considering the totality of the circumstances. *Steel Threaded Rod from China*, 79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014). A numerical quantity of inputs may be aberrational in one case, depending on the record facts, but the same or similar amount may not be in another. However, here, 132,940 kilograms is a commercial quantity of nitrogen.

In any event, Commerce has determined quantities lower than 132,940 kilograms of nitrogen to be commercially reasonable quantities. *See, e.g.*, *Trust Chem Co.*, 791 F. Supp. 2d at 1264-65 (sustaining Commerce's determination that 26.2 metric tons of nitric acid was a commercial volume); *Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015), and accompanying IDM at Comment 5 (determining that 19,586 kilograms of corrugated paper is a commercial volume); *Frozen Warmwater Shrimp from China*, 78 Fed. Reg. 56,209 (Dep't of Commerce Sept. 12, 2013) (final results) and accompanying IDM at Comment 4 (determining that four metric tons of steel scrap is not so small a quantity as to result in a distorted AUV); *Glycine from China*, 77 Fed. Reg. 64,100 (Dep't of Commerce Oct. 18, 2012) (final results) and accompanying IDM at Comment 4 (determining that 604 metric tons of steam coal is a commercial quantity).

Next, Commerce explained that, simply because the overarching Thai AUV for nitrogen imports is dissimilar to the overarching AUV of nitrogen imports into Bulgaria, Romania and Mexico during the same period of review, does not mean that the Thai AUV deviates markedly from all other values in Bulgaria, Romania and Mexico especially those not purchased from neighboring countries. Commerce considered the prices comprising the Bulgarian, Romanian and Mexican AUVs and found that the $9.36 per kilogram AUV fell within all three ranges. Remand Redetermination at 6-7. Commerce concluded that "a customer in any of these markets would not find a price of 9.36 per kg. for nitrogen to be unusual, an 'extreme outlier,' or 'somehow incorrect.'" *Id.*

The plaintiffs argue that high prices in the Romanian, Bulgarian and Mexican data account for a small quantity of imports that are similar to the Thai AUV. Canadian Solar/BYD Remand Comments at 9-13. But the fact that the $9.36 per kilogram price is an *actual* price that

customers paid in markets that the plaintiffs argue are more realistic shows that the price itself is not an extreme outlier or somehow incorrect.

The Federal Circuit's finding that Commerce's bookend methodology is "illogical" is premised on the fact that Commerce did not account for the majority of AUVs falling on one side of the bookend. *SolarWorld*, 962 F.3d at 1357-58. On remand, Commerce further considered the Bulgarian, Romanian and Mexican import data. Remand Redetermination at 7-8; 21-22. Commerce found that prices in those markets represented transactions between a small number of geographically close suppliers and customers. *Id.* at 21-22. Commerce inferred that the relatively lower import prices in those countries likely resulted from negotiated savings due to bulk purchases and lower transportation costs. *Id.*

Commerce found that Thailand had different market conditions such that one would not expect similar import values. Remand Redetermination at 22. Specifically, Thailand's nitrogen imports were imported from several countries, only one of which was a bordering country. *Id.* Thus, the disparity between the Thai AUV and the Romanian, Bulgarian and Mexican AUVs were more likely explained from different market conditions, not because the Thai data were aberrational.

Canadian Solar and BYD contend that there is no record evidence indicating that AUVs from Romania, Bulgaria and Mexico are unreliable because they are primarily from neighboring countries and that such imports may be "broadly representative of the market for nitrogen in the importing countries" and representative of multiple supplier and buyer relationships. Canadian Solar/BYD Remand Comments at 13-15. However, the fact that a reasonable mind could disagree with an agency interpretation does not detract from the fact that Commerce's determination may also be reasonable. *Zhejiang DunAn Hetian Metal*, 652 F.3d at 1341.

Moreover, Commerce did not conclude that the Romanian, Bulgarian and Mexican data were themselves *unreliable*, only that the (relatively) lower AUVs were likely explained by trade conditions unique to those countries and that those same trade conditions could not be inferred for Thailand. Remand Redetermination at 21-22; Petitioner's Surrogate Value Rebuttal July 25, 2016 at Exhibit 3, P.R. 397-98, C.R. 482-84. As a result, Commerce determined because there was no information on the record regarding the effect of this relationship that the import data may not reflect a broad price average experienced by all customers in those markets.

