

UNITED STATES COURT OF INTERNATIONAL TRADE
ONE FEDERAL PLAZA
NEW YORK, NY 10278-0001

CHAMBERS OF
Claire R. Kelly
    Judge

May 4, 2021

Craig Anderson Lewis, Esq.
Jonathan Thomas Stoel, Esq.
Lindsay K. Brown, Esq.
Michael Grant Jacobson, Esq.
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
   Email:      craig.lewis@hoganlovells.com
                  jonathan.stoel@hoganlovells.com
                  Lindsay.Brown@hoganlovells.com
                  michael.jacobson@hoganlovells.com

Adams Chi-Peng Lee, Esq.
Harris Bricken McVay Sliwoski, LLP
600 Stewart Street
Suite 1200
Seattle, WA 98101
   Email:      adams@harrisbricken.com

John Robert Magnus, Esq.
Tradewins LLC
1330 Connecticut Avenue, NW
Washington, DC 20036
   Email:      jmagnus@tradewinsllc.net

Richard L.A. Weiner, Esq.
Justin Ross Becker, Esq.
Rajib Pal, Esq.
Shawn Michael Higgins, Esq.
Sidley Austin, LLP
1501 K Street, NW
Washington, DC 20005-1401

Case 1:17-cv-00173-CRK   Document 192   Filed 05/04/21   Page 2 of 6

Consol. Court No. 17-00173                                                Page **2** of **6**

Email:    rweiner@sidley.com
          jbecker@sidley.com
          rpal@sidley.com
          shawn.higgins@sidley.com

Joshua Ethan Kurland, Esq.
Meen Geu Oh, Esq.
Tara Kathleen Hogan, Esq.
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email:    joshua.e.kurland@usdoj.gov
          Meen-Geu.Oh@usdoj.gov
          tara.hogan@usdoj.gov

Brendan Scott Saslow, Esq.
Of Counsel
U.S. Department of Commerce
Chief Counsel of Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 3614
Washington, DC 20230-0001
Email:    brendan.saslow@trade.gov

      Re:   *Canadian Solar International Limited et al v. United States*
           Consol. Court No. 17-00173

Dear Counsel:

    As you know, oral argument in this case will be held virtually on Wednesday, May 19, 2021 at 9:30 a.m. in Courtroom 1 of the James L. Watson Courthouse of the United States Court of International Trade, One Federal Plaza, New York, NY 10278. The court has examined the parties' submissions and would like counsel to be prepared to address the following issues.

**For Plaintiffs**

1. Notwithstanding any criticisms or qualifications you assert as to its content, do you concede that the U.S. Department of Commerce's ("Commerce") practice

Case 1:17-cv-00173-CRK   Document 192   Filed 05/04/21   Page 3 of 6

Consol. Court No. 17-00173                                                    Page **3** of **6**

for determining whether average unit value ("AUV") data from a primary surrogate country are aberrational is to determine whether the overall AUV for imports of the subject input from all countries into the primary surrogate country deviates markedly from the overall AUV for imports of the subject input into other potential surrogate countries?

2. Commerce states that it "determines whether data are aberrational on a case-by-case basis after considering the totality of the circumstances." Final Results of Redetermination Pursuant To Ct. Remand at 23, Jan. 13, 2021, ECF No. 180-1 ("Third Remand Results"). Why is Commerce's position unreasonable?

3. You respond to the Government's invocation of this Court's decision in Tri Union Frozen Prods. Inc. v. United States by suggesting that the decision calls for a broader definition of aberrationality. See Cmts. of Canadian Solar International Limited et al. & Shanghai BYD Co., Ltd. Opp.'n [Third Remand Results] at 8, Feb. 24, 2021, ECF No. 184 ("Canadian Solar & Shanghai BYD's Br.") (citing Tri Union Frozen Prods. Inc. v. United States, 41 CIT __, 227 F. Supp. 3d 1387 (2017) ("Tri Union")). However, doesn't Tri Union underscore the fact that Commerce needs to analyze what is aberrational on a case-by-case basis? See 41 CIT at __, 227 F. Supp. 3d at 1397.

4. Given that the U.S. International Trade Commission's ("ITC") export data indicates that "380 times more nitrogen was exported from the United States to Thailand . . . than the Thai [Global Trade Atlas ("GTA")] data indicated was imported into Thailand from the United States[,]" Canadian Solar & Shanghai BYD's Br. at 17, you argue that Commerce's attempt to explain the discrepancy between ITC export data and Thai GTA data by appealing to differences in timing, reporting, and inspection requirements between the two datasets is unavailing. See id. at 16–18; Third Remand Results at 13–15, 27–28.

    a. Even if "[t]he ITC data and the Thai GTA data cannot both be correct[,]" SolarWorld Ams. Inc. v. United States, 962 F.3d 1351, 1358 (2020) ("SolarWorld"), without record evidence demonstrating which dataset is the correct source, why is it unreasonable for Commerce to defer to its methodological choice not to rely solely on such disparities as the basis for disregarding import data from a surrogate country? See Third Remand Results at 28 ("[I]f Commerce was obligated to reject GTA import data merely because of such differences, it would hamstring Commerce's [nonmarket economy ("NME")] practice and may severely limit its use of most import data to value FOPs; thus, frustrating the intent of the NME provisions of the statute.").

   b. Isn't it the case that Thai imports of nitrogen from the United States "amount to only approximately 1.5% of its total POR nitrogen imports by quantity[?]" Third Remand Results at 29 (citing Trina's Case Br. at Enclosures 1 & 2, A-570-979, PDs 531–532, bar codes 3538943-01–02 (Jan. 25, 2017)).[1] If so, why is it unreasonable for Commerce to conclude that the fact that "a relatively small portion of the GTA import data differ from U.S. export data" is insufficient to reject the entirety of the Thai GTA data? Id.

