Slip Op. 21-92

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED ET AL., | |
|     Plaintiffs and Consolidated Plaintiffs, | |
| and | |
| SHANGHAI BYD CO., LTD. ET AL., | Before: Claire R. Kelly, Judge |
|     Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors, | Consol. Court No. 17-00173 |
| v. | |
| UNITED STATES, | |
|     Defendant, | |
| and | |
| SOLARWORLD AMERICAS, INC. ET AL., | |
|     Defendant-Intervenor and Consolidated Defendant-Intervenors. | |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's third remand redetermination in the third administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: July 28, 2021

Craig A. Lewis, Jonathan T. Stoel, and Lindsay K. Brown, Hogan Lovells US LLP, of Washington, D.C., for plaintiffs and consolidated plaintiffs, Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Solar Power (China) Inc.; CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd.; CSI Cells Co., Ltd.; Canadian Solar (USA), Inc.; and plaintiff-intervenor and consolidated plaintiff-intervenor Shanghai BYD Co., Ltd.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief was Brendan S. Saslow, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce") third remand redetermination filed pursuant to the court's order in Canadian Solar Int'l Ltd. v. United States, 44 CIT __, 471 F. Supp. 3d 1379 (Sept. 14, 2020) ("Canadian Solar IV"). See Final Results of Redetermination Pursuant to Ct.'s Remand in [Canadian Solar IV], Jan. 13, 2021, ECF No. 180-1 ("Third Remand Results"). In Canadian Solar IV, the court remanded Commerce's decision to use Thai import data published by the Global Trade Atlas ("Thai import data") to construct a surrogate value for Canadian Solar's[1] nitrogen input in Commerce's third administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from

---

[1] Plaintiffs Canadian Solar International Limited; Canadian Solar (USA), Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI Cells Co., Ltd.; CSI-GCL Solar Manufacturing (Yancheng) Co., Ltd.; and CSI Solar Power (China) Inc. are referred to, collectively, as "Canadian Solar."

the People's Republic of China ("PRC") covering the period December 1, 2014 through November 30, 2015 ("AR3"). See Canadian Solar IV, 44 CIT at __, 471 F. Supp. 3d at 1383–84; see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the [PRC], 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017) (final results of [ADD] administrative review and final determination of no shipments; 2014-15) ("Final Results") and accompanying Issues and Decision Memo., A-570-979 (June 20, 2017), ECF No. 44-5 ("Final Decision Memo").

On June 24, 2020, the Court of Appeals for the Federal Circuit ("Court of Appeals") decided SolarWorld Americas, Inc. v. United States, 962 F.3d 1351 (Fed. Cir. 2020) ("SolarWorld"). In SolarWorld, the Court of Appeals held that Commerce failed to adequately justify its use of Thai import data to value Trina Solar Energy Co., Ltd.'s ("Trina") nitrogen input in Commerce's previous administrative review of the same ADD order and vacated in part this court's judgment sustaining Commerce's final determination. See id. at 1356–59.

In Canadian Solar IV, the court reconsidered its decision in Canadian Solar Int'l Ltd. v. United States, 44 CIT __, 448 F. Supp. 3d 1333 (June 15, 2020) ("Canadian Solar III") to sustain Commerce's Redetermination Pursuant to Ct.'s Second Remand Order in [Canadian Solar III], Feb. 11, 2020, ECF No. 147-1 ("Second Remand Results"), vacated the court's Judgment sustaining the Second Remand Results, and ordered Commerce to "either adequately explain why the Thai [Global Trade Atlas] data is not aberrational or adopt an alternative surrogate value for [Canadian Solar's]

nitrogen input" in accordance with the Court of Appeals' decision in SolarWorld. See Canadian Solar IV, 44 CIT at __, 471 F, Supp. 3d at 1383 (internal quotation marks omitted).