Finally, in its overall evaluation of what constitutes the "best available information," Commerce considered the specificity of the Thai data compared with the Bulgarian, Romanian and Mexican data. Remand Redetermination at 22-23. "Representativeness is important if Commerce is to fulfill its statutory mandate of calculating dumping margins as accurately as possible." *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1362 (Ct Int'l Trade 2018). Commerce concluded that the nitrogen imports into Thailand included nitrogen appropriate for solar cell production, whereas there was no evidence of any solar cell production into Bulgaria, Romania and Mexico. *Id*. For this reason, Commerce confirmed that the Thai GTA data are also the most specific surrogate value for nitrogen on the record under Commerce's surrogate value criteria, *Jiaxing Bro.*, 822 F.3d at 1293.

Canadian Solar and BYD challenge this conclusion. Canadian Solar/BYD Remand Comments at 14-15. In doing so, they overlook record evidence that supports a conclusion that Thai GTA data is the appropriate purity level because subject merchandise is produced in Thailand, whereas there is no record evidence that subject merchandise is produced in either Bulgaria, Romania or Mexico. Remand Redetermination at 23; PDM at 16-17 (stating that the record does not contain evidence that solar cells are produced in Bulgaria).

Plaintiffs also argue that they did not have an opportunity to comment on Commerce's finding that Thai nitrogen was of a suitable purity level for solar cell production because Commerce did not present this conclusion until its final remand results. Canadian Solar/ BYD Remand Comments at 14-15. Commerce, of course, retains authority to change positions between a draft and a final remand redetermination. *Cf. Ferro Union, Inc. v. United States*, 44 F. Supp. 2d 1310, 1330 (Ct Int'l Trade 1999) ("The Preliminary Results, by their nature, and given Commerce's additional inquiries, were subject to change."); *Peer Bearing Co. v. United States*, 12 F. Supp. 2d 445, 456 (Ct Int'l Trade 1998) (same). Nor is Commerce required to "expressly notify interested parties any time it intends to change its methodology between its preliminary and final determinations," *Boomerang Tube LLC v. United States*, 856 F.3d 908, 913 (Fed. Cir. 2017), including remand determinations.

Here, after consideration of the parties' comments, Commerce expanded its reasoning for continuing to rely on the Thai GTA data to value nitrogen. Further, that Bulgaria did not produce subject merchandise and Thailand does, was a finding made in the final results. IDM at 7-8. Thus, interested parties were on notice that Commerce might consider the extent that inputs in potential surrogate countries were sufficiently specific to serve as surrogate value data. The fact that Canadian Solar and BYD did not have an opportunity to comment on Commerce's final reasoning does not undermine Commerce's finding that the specificity of the Thai surrogate GTA data supports its conclusion that it is the "best available information" to value nitrogen inputs.

The burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citation, quotation marks, and internal brackets omitted). That burden extends to the requirement that

parties must provide "specific evidence" that a value is aberrational. *Trust Chem Co.*, 791 F.

Supp. 2d at 1263-64. A party must do more than show that values are higher or lower than other

values, or show that there is a potential surrogate value comprised of higher quantities of

imports. *Id.*; *Jacobi Carbons*, 313 F. Supp. 3d at 1362 and n.32. A smaller data set may still be

the better data, if it is representative and reliable. *Laizhou Auto Brake Equip. Co. v. United

States*, 32 C.I.T. 711, 717-18 (2008).

Commerce has further explained that while AUV price and quantity play a role in

Commerce's analysis of whether an AUV is aberrational, there is nothing indicating that the

quantity of nitrogen imports into Thailand, underlying the GTA data, is not commercially

reasonable. Accordingly, Commerce has explained why its findings are reasonable, supported

by substantial evidence, and in accordance with law.

### C. Commerce's Explanations Regarding Why Both The Thai GTA Import Data And Dataweb Data May Be Correct Is Supported by Substantial Evidence

On remand, Commerce reevaluated the ITC Dataweb data and provided additional

explanations as to why it did not call the accuracy and reliability of the Thai GTA data into

question. Remand Redetermination at 15; 27-29. Commerce complied with the Court's

instruction to "adequately explain why the Thai {GTA} data is not aberrational." *Canadian

Solar Int'l Ltd. v. United States*, No. 17-00173, 2020 Ct Int'l Trade LEXIS 140, at *9 (Sept. 14,

2020). Further, substantial evidence supports Commerce's determination that both the ITC

Dataweb data on United States exports of nitrogen into Thailand and the Thai GTA data on

nitrogen could be correct.