5. Given Commerce's position that low AUVs for Mexico, Bulgaria, and Romania can be explained by the fact that large quantities of nitrogen are imported into those countries from neighboring countries, see Third Remand Results at 21–22, why is it necessarily the case that "[t]he only reasonable inference is that the AUV derived from the Thai GTA data . . . is likely incorrect and unreliable[?]" See Canadian Solar & Shanghai BYD's Br. at 17 (citations omitted).

6. Why is it unreasonable for Commerce to take into account the burden of "assess[ing] the suitability and/or potential aberration of each AUV based on the import quantities used to calculate the AUV" and entertaining "subjective arguments" and "cherry picking" from parties when formulating its methodology for determining whether overall AUV data from a surrogate country is aberrational? See Third Remand Results at 13.

**For Defendant**

1. Is it essentially your position that the Court of Appeals for the Federal Circuit ("Court of Appeals") misunderstood Commerce's practice? See generally SolarWorld, 962 F.3d 1351.

2. Notwithstanding Commerce's clarification of its practice:

---

[1] Commerce appears to inadvertently describe the record document it cites to support this assertion as having been dated "January 25, 2020" instead of "January 25, 2017". See Third Remand Results at 29 & n.78. On October 26, 2017, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination. These indices are located on the docket at ECF No. 44-2–4. Citations are to the numbers assigned to the documents by Commerce in these indices. References to the public administrative record are in the form of "PD," and references to the confidential administrative record are in the form of "CD."

    a. Didn't the Court of Appeals also criticize Commerce's "bookend" methodology as being illogical, and wasn't that the more pertinent criticism? See SolarWorld, 962 F.3d at 1357–58 ("[T]he use of a bookend methodology here is illogical because it fails to account for the fact that countries on one end of the bookend (Bulgaria and Romania) account for the vast majority (99.22%) of the recorded nitrogen imports, that these countries have a substantially lower average unit value than that of Thailand, and that the other countries to which Commerce compares the Thai average unit value (the other end of the bookend) together represent only a fraction of a percent of the quantity (about 0.40%) recorded in the GTA.")

    b. Did the Court of Appeals generally suggest that there was a problem with the bookend methodology in this case because of a distortive effect of low quantity imports? See SolarWorld, 962 F.3d at 1357–58.

3. You cite Tri Union for the proposition that "Commerce clarified that its practice is to consider data to be aberrational when it is an extreme outlier, is distorted or misrepresentative, or is somehow incorrect." See Def.'s Resp. to Cmts. on [Third Remand Results] at 5, Mar. 26, 2021, ECF No. 185 ("Def.'s Resp.") (citing Tri Union, 41 CIT at __, 227 F. Supp. 3d at 1394–95). Aside from this case being non-binding, aren't you misstating the court's opinion which underscores that while Commerce stated that its practice was to consider data aberrational when it is an extreme outlier, Commerce failed to provide a definition or explanation for "aberrational"? See Tri Union, 41 CIT at __, 227 F. Supp. 3d at 1394–95.

4. Although differences between ITC export data and Thai GTA import data may be explained by differences in timing, reporting, and inspection requirements, how does that reasonably address Plaintiffs' argument that the ITC data indicates 380 times more nitrogen was exported into Thailand than is reported by the Thai GTA data? See Canadian Solar & Shanghai BYD's Br. at 17. Doesn't the large variation suggest that the Thai GTA data can't be trusted?

5. Commerce posits that low AUVs for Mexico, Bulgaria, and Romania can be explained by the fact that large quantities of nitrogen are imported into those countries from neighboring countries. See Third Remand Results at 21–22. Is there any record evidence that supports Commerce's position?

6. In its remand redetermination, what support does Commerce cite for its apparent position "that Bulgaria did not produce subject merchandise and

Thailand does"? See Def.'s Resp. at 21 (citing Issues & Decision Memo. for the Final Results of the 2014–2015 Antidumping Duty Admin. Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China at 7–8, A-570-979, (June 20, 2017), ECF No. 44-5). How do you respond to Plaintiffs' argument that Commerce does not cite record evidence to support its assertions with respect to the purity of nitrogen used in solar cells? See Canadian Solar & Shanghai BYD's Br. at 15; see also Third Remand Results at 22–23.

                                                                 Sincerely,

                                                                 /s/ Claire R. Kelly
                                                                Claire R. Kelly, Judge

Cc: Steve Taronji
     For docketing