In its Third Remand Results, Commerce continues to value Canadian Solar's nitrogen input using Thai import data, explaining that the use of Thai import data is not aberrational. See Third Remand Results at 2. Canadian Solar and plaintiff-intervenor Shanghai BYD Co., Ltd. ("Shanghai BYD") (collectively with Canadian Solar, "Plaintiff") object to the Third Remand Results. See Comments of [Plaintiff] in Opposition to the Final Results of Redetermination Pursuant to C. Remand, February 24, 2021, ECF No. 184 ("Pl.'s Br."). Defendant United States argues that Commerce complies with the court's remand order by sufficiently explaining why the Thai import data is reliable and not aberrational. See Defendant's Response to Comments on the Remand Determination, March 26, 2021, ECF No. 185 ("Def.'s Br."). For the following reasons, the court remands Commerce's decision to continue using Thai import data to value Canadian Solar's nitrogen input.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinions ordering remand to Commerce, and now recounts only those facts relevant to the court's review of the Third Remand Results. See Canadian Solar IV, 44 CIT at __, 471 F. Supp. 3d at 1381–82; see also Canadian Solar Int'l Ltd. v. United States, 43 CIT __, __, 378 F. Supp. 3d 1292, 1310–13 (Apr. 16, 2019) ("Canadian Solar

I"); Canadian Solar Int'l Ltd. v. United States, 43 CIT __, 415 F. Supp. 3d 1326, 1328–31 (Dec. 3, 2019) ("Canadian Solar II"); Canadian Solar III, 44 CIT at __, 448 F. Supp. 3d at 1335–39.

Canadian Solar previously challenged the Final Results on the grounds that, inter alia, Commerce's decision to use Thai import data to value Canadian Solar's nitrogen input was unsupported by substantial evidence because the data was aberrational and unreliable. See Canadian Solar I, 43 CIT at __, __, 378 F. Supp. 3d at 1310. The court disagreed, sustaining Commerce's use of the Thai import data, but remanded the Final Results on other grounds. Id. at __, 378 F. Supp. 3d at 1325.

In Canadian Solar II, the court sustained Commerce's surrogate value methodology, but remanded for a second time on other unrelated grounds. See Canadian Solar II, 43 CIT at __, 415 F. Supp. 3d at 1334–35. Commerce issued its Second Remand Results, which the court then sustained and entered judgment accordingly. See Canadian Solar III, 44 CIT at __, 448 F. Supp. 3d at 1339–40.

However, on June 24, 2020, the Court of Appeals decided SolarWorld, holding that Commerce failed to adequately justify its use of Thai import data to value Trina's nitrogen input in Commerce's previous administrative review of the same ADD order at issue in this action, and vacated in part this court's judgment sustaining Commerce's final determination. See SolarWorld, 962 F.3d at 1356–59. In particular the Court of Appeals stated that relying on Thai data was "illogical" in light of the fact that the average price of imports into Bulgaria and Romania, which accounted

for over 99% of the imports in the period of review, was significantly lower than imports into Thailand, and that Commerce appeared to deviate from past practice of disregarding small quantity import data where the per unit value were substantially different from large quantity data. Id. at 1357–58. Further, it concluded Commerce "failed to explain how the Thai data can be reconciled with data from the United States International Trade Commission's ("ITC") Data website." Id. at 1358.

In Canadian Solar IV, this court held that the Court of Appeals' decision in SolarWorld, which instructed Commerce to "either adequately explain why the Thai [Global Trade Atlas] data is not aberrational" or "adopt an alternative surrogate value for [Trina's] nitrogen input," constituted an intervening change in controlling law that relates to whether Commerce's determination to rely on Thai import data to value Canadian Solar's nitrogen input was supported by substantial evidence. See Canadian Solar IV, 44 CIT __, 471 F. Supp. 3d at 1382–83.

On remand Commerce continues to use Thai import data to value Canadian Solar's nitrogen input. See Third Remand Results at 2. Defendant argues that Commerce provides a sufficient explanation of its choice of Thai data in compliance with SolarWorld and asks the court to sustain the Third Remand Results. See Def.'s Br. at 1–2. Plaintiff, on the other hand, asserts that Commerce's choice of Thai data is unreasonable in this case because the surrogate value is aberrational and Commerce's explanations for the difference between Thailand's import price versus

the prices of the vast majority of imports which Commerce reviewed are speculative and unsupported by record evidence. See Pl.'s Br. at 1–2.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[2] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008).

## DISCUSSION

Defendant argues that Commerce sufficiently explains its reliance on Thai import data to value Canadian Solar's nitrogen input and asserts that Commerce's reliance is reasonable, in accordance with its established practice, and should be sustained. See Def.'s Br. at 8–24. Plaintiff asks the court to reject Commerce's use of

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Thai data to calculate the surrogate value for Canadian Solar's nitrogen input as unreasonable and unsupported by substantial evidence because Plaintiff alleges the Thai data is aberrational and Commerce has offered only speculation in response to the court's instruction to provide further explanation. See Pl.'s Br. at 9–21. For the following reasons, the court remands Commerce's Third Remand Results for further consideration in accordance with this opinion.

When subject merchandise is exported from a nonmarket economy country, Commerce calculates normal value based on factors of production ("FOPs"). 19 U.S.C. § 1677b(c)(1). Commerce uses "the best available information" to value the FOPs, id., and has discretion to determine what constitutes the best available information. QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011). Commerce generally selects surrogate values that are publicly available, product specific, reflect a broad market average, and are contemporaneous with the POR. Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at https://enforcement.trade.gov/policy/bull04-1.html (last visited July 22, 2021) ("Policy Bulletin 04.1"). Commerce's practice is to avoid using aberrational values as surrogate values. See generally Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997). Commerce further defines "aberrational" to mean an extreme outlier, distorted or misrepresentative, or

Consol. Court No. 17-00173                                                                 Page 9

somehow incorrect. See Tri Union Frozen Prods. v. United States, 41 CIT __, __, 227 F. Supp. 3d 1387, 1394-95 (2017).

In SolarWorld, the Court of Appeals addressed Commerce's use of a "bookend methodology" where Commerce accepted data as reliable and not aberrational because it fell within the range of average import prices of the potential surrogate countries. 962 F.3d at 1357. The Court of Appeals rejected Commerce's bookend methodology in those cases where specific evidence detracts from its use. Id. at 1357–58. Specifically, the Court of Appeals noted that over 99% of the imports into potential surrogate countries were for $0.13 or less/kg, while Thailand's imports, which made up less than 1% of the imports reviewed, averaged over $11.00/kg. Id. at 1357-58. The Court of Appeals further found that Commerce had not sufficiently explained the discrepancy between the Thai data and the ITC data. Id. at 1358–59. Those same concerns regarding the use of the bookend methodology and a discrepancy between the Thai data and the ITC data are present here. See Final Decision Memo. at 53–55; Petitioner's Submission of Information to Rebut, Clarify or Correct Information Pertaining to Surrogate Values, Exhibit 3, PD 397–98, CD 482–84, bar codes 3490795-01–02, 3490786-01–03 (July 26, 2016) ("Petitioner's SV Rebuttal Letter"). Thus, on remand Commerce was required to provide an additional explanation for its choice of Thai AUV data for the surrogate value for Plaintiff's nitrogen input beyond its prior explanations rejected by the Court of Appeals.

Consol. Court No. 17-00173											Page 10

      Commerce's additional explanations in the Third Remand Results for its continued reliance on Thailand for the surrogate value of Canadian Solar's nitrogen input are unsupported by substantial evidence and unreasonable in light of the Court of Appeals' decision in SolarWorld. First, Commerce states that not only is the Thai AUV within the range of potential surrogate countries, but also that the Thai AUV is within the ranges of import prices in Bulgaria, Romania, and Mexico. See Third Remand Results at 7, 22. However, this reasoning suffers from the same defect as the Court of Appeals found in Commerce's use of the "bookend" methodology. Although Commerce looks at the range of individual prices for imports into certain potential surrogate countries rather than only the range of average prices paid, it once again fails to account for the discrepancy in the volume of imports at the low end of the spectrum versus the high end. Just as Bulgaria, Romania, and Mexico account for over 99% of the imports into potential surrogate countries and Thailand, Ecuador, and South Africa account for less than 1%, so too do the low-priced imports into Bulgaria, Romania, and Mexico account for over 99% of the imports into those individual countries while the high-priced imports account for less than 1%. See Petitioner's SV Rebuttal Letter, Ex. 3, PDs 397–98, CDs 482–84. The Court of Appeals expressly found Commerce's failure to address this discrepancy to be unreasonable, yet on remand Commerce uses the same bookend methodology to justify its determination. Commerce's explanation that the Thai AUV is within the ranges of the individual countries' imports is insufficient in light of SolarWorld. The

court cannot sustain Commerce's determination as reasonable on this record. The Court of Appeals made clear that it is not reasonable to select a price that is consistent with a fraction of a percent of imports and thousands of percent higher than 99% of imports solely because at least one importer in similarly situated countries, under unknown circumstances, paid a higher price. SolarWorld, 962 F.3d 1357-58; see also Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (stating that the court's duty is to "evaluate . . . whether a reasonable mind could conclude that Commerce chose the best available information.").[3]

Next, Commerce attempts to differentiate the import data from Romania, Bulgaria, and Mexico from that of Thailand and argues that the Thai import data is actually more reliable. Third Remand Results at 7, 21–22. In support of this theory, Commerce notes that more than 99% of the imports into Bulgaria, Romania, and Mexico come from neighboring countries, and concludes that there must be unique conditions that permit neighboring countries to import nitrogen at unusually low

---

[3] Defendant argues that requiring Commerce to implement a new practice to consider relative quantities of imports when determining whether an AUV is aberrational would impose an unbearable administrative burden on Commerce and lead to endless litigation and "cherry picking" of data. See Def.'s Br. at 14–15; Third Remand Results at 25–26. However, the Court of Appeals found that it is unreasonable to employ a bookend methodology and ignore a vast discrepancy in import quantity without explaining why that discrepancy coupled with an enormous difference in AUV does not render a primary surrogate country's data aberrational. SolarWorld, 962 F.3d at 1357–58. Therefore, Commerce was required to provide an additional explanation in this case. That Commerce found the imports into Thailand constitute a "commercial quantity" does not sufficiently explain why the AUV is not aberrational. See Third Remand Results at 27.

prices. Id. at 21. Specifically, Commerce states, "Hence, the overall AUV of imports of nitrogen into these countries may be more reflective of prices between certain suppliers (the suppliers in one or two exporting countries) and certain customers (the customers of those suppliers) and may not reflect the prices experienced by other customers in those markets." Id. at 7. Commerce further states that those lower prices are "[u]ndoubtedly due to lower transportation costs." Id. at 21.

Commerce does not cite any record evidence that would permit it to make an inference that importers in Bulgaria, Romania, and Mexico receive special deals from suppliers in neighboring countries that are somehow unrepresentative of the nitrogen import market as a whole. See id. at 7, 21–22. Although Commerce cites to the record in support of its explanation, the document to which Commerce cites provides the volume and pricing of imports into the potential surrogate countries sorted by country of export, and does not contain any information about suppliers, consumers, or the contractual arrangements between them. See id. at 7; Petitioner's SV Rebuttal Letter, Ex. 3, PDs 397–98, CDs 482–84. Commerce's conclusion that the lower prices of imports into Bulgaria, Romania, and Mexico from neighboring countries are due to special prices between buyers and sellers in those countries that are not reflective of the overall market is speculative, as is Commerce's explanation that the lower prices are "undoubtedly due to lower transportation costs."

Although it may be reasonable to infer transportation over shorter distances may cost less, there is no record evidence to support any conclusion that lower

transportation costs account for the entirety of the lower cost or even that lower transportation costs account for a significant difference in the price of nitrogen. In fact, the nitrogen imported into Thailand from the neighboring country of Malaysia contradicts Commerce's explanation. Petitioner's SV Rebuttal Letter, Ex. 3, PDs 397–98, CDs 482–84. Imports of nitrogen into Thailand from Malaysia were four times as expensive as those from Austria, for example, and were approximately the same price as imports from the United Kingdom and Spain. Id. Thus, Commerce's explanation that the vast majority of imports into Bulgaria, Romania, and Mexico are not reliable approximations of the market for nitrogen because those imports enjoy special pricing and lower transportation costs from neighboring countries is not supported by substantial evidence.

Commerce also suggests that the discrepancy between the price of the nitrogen imported into Thailand and the price of the nitrogen imported into Bulgaria, Romania, and Mexico can be explained by the fact that the nitrogen imported into Thailand was of unique "purity" necessary to construct solar cells. Third Remand Results at 22–23. Commerce reasons that because there is evidence of Thai businesses engaged in the manufacture of solar cells (and no such evidence for Bulgaria, Romania, or Mexico), the price of nitrogen imports into Thailand is a more reliable indicator of the market price applicable to Canadian Solar. Id. at 23. However, Commerce itself admits that "There is no record evidence that Thailand imported an anomalous type, form, or purity of nitrogen during the POR." Third

Remand Results at 20. The only evidence Commerce cites in support of the explanation that Thai data is more accurate because the nitrogen imported into Thailand is of the proper "purity" for solar cell production is a Wikipedia article discussing different uses for nitrogen. See Third Remand Results at 22–23; Canadian Solar's Surrogate Value Information, Exhibit SV-10 PD362, CD421, bar codes 348871-01, 348824-16 (July 16, 2016). Setting the reliability of the Wikipedia article aside, nowhere does the article state that solar cell production requires a different type or purity of nitrogen or that there is any difference in the price of nitrogen depending on its use. Canadian Solar's Surrogate Value Information, Exhibit SV-10 PD362, CD421, bar codes 348871-01, 348824-16 (July 16, 2016). Commerce's explanation that Thai data is not aberrational because nitrogen imported into Thailand is of the type and purity for use in the manufacture of solar cells is speculative and not supported by substantial evidence.

Lastly, Commerce's explanation for the discrepancy between Thai import data and ITC export data is speculative and unsupported by substantial evidence. See Third Remand Results at 13–15, 27–30. The Court of Appeals found that Commerce's decision to rely on Thai import data instead of U.S. export data compiled by the ITC required further explanation because the two datasets "cannot both be correct." SolarWorld, 962 F.3d at 1358. On remand, Commerce asserts that the discrepancy could be due to a number of factors, including that transportation and insurance costs might be included in one set but not the other, time lags for when exports are shipped

and imports enter the receiving country, delays at customs warehouses, and differences in reporting data from free trade zones. Third Remand Results at 28. However, although these discrepancies may explain minor differences, it is unreasonable to conclude that they reconcile the "admitted inconsistencies" noted by the Court of Appeals. SolarWorld, 962 F.3d at 1358. Moreover, none of Commerce's explanations is supported by record evidence, and Commerce does not cite to the record in support of its explanations. Third Remand Results at 28.

Commerce fails to satisfactorily explain its continued reliance on Thailand's AUV for use as the surrogate value for Canadian Solar's nitrogen input. Commerce did not sufficiently explain why the detracting evidence cited by the Court of Appeals does not render Thailand's AUV aberrational.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's redetermination of its surrogate value selection for valuing Canadian Solar's nitrogen input is remanded to the agency for reconsideration or further explanation consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand determination; and it is further

Consol. Court No. 17-00173 Page 16

**ORDERED** that the parties shall have 30 days thereafter to file a reply to comments on the remand determination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of the filing of its remand determination.

          /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:     July 28, 2021
           New York, New York