Commerce generally does not consider export statistics for purposes of evaluating the

legitimacy of surrogate import data. *Lightweight Thermal Paper from China*, 73 Fed. Reg.

57,329 (Dep't of Commerce Oct. 2, 2008), and accompanying IDM at Comment 9. That practice

is based on the rationale that, given "differing reporting and inspection requirements and timing considerations, it would be unrealistic to expect export statistics to match perfectly import statistics for any given shipment of merchandise." *Id.* Commerce generally does not expect one country's export quantities to be a one-to-one match with another country's import data due to reporting, inspection requirements, and timing considerations between import and export datasets. *Activated Carbon from China*, 74 Fed. Reg. 57,995 (Dep't of Commerce Nov. 10, 2009), and accompanying IDM at Comment 3f.

Nonetheless, to comply with the remand order, Commerce further explained its reasoning for concluding that import and export data do not necessarily correspond, and it continued to find that the ITC Dataweb data are not reliable for purposes of evaluating the legitimacy of the corresponding import volumes into Thailand. Remand Redetermination at 15, 27-29. Specifically, Commerce reasoned that mismatches between the United States ITC exports of nitrogen to Thailand, as stated in the Dataweb data, Trina Surrogate Value Comments July 25, 2016, at 2 and Exhibit C, P.R. 390, and the Thai imports of United States nitrogen, covering the same period, may be due to various, valid, reasons other than inaccuracy. *Id.* For instance, transportation and insurance costs are typically included in import values but not export values. Remand Redetermination at 28. Additional factors, such as time lags between export and when merchandise is entered into the importing country, goods remaining in customs warehouses for extended periods of times, and free trade zones, may all account for differences between import and export data. *Id.* These reasons all support Commerce's practice not to rely upon discrepancies with export data as a basis to disregard import data. Remand Redetermination at 28-29.

Canadian Solar and BYD argue that Commerce ignored the ITC data and that the disparity between the Thai GTA data and ITC data is so great that only an error in one of the datasets can account for it. Canadian Solar/BYD Remand Comments at 15-16. They further argue that the error must be in the Thai GTA data because the AUV of the ITC data is similar to the Romanian and Bulgarian data. *Id.*

However, Commerce did not ignore the ITC Dataweb data. Rather, in compliance with the remand order, Commerce reconsidered its reliance on the ITC data as a benchmark for determining an appropriate surrogate AUV for nitrogen. Remand Redetermination at 28-29. While Canadian Solar and BYD view the discrepancy between the ITC and GTA data as an error, Commerce provided various explanations for why the two datasets may differ, and neither party claims that these are not plausible explanations. Finally, the parties' contention that the Thai GTA data must be incorrect because it is not as similar to the Romanian, Bulgarian or Mexican AUVs as the Thai Dataweb data presupposes that the Romanian, Bulgarian and Mexican AUVs are representative of the correct value. Commerce reasonably inferred that the Romanian, Bulgarian and Mexican values are more likely explained by the specific circumstances and trade patterns of specific regions. By contrast, plaintiffs merely rely on the magnitude of the data to draw their conclusion.

## III. Commerce's Determination Not To Recalculate the Separate Rate for Companies that were Not Individually Examined Is in Accordance with Law Because It Has Continued to Rely on the Thai Import Data for Nitrogen Inputs

Commerce's determination not to recalculate the separate rate for companies not individually examined in this administrative review is in accordance with law because Commerce has continued to rely on the Thai GTA import data to value nitrogen inputs and there is no change to the rate of the sole mandatory respondent remaining with an above zero margin.

As a result, there is no possible change to the separate rate companies' margins. In the final results, Commerce assigned a dumping margin to the separate rate companies that it did not individually examine, but which demonstrated their eligibility for a separate rate, based on the mandatory respondents' dumping margins. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 82 Fed. Reg. 29,033, 29,035 (Dep't of Commerce June 27, 2017) (final results). However, because Commerce has further explained its valuation of nitrogen, and not modified the existing dumping margins for the sole mandatory respondent with an above zero margin, Canadian Solar, Commerce has not made any changes to the calculated separate rate for this review.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

 /s/Tara K. Hogan
TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-2228

Of Counsel:

BRENDAN S. SASLOW
Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
United States Department of Commerce

March 26, 2021

Attorneys for Defendant United States

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains **7,135** words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>s/Tara K. Hogan</